# 13-2894(L)

## 13-3877(CON), 14-0115(CON), 14-0143(CON)

*To Be Argued By*:
JOHN J. DURHAM

# United States Court of Appeals

### For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

GIOVANNI PRADO, also known as JOKER, ERICK ALVARADO, also known as "GATO SECO", ELENILSON ORTIZ, also known as "SHORTY", EFRAIN ZUNIGA, also known as PANICO, DIEGO NINOS, also known as VENENO, also known as MICO, SERGIO MEJIA-BARRERA, also known as PELON, EMILIO SABALLOS, also known as CABALLO, WALTER FLORES-REYES, also known as SCRAPPY, also known as WALTER REYES, DAVID VALLE, also known as OREO, LOUIS RUIZ, also known as CHUCKY, also known as LUIS RUIZ, FRANCISCO RAMOS, also known as CRUISER, CESAR LANDAVERDE, also known as FLACO, also known as REBELDE,

(*Caption continued on inside cover*)

On Appeal From The United States District Court
For The Eastern District of New York

**BRIEF AND APPENDIX FOR THE UNITED STATES**

PETER A. NORLING,
JOHN J. DURHAM,
CARRIE N. CAPWELL,
RAYMOND A. TIERNEY,
 *Assistant United States Attorneys,*
  *Of Counsel.*

KELLY T. CURRIE,
*Acting United States Attorney,*
*Eastern District of New York.*

ROGER ALVARADO, also known as MICHICHI, CARLOS MARTINEZ, also known as CARLITO, JOSE GUSTAVO ORELLANA-TORRES, also known as DIABLITO, also known as GUSTAVO JEFFERSON ORELLANA TORRES, JIMMY SOSA, also known as JUNIOR, JEREMIAS EXEQUIEL AMAYA, also known as PAYASO, JOSE SALAZAR ERAZO, also known as JOSE SALAZAR ERZAO, FRANKLIN VILLATORO, also known as MONSTRO, WILBER AYALA-ARDON, also known as PAJARO, also known as PIOLIN, YOBANY CALDERON, also known as TEGO, ADALBERTO ARIEL GUZMAN, also known as GRINGO, RENE MENDEZ MEJIA, also known as ZORRO,

*Defendants,*

VIDAL ESPINAL, also known as DEMENTE, MARIO ALPHONSO HERRERA-UMANZOR, also known as PERDIDO, also known as MARIO UMANZOR, YONIS ACOSTA-YANES, also known as BRUJITA, HERIBERTO MARTINEZ, also known as BOXER, CARLOS ORTEGA, also known as SILENCIO, also known as SILENT,

*Defendants-Appellants.*

i

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..........................................iii

PRELIMINARY STATEMENT..........................................1

STATEMENT OF FACTS.............................................4

    I.   Overview..............................................4

    II.  The Trial.............................................5

        A.   The MS-13 Gang Generally.........................5

        B.   The Crimes.......................................6

            1.   The Murder of Vanessa Argueta...............6

            2.   The Murder of Nestor Moreno...............11

            3.   The Murder of Mario Alberto Canton Quijada.14

        C.   The Defense.....................................20

ARGUMENT......................................................21

POINT ONE - THE EVIDENCE WAS SUFFICIENT TO
           ESTABLISH THAT THE MURDERS OF
           ARGUETA, MORENO AND QUIJADA WERE
           COMMITTED IN ORDER TO INCREASE AND
           MAINTAIN POSITION IN THE MS-13 GANG...............21

    I.   The Legal Standard..................................21

    II.  The VICAR Statute...................................22

    III. Argument...........................................23

        A.   The Evidence Established that
            Martinez Participated in the
            Murders of Argueta, Moreno and
            Quijada to Maintain and Increase
            His Position in the MS-13......................23

            1.   The Argueta Murder........................23

            2.   The Moreno Murder.........................27

3.   The Quijada Murder..........................30

B.   Ortega Participated in the Murder
     of Quijada to Maintain and Increase
     His Position in the MS-13......................33

POINT TWO - THE EVIDENCE WAS SUFFICIENT TO CONVICT
            MARTINEZ OF MURDERING AND CONSPIRING
            TO MURDER ARGUETA.................................36

POINT THREE - THE DISTRICT COURT DID NOT ABUSE
              ITS DISCRETION IN EMPANELING AN
              ANONYMOUS JURY.................................41

I.   The Legal Standard .................................41

II.  The District Court's Decision.......................45

III. Argument............................................47

POINT FOUR - THE JURY INSTRUCTIONS ON COUNT
             TWENTY-ONE WERE NOT ERRONEOUS
             AND THE EVIDENCE WAS SUFFICIENT TO CONVICT.......54

I.   The Applicable Law .................................54

II.  The Jury Instructions...............................57

III. The Jury Instructions Were Proper and
     the Evidence Was Sufficient to Support
     the Defendants' Convictions.........................60

A.   There Was No Plain Error......................60

B.   Any Error Does Not Warrant Reversal.............66

CONCLUSION.................................................74

iii

TABLE OF AUTHORITIES

Page

CASES

Johnson v. United States,
  520 U.S. 461 (1997)..................................... 61, 72

Rosemond v. United States,
  134 S. Ct. 1240 (2014)................................. passim

Salinas v. United States,
  522 U.S. 52 (1997)........................................ 61

United States v. Adams,
  --- F.3d ----, 2015 WL 3649602 (7th Cir. June 12, 2015)..... 70

United States v. Amuso,
  21 F.3d 1251 (2d Cir. 1994)................................ 42

United States v. Aulicino,
  44 F.3d 1102 (2d Cir. 1995)............................ 41, 42

United States v. Barnes,
  604 F.2d 121 (2d Cir. 1979)................................ 52

United States v. Bentley,
  571 Fed. Appx. 760 (11th Cir. 2014) ....................... 71

United States v. Botti,
  711 F.3d 299 (2d Cir. 2013)................................ 61

United States v. Concepcion,
  983 F.2d 369 (2d Cir. 1992).................... 22, 23, 26, 34

United States v. Coplan,
  703 F.3d 46 (2d Cir. 2012)................................. 22

United States v. Cotton,
  535 U.S. 625 (2002)........................................ 72

United States v. Danielson,
  199 F.3d 666 (2d Cir. 1991)................................ 61

United States v. Dhinsa,
  243 F.3d 635 (2d Cir. 2001)............................ 22, 23

United States v. Farmer,
  583 F.3d 131 (2d Cir. 2009) ..................... 22, 26, 31, 34

United States v. James,
  239 F.3d 120 (2d Cir. 2000) ................................. 29

United States v. Joyner,
  313 F.3d 40 (2d Cir. 2002) ................................. 73

United States v. Kadir,
  718 F.3d 115 (2d Cir. 2013) ................................ 44

United States v. Naiman,
  211 F.3d 40 (2d Cir. 2000) ................................. 64

United States v. Newman,
  773 F.3d 438 (2d Cir. 2014) ........................... passim

United States v. Olano,
  507 U.S. 725 (1993) ......................... 66, 67, 68, 72

United States v. Paccione,
  949 F.2d 1183 (2d Cir. 1991) ........................... 42, 44

United States v. Park,
  421 U.S. 658 (1975) ....................................... 64

United States v. Pica,
  692 F.3d 79 (2d Cir. 2012) ............................ 41, 45

United States v. Pimentel,
  346 F.3d 285 (2d Cir. 2003) ................................ 26

United States v. Prado,
  2011 WL 3472509 (E.D.N.Y. Aug. 5, 2011) .................... 45

United States v. Quinones,
  511 F.3d 289 (2d Cir. 2007) ........................... passim

United States v. Rahman,
  189 F.3d 88 (2d Cir. 1999) ................................. 22

United States v. Rivera,
  571 Fed. App'x 55 (2d Cir. 2014) .......................... 55

United States v. Rivera,,
  272 Fed. App'x. 55 (2d Cir. 2008) ......................... 29

v

United States v. Santiago,
  207 F. Supp.2d 129 (S.D.N.Y. 2002) .......................... 28

United States v. Stewart,
  433 F.3d 273 (2d Cir. 2006) ................................. 61

United States v. Stewart,
  590 F.3d 93 (2d Cir. 2009) ........................ 42, 46, 47

United States v. Thai,
  29 F.3d 785 (2d Cir. 1994) .................... 41, 43, 45, 50

United States v. Thomas,
  274 F.3d 655 (2d Cir. 2001) ................................. 66

United States v. Thomas,
  757 F.2d 1359 (2d Cir. 1985) ........................... 44, 45

United States v. Tipton,
  90 F.3d 861 (4th Cir. 1991) ........................... 27, 29

United States v. Tutino,
  883 F.2d 1125 (2d Cir. 1989) ........................... 45, 52

United States v. Vario,
  943 F.2d 236 (2d Cir. 1991) ........................... 43, 50

United States v. Whitten,
  610 F.3d 168 (2d Cir. 2010) ................................. 30

United States v. Young,
  470 U.S. 1 (1985) ......................................... 72

United States v. Viola,
  35 F.3d 42 (2d Cir. 1990) ................................. 72

STATUTES

18 U.S.C. § 924(c)(1)(A)(i) ................................... 54

18 U.S.C. § 924(c)(1)(A)(ii) .................................. 54

18 U.S.C. § 2(a) ............................................. 54

RULE

Fed. R. Crim. P. 52(b) ..................................... 64

1

PRELIMINARY STATEMENT

Defendant-Appellants Heriberto Martinez and Carlos Ortega appeal from judgments entered on January 6, 2014, in the United States District Court for the Eastern District of New York (Bianco, J.). Each was convicted, after a jury trial, of racketeering, in violation of 18 U.S.C. § 1962(c) (Count One)[1], racketeering conspiracy (18 U.S.C. § 1962(d)) (Count Two), conspiracy to commit murder in aid of racketeering, (18 U.S.C. § 1959(a)(5)) (Count Nineteen) (Mario Alberto Canton Quijada), murder in aid of racketeering (18 U.S.C. § 1959(a)(1)) (Count Twenty) (Quijada), and using a firearm during a crime of violence (18 U.S.C. § 924(c)(1)(A)(ii)) (Count Twenty-One) (Quijada). Martinez was also convicted of conspiracy to commit murder in aid of racketeering (18 U.S.C. § 1959(a)(5)) (Counts Three (Vanessa Argueta) and Fifteen (Nestor Moreno)), murder in aid of racketeering (18 U.S.C. § 1959(a)(1)) (Counts Four (Argueta) and Sixteen (Moreno)), using a firearm during crimes of violence (18 U.S.C. § 924(c)(1)(A)(iii)) (Counts Five (Argueta) and Seventeen (Moreno)), causing the death of another

---

[1] References herein to the indictment are to the trial version, set forth in Martinez's appendix at 41. (Both Martinez and Ortega have filed documents entitled "Joint Appendix." We refer to Martinez's appendix as "MA" and Ortega's appendix as "OA." "T" refers to the trial transcript, "MBr." refers to Martinez's brief, and "OBr." refers Ortega's brief.) "GA" refers to the Government's Appendix.

2

through the use of a firearm (18 U.S.C. § 924(j)(1)) (Counts Six (Argueta) and Eighteen (Moreno)), and being an accessory after the fact (18 U.S.C. § 3) (Count Seven).

Ortega was also convicted of conspiracy to commit murder in aid of racketeering (18 U.S.C. § 1959(a)(5)) (Count Eight) (David Sandler), murder in aid of racketeering (18 U.S.C. § 1959(a)(1)) (Count Nine) (Sandler), using a firearm during a crime of violence (18 U.S.C. § 924(c)(1)(A)(iii)) (Count Ten) (Sandler), causing the death of another through the use of a firearm (18 U.S.C. § 924(j)(1)) (Count Eleven) (Sandler), attempted murder in aid of racketeering (18 U.S.C. § 1959(a)(5)) (Count Twelve) (John Doe), assault with a dangerous weapon (18 U.S.C. § 1959(a)(3)) (Count Thirteen) (John Doe), and using a firearm during a crime of violence (18 U.S.C. §§ 924(c)(1)(A)(ii), 924(c)(1)(A)(iii)) (Count Fourteen) (John Doe).[2]

The district court sentenced the defendants principally to multiple terms of life in prison, among other terms. They are currently serving their sentences.

Martinez and Ortega (joining in one another's claims under Fed. R. App. P. 28(i)) claim that (1) the evidence was

---

[2] Ortega does not challenge his convictions on Counts Eight through Fourteen, relating to the murder of Sandler and attempted murder of John Doe.

3

insufficient to prove that the murders of Argueta, Moreno and Quijada were committed for the purpose of maintaining or increasing position in the racketeering enterprise, (2) aside from this purported insufficiency of proof of the purpose of the commission of the three murders, there was insufficient evidence that Martinez participated in the murder of Argueta, (3) the district court violated the defendants' due process rights by empaneling an anonymous jury, (4) the jury instructions on Count Twenty-One were erroneous, and (5) the evidence was insufficient to support the defendants' convictions on Count Twenty-One.

For the reasons set forth below, each of these claims is without merit.

4

## STATEMENT OF FACTS

I. <u>Overview</u>

Martinez and Ortega's convictions arose from their participation in acts of violence committed by La Mara Salvatrucha, also known as the "MS-13," an international street gang with members on Long Island, New York. (T 193-99, 1715-17). Martinez, whose gang name was "Boxer," was the leader of the Coronados Locos Salvatruchas ("Coronados" or "CLS") clique of the MS-13, located in Brentwood, New York. (T 693-94, 1183-84). Ortega was a member of the Sitios Loco Salvatruchas or "STLS" clique of the MS-13, based in El Salvador. (T 371, 1221, 2398; GX 284). As is relevant to this appeal, the charges concerned three murders: (1) the shooting death of Vanessa Argueta on February 5, 2010 in a wooded area in Central Islip, New York (Counts Three through Six); (2) the shooting death of Nestor Moreno on March 6, 2010 at a nightclub in Hempstead, New York (Counts Fifteen through Eighteen); and (3) the stabbing death of Mario Alberto Canton Quijada on March 17, 2010 on the beach in Far Rockaway, New York (Counts Nineteen through Twenty-One).

To prove the foregoing, the government's evidence, at a six-week trial commencing on February 4, 2013, included, among other evidence, (1) the testimony of four former members of MS-13, including some of the participants in the murders set

5

forth above, (2) the testimony of a close female associate of the Coronados clique of the MS-13, (3) the testimony of eyewitnesses to the Moreno murder, (4) the testimony of various federal and local law enforcement officers, and (5) the testimony of several expert witnesses, including ballistics experts, medical examiners, DNA experts and an expert in cell site technology.

II. <u>The Trial</u>

    A.   <u>The MS-13 Gang Generally</u>

      The MS-13 was originally formed in Los Angeles, California. (T 687). Its members are divided into cliques, located across the United States and in Central America. (T 327-28, 1162-64, 1679-80). MS-13 members identify themselves, to other members as well as to rival gangs, by wearing the gang colors -- blue and white -- and through tattoos, hand signs and graffiti. (T 168-70, 331-33, 344, 690-91, 695, 1181-82, 1711-15).

      Each MS-13 clique has a leader (or leaders) and holds weekly meetings. Each MS-13 member is obligated to adhere to a set of rules, which include (1) attack and kill rival gang members or anyone who disrespects the MS-13, (2) commit various other violent acts, as set forth in part below, (3) do not cooperate with law enforcement officials, (4) kill anyone who cooperates with law enforcement, (5) attend weekly clique

6

meetings and pay dues to the clique, and (6) do not abandon fellow MS-13 members. (T 162-63, 166-67, 329, 1172-73, 1694-97). The money raised through dues was used to buy guns for the clique and, when necessary, to help MS-13 members, such as those in jail. (T 335-36, 1173, 1697-98). Discipline of members often takes the form of ritualized beatings; some infractions, including cooperating with law enforcement and refusing to engage in acts of violence, are punishable by death. (T 163-66, 195, 329-30, 828-29, 1174-75, 1699-1700, 1719-20).

Members of the MS-13 engage in criminal activity, such as acts and threats involving murder, robberies, extortion, and narcotics trafficking. (T 186-92, 334-35, 713-14, 1710). Participation in criminal activity by an MS-13 member, especially violence directed at rival gangs, increases the respect accorded to that member and can result in a promotion to a leadership position. (T 183, 330-31, 345, 492-93, 1758). A member becomes a leader within the MS-13 by committing violent acts. (T 183).

    B.   The Crimes

        1.   The Murder of Vanessa Argueta

In the beginning of 2010, Vanessa Argueta was in a romantic relationship with Juan Garcia, also known by his gang name "Cruzito." (T 758-59). Garcia was a member of the Coronados clique of the MS-13. (T 735, 1721). Argueta and

Garcia's relationship deteriorated when Argueta learned that Garcia had a new girlfriend. (T 760). Garcia believed that Argueta had sent members from the 18th Street gang, a rival gang, to his house to beat him with bats and knives. (T 760-61, 1777).

In early February 2010, Garcia and other MS-13 gang members, including Adalberto Guzman, also known as "Gringo," and Rene Mejia, also known as "Zorro," both of the Karlington Locotes Salvatruchas clique of the MS-13, based in Central Islip, spoke with Martinez by telephone and debriefed him regarding the situation with Argueta. (T 764-67, 1260, 1824). During that conversation, Martinez sanctioned the murder of Argueta for having "disrespect[ed]" Garcia and the MS-13 by sending rival gang members to Garcia's home. (T 765-68). Martinez told Garcia, Guzman and Mejia to "fix it" and "do what [you] have to do." (T 768). Martinez told Garcia where to get the gun, which Garcia subsequently acquired to kill Argueta. (T 1064-65).

On February 5, 2010, Garcia, Guzman and Mejia killed Argueta and Diego Torres, who was with Argueta that night, in a wooded area near Windsor Place in Central Islip.[3] (T 995, 1018).

---

[3] Argueta was shot once in the head and once in the chest. (T 1329-30). Torres was shot twice in the head. (T 1333). Three .22 caliber shell casings were recovered at the

According to the account Martinez gave to detectives of the Suffolk County Police Department ("SCPD") on March 18, 2010, Guzman shot Argueta in the head first, Mejia then shot Torres twice, and then Garcia shot Argueta in the chest. (T 995).

Carla Santos, a close associate of the Coronados clique, testified that, the morning after the murders, Martinez instructed her to pick Garcia, Guzman and Mejia up from a laundromat in Baldwin, New York. (T 782-83). Garcia cried and admitted to Santos that he had killed Argueta. (T 738, 784-85). Later that day, at Martinez's request, Santos drove Garcia, Guzman and Mejia to Martinez's apartment in Far Rockaway. (T 786-87). Cooperating witness Santos Joel Calderon, also known as "Gasparin," met Garcia, Guzman and Mejia while they were staying in Far Rockaway. (T 1259). Guzman admitted to Calderon that Garcia, Guzman and Mejia had murdered two people, including a girl whom Garcia had dated. (T 1261). Martinez and Guzman both told Calderon that the girl deserved to die because she had taken rival 18th Street gang members to Garcia's house to kill him. (T 1261-62).

The next day, February 6, 2010, Santos returned to Far Rockaway, again at Martinez's instruction, to pick up Garcia, Guzman and Mejia. She drove them to a Greyhound bus station,

---

scene, as well as one .22 caliber bullet in Torres's clothing. (T 557, 658-64, 2893-95).

but the buses were not running due to weather conditions. (T 789-90). Santos took the three men to a motel in Farmingdale, where she reserved a room for them in her name. (T 799-800; GX 108). Martinez told Santos that Argueta deserved to die because "she put herself in that position." (T 808).

On February 7, 2010, Santos drove Garcia, Guzman and Mejia back to Martinez's apartment in Far Rockaway. (T 803-04). Later on that day, Santos drove the three men to the Bronx, where they caught a transport van leaving the state. (T 804-05). While waiting for the van, Guzman admitted to Santos that they had killed Argueta and Torres. (Id.). Garcia, Guzman and Mejia traveled to El Salvador. (T 806). While there, they remained in contact with Martinez and Santos. (T 806, 808-09). Martinez provided Garcia, Guzman and Mejia with money and his telephone number, so that the MS-13 in El Salvador could contact Martinez to receive assurances that Garcia, Guzman and Mejia were loyal MS-13 members (T 808-10, 1826) and thus worthy of assistance. On February 23, 2010, Martinez directed Santos to send MS-13 money to El Salvador for Garcia, Guzman and Mejia by wire transfer, which she did. (T 809-11; GX 127).

After Martinez was arrested on March 17, 2010 at the beach in Far Rockaway in connection with the murder of Quijada (discussed below at 14-19), he was interviewed by detectives of the SCPD concerning the murders of Argueta and Torres. (T 979,

983, 1005).   After being advised of his <u>Miranda</u> rights, which he waived, Martinez told detectives, in relevant part, that Garcia and Guzman told him they had shot Argueta and that Mejia had shot Torres.   (T 995, 1003).   Martinez further told the detectives that Argueta was killed because she tried to have Garcia killed (T 996) and that the gun used to kill Argueta and Torres was the same gun Martinez was carrying prior to his arrest (T 1016).

On April 23, 2010, Martinez was arrested by special agents of the Federal Bureau of Investigation ("FBI").   After being advised of and waiving his <u>Miranda</u> rights (T 1055-56), Martinez admitted that he was a member of the Coronados clique of the MS-13 (T 1062-63).   Martinez further stated that an MS-13 member who wanted to kill Argueta because she had set him up to be killed by rival gang members had contacted Martinez to acquire a gun.   (T 1064-65).   Martinez admitted that he had directed this MS-13 member as to where to obtain the gun and that the MS-13 member did in fact commit a double homicide with two other gang members.   (T 1065).   Martinez told the FBI that he then harbored the three murderers by hiding them at his home and arranged for them to flee the country.   (<u>Id.</u>).

2.  The Murder of Nestor Moreno

On February 20, 2010, Martinez, cooperating witness Calderon, and two other MS-13 gang members, "Pollo" and "Guanaco," were invited to the El Rancho Bar & Grill ("El Rancho") in Hempstead by one "Princessa," with whom Martinez was acquainted, on the premise that "Princessa" would treat the MS-13 gang members to drinks. (T 1138, 1184-87). While the group was at El Rancho, "Princessa" left without paying the bill. (T 1187-88). Martinez, Calderon, Pollo and Guanaco did not have money to pay the bill, so they decided to leave the bar. (T 1135-36, 1188). When the MS-13 gang members attempted to leave without paying, Nestor Moreno, who worked as a bouncer at the bar, refused to allow Calderon to leave until the bill was paid. (T 1136, 1188). Martinez, who was outside the bar with Pollo and Guanaco, yelled at Moreno to let Calderon go. (T 1189). Moreno tackled Calderon (id.); Martinez then grabbed a beer bottle and began threatening Moreno with the bottle (T 1189). Moreno took out his pepper-spray container and sprayed Martinez in the face. (T 1086, 1137, 1189). Moreno then released Calderon, who arose and helped Martinez, who was "very angry," walk away from the bar. (T 1190). During and after the altercation with Moreno, the MS-13 members flashed gang hand signs and told Moreno that they belonged to "the Mara" and would

return to the bar; Martinez stated "this [won't] end here."
(T 1063, 1087, 1136, 1191, 1731).

Only a couple of weeks later, on March 6, 2010,
Martinez and his fellow MS-13 gang members -- Calderon, Vidal
Espinal, also known as "Demente," and Carlos Martinez, also
known as "Carlito,"[4] -- were driving around Far Rockaway looking
for rival gang members to shoot. (T 1196, 1733, 1995-99).
Calderon and Carlito were members of the Sureños Locotes
Salvatruchas clique of the MS-13, also known as the "Sureños" or
"SLS," which was based in Far Rockaway. (T 1687-88, 1994,
1737). Espinal was a member of the Coronados, the MS-13 clique
run by Martinez. (T 1737). An MS-13 associate, Roger Alvarado,
or "Michichi," was driving. (T 1196, 1736-37, 1995-99). They
had a silver .22 caliber gun, which belonged to Martinez's
clique, in the truck. (T 1196, 1738-39). After the group could
find no rival gang members to shoot in Far Rockaway, the group
headed toward Long Island. (T 1741). On the way, Martinez
directed Michichi to El Rancho in Hempstead, explaining to the
group that the bouncer had to pay for what he had done to
Martinez. (T 1197-98, 1741).

---

[4]     Hereafter, we refer to cooperating witness Carlos
Martinez by his nickname "Carlito" to avoid confusion with
defendant Martinez.

13

In a parking lot behind the bar, the gang members
formed a plan: Calderon was to identify the bouncer, as he had
been there the night of the incident, Carlito would open the
door to the bar, and Espinal would shoot the bouncer. (T 1197-
98, 1742-43). Martinez and Michichi waited in Michichi's truck.
(T 1199). Calderon testified that Martinez waited in the car
because he would be recognized and "he's the one who sent others
to do the job." (Id.).

After the three men walked by El Rancho the first
time, Carlito called Martinez to advise him that there were too
many people in front of the bar to shoot the bouncer. (T 1743-
44). Martinez told Carlito that they had to do it because they
were already there. (Id.). Calderon, Espinal and Carlito
returned to Michichi's truck and again told Martinez that there
were too many people around. (T 1200, 1745). Martinez re-
asserted that they should return to the bar and finish the job
they were there to do. (T 1200-01, 1745). The three men headed
back toward the bar. (T 1201, 1745). Calderon and Carlito
opened the door to the bar and Espinal shot Moreno in the middle
of the forehead with the .22 caliber gun. (T 1088-89, 1202-03,
1746).

After Calderon, Espinal and Carlito jumped into
Michichi's truck, they sped off, while the group excitedly
screamed, "La Mara, La Mara!", "the Coronados and the Sureños

will be together forever," "nobody messes with the Mara," and "the beast" (the devil) had "eaten up" the bouncer. (T 1206-07, 1748). The group then continued east, toward Brentwood. (T 1217). They stayed on Long Island for some time; when Espinal left the group, he took the gun with him. (T 1217, 1749). While on Long Island, Martinez told Calderon that Espinal had his first "killing" that night and was a "good soldier," meaning "a good gang member for the MS-13." (T 1219). Carlito testified at trial that members of the MS-13 are expected to engage in violent crimes against others and that he had gained respect from other MS-13 members for his participation in Moreno's murder. (T 1699-1700, 1758).

Martinez was arrested on March 17, 2010. Thereafter, he admitted to law enforcement officers that Moreno had pepper-sprayed him at El Rancho during an altercation, during which Martinez and his associates identified themselves as MS-13 members, and that Martinez and his MS-13 associates returned to the bar to shoot Moreno, which they did. (T 1063-64, 1543-37; GX 302).

### 3. The Murder of Mario Alberto Canton Quijada

On March 16, 2010, Carlito received a phone call from his brother, Diego Marroquin, also known as "Lil Lonely," who insisted that Carlito meet him at the apartment they shared in Far Rockaway to discuss an important matter. (T 1760). When

Carlito arrived, Marroquin told him he had had a conversation with a "Smokey," a leader of the Sureños clique, about Quijada, whose gang name was "Baby Blue." (T 1761). Smokey was concerned that Quijada "didn't do the work that he was supposed to do" and that Quijada should be given "one more chance either for him to kill somebody or otherwise they would kill him." (Id.).

Soon thereafter, at Marroquin's request, several MS-13 members arrived at Carlito and Marroquin's apartment, including Quijada, Calderon and Martinez. (Id.). Outside of Quijada's presence, Carlito explained to both Martinez and Calderon that they were going to give Quijada one last chance to prove himself and that, if he failed, they would kill him. (T 1762-63). When the group learned Espinal and Michichi were downstairs, they headed down to the meet them. Before leaving the apartment, Marroquin gave Quijada a knife and Calderon took Carlito's machete. (T 1764-65).

In the parking lot downstairs, the group joined Espinal and Michichi and, for the first time, met Ortega, who introduced himself as "Silencio," flashed an MS-13 hand sign, and stated he was from El Salvador. (T 1765-66). Carlito filled Espinal in on the plan regarding Quijada. (T 1770). Ortega, Calderon, Espinal and Quijada left with Michichi in Michichi's truck to look for rival 18th Street gang members to

shoot. (T 1771-72). Martinez, Carlito and Marroquin stayed behind and, a little later that evening, met with MS-13 member Jeremias Amaya, nicknamed "Payaso," and his friend Gabriel at the nearby subway station. (T 1772-73, 2489). The five men eventually went back to Amaya's apartment at 22-30 Mott Avenue, the building in which Carlito, Marroquin and Amaya all lived. (T 1775).

After some time, the other group -- minus Quijada -- arrived at Amaya's apartment. (T 1775). Ortega reported that Quijada had refused to take the gun while they were looking for 18th Street gang members to shoot and that they "had to kill [Quijada]." (T 1776). Martinez agreed that Quijada should be killed because he could not be trusted and might "snitch" on fellow gang members. (Id.). As the cooperating witnesses testified, MS-13 members are expected to kill rival gang members or be killed by their fellow gang members if they refuse to engage in violence. (T 1699-1700).

The group decided they had to kill Quijada that night, so Marroquin called Quijada, claiming they had spotted some rival gang members. (T 1776-77). Martinez, Ortega, Marroquin, Amaya and Michichi left to pick up Quijada. Carlito, Calderon and Espinal stayed behind at Amaya's apartment, as they had recently carried out a violent act for the gang in killing Moreno, the bouncer. (T 1777). Surveillance footage from the

lobby and elevator of 22-30 Mott Avenue showed that the MS-13 members, including Martinez and Ortega, and their associates went in and out of the apartment building that night. (T 1809-19; GX 418, 418A-N).

Later that night, Ortega called Espinal to report that some of the participants had been arrested and that he and one of the other MS-13 members were in hiding. (T 1779). At some point after 3:00 a.m., Ortega and Payaso returned to 22-30 Mott Avenue and were "dirty, full of sand, and wet." (T 1238, 1782-83). Carlito took Ortega and Espinal to a nearby taxi stand, where Ortega and Espinal took a taxi back to Brentwood. (T 1784-85, 2495-97).

Amaya described Quijada's murder to Carlito and Calderon. Amaya explained that, when they arrived at the beach, Amaya took out the gun and tried to shoot Quijada, but the gun jammed. (T 1239-40, 1785). Quijada started to run and the group chased him. Amaya gave Martinez the gun, took the machete from Martinez and used it to stab Quijada numerous times, including in the back, stomach and eye. (T 1240, 1786-87). While the group walked from the beach back to the parking lot, where Michichi was waiting with the truck, Amaya realized that the police had stopped Martinez and Marroquin, who were walking ahead of Amaya. (T 1242, 1787). Ortega and Amaya ran down the beach and into the water. (T 1787). They later hid in a wooded

area until they were able to make their way to the home of Amaya's friend, Lorena Cifuentes. (T 1787-88, 2490). Amaya and Ortega stayed at Cifuentes's residence and used her telephone from approximately 3:00 a.m. to 4:00 a.m., until Amaya's uncle picked them up and drove them back to 22-30 Mott Avenue in Far Rockaway. (T 1788, 2491).

On the beach, NYPD officers found Quijada's bloody body covered with stab wounds as well as the blade of a kitchen knife, a switchblade knife, and a silver .22 caliber firearm. A detective found a machete in the water, which washed up onto the shore as the tide receded. In the parking lot, officers found a wooden handle of a kitchen knife. (T 2113, 2173, 2176-77, 2193, 2200; GX 405.2, 405.49, 405.51, 405.71, 406.7, 406.10, 417.6).

The autopsy of Quijada revealed that he had suffered four major stab wounds -- to his left eye, chest and back -- and over a dozen incision and puncture wounds to various parts of his body. (T 1486-88, 1498-1507; GX 408.8, 408.63, 408.67, 408.73, 409A). The wounds varied in depth, size and shape (id.), suggesting multiple attackers using different weapons. DNA profiles from the blood found on Martinez's pants and right boot matched the DNA profile from Quijada's blood. (T 2084-85; GX 419A, 419B, 420A, 420B).

Ballistics examination showed that the casings found at the Argueta-Torres crime scene, the casing found at the

19

Moreno crime scene and the test-fired casings were all fired from the silver .22 caliber gun that NYPD detectives recovered from the Quijada crime scene. (T 3043).

When Martinez was interviewed by detectives on March 17, 2010, he admitted that Amaya had tried to shoot Quijada at the beach but stated that the gun did not work. (T 2301; GX 404). Martinez further admitted that Martinez hit Quijada in the face or head with the machete at the beach and also kicked Quijada, causing Quijada to fall so he could not get away. (T 2300-02; GX 404). Martinez further stated that Amaya and the other MS-13 members were stabbing Quijada. (T 2301-02; GX 404). When Ortega was arrested in March 2012, he admitted to FBI agents,

> Baby Blue [Quijada] didn't want to put work in and the decision was that he had to be 'done.' . . . We went to the beach . . . One of the guys tried to fire the gun, but it didn't work . . . so then, Payaso [Amaya] 'hit' him with the machete, into 'shreds.'

(T 2423; GX 250B).

Ortega further admitted that he and others were "yelling La Mara, La Mara during the attack" upon Quijada. (T 2412; GX 250B). When the police arrived, Ortega and Amaya ran, evading arrest. (Id.).

C.    <u>The Defense</u>

Martinez did not present a case.    Ortega offered one stipulation, in which the parties agreed that if Ortega's uncle, Valentin Andrades, had been called as a witness, he would have testified that:

> Defendant Carlos Ortega was born on [redacted], in a town in El Salvador called San Miguel; . . . [he] was raised in poverty in a family with four sisters and one brother; . . . [he] had less than two years of school.    Defendant Carlos Ortega had health problems which kept him out of school. . . . [He] came to the United States when he was 18.

(T 3047).

ARGUMENT

POINT ONE

THE EVIDENCE WAS SUFFICIENT TO ESTABLISH THAT THE
MURDERS OF ARGUETA, MORENO AND QUIJADA WERE COMMITTED IN
ORDER TO INCREASE AND MAINTAIN POSITION IN THE MS-13 GANG

Martinez argues that the evidence was insufficient to support his convictions for the murders of Argueta, Moreno and Quijada under 18 U.S.C. § 1959 because the government failed to prove beyond a reasonable doubt that he participated in the murders for the purpose of maintaining or increasing his position in the MS-13. (MBr. 34-46). Ortega joins in this argument with respect to the murder of Quijada. As we show below, these claims are meritless.

I.   The Legal Standard

A defendant challenging the sufficiency of the evidence "bears a heavy burden, as the standard of review is exceedingly deferential." United States v. Newman, 773 F.3d 438, 451 (2d Cir. 2014). Although this Court's sufficiency review is de novo, the conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. In reviewing a denial of a Rule 29 motion, the appellate court "'must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of

witness credibility and its assessment of the weight of the evidence.'" Id. (quoting United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)).

II.  The VICAR Statute

In United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992), this Court held that the motive element of "maintaining and increasing position" in Section 1959 is satisfied if a jury could conclude that a defendant "committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." More recently, the Court found that "[b]y shooting [the victim] . . . [the defendant] conformed to the expectations of the [gang] enterprise . . . [and] [a] reasonable jury could infer from these facts 'that [the defendant] committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" United States v. Farmer, 583 F.3d 131, 142 (2d Cir. 2009), (quoting United States v. Dhinsa, 243 F.3d 635, 671 (2d Cir. 2001) (racketeering acts committed by defendant, the leader of the enterprise, were to silence both victims, who were believed to be cooperating with the government and who posed a threat to the enterprise's operations and defendant's leadership)). See also United States v. Rahman, 189 F.3d 88,

127 (2d Cir. 1999) (noting that the "maintaining or increasing position" language in Section 1959 "should be construed liberally")(internal quotation marks omitted). The <u>Concepcion</u> Court further held,

> With respect to the motive element, the legislative history contains no indication that Congress meant to require proof that self-promotion was the defendant's only or primary concern. Rather, the history states that this phrase was included as a means of proscribing murder and other violent crimes committed as an integral aspect of membership in such enterprises. Given this explanation and given that Congress intended RICO, which § 1959 complements, to be liberally construed to effectuate its remedial purposes, we reject any suggestion that the "for the purpose of" element requires the government to prove that maintaining or increasing position in the RICO enterprise was the defendant's sole or principal motive.

983 F.2d at 381 (internal quotation marks and citations omitted); <u>see also</u> <u>Dhinsa</u>, 243 F.3d at 671.

III. <u>Argument</u>

    A.  The Evidence Established that Martinez Participated in the Murders of Argueta, Moreno and Quijada to <u>Maintain and Increase His Position in the MS-13</u>

       1.  <u>The Argueta Murder</u>

The jury was presented with compelling evidence from which it could find, beyond a reasonable doubt, that at least one of Martinez's motives in participating in Argueta's murder was to maintain or increase his position within the MS-13.

Multiple witnesses testified that Argueta's murder was orchestrated because she was deemed to have disrespected Garcia and the MS-13 by sending rival gang members to Garcia's home even though she knew about Garcia's affiliation with the MS-13. (See T 766-68 (Santos testifying that the decision to murder Argueta was based upon the fact that she had disrespected Garcia by taking rival gang members to his home, knowing that he was from another gang); T 996 (Detective Ralph Rivera of the SCPD testifying that Martinez told him that "[Argueta] was shot because she had tried to have Cruzito [Garcia] killed a month earlier by the 18th Street Gang"); T 1065 (FBI Special Agent Edward Heslin testifying that Martinez indicated that Argueta's murder was motivated by the fact that she had set Garcia up for an assault by a rival gang member)). Calderon explicitly testified that Martinez told him he believed Argueta deserved to die "[b]ecause she had brought over members of a rival gang to Cruzito's place to kill him." (T 1261-62). Santos also testified that when Martinez asked her to help Guzman, Garcia and Mejia to flee, she agreed to do so and then provided updates to Martinez because he was the leader of the CLS clique. (T 806). All of this testimony corroborates the conclusion that Argueta's murder was related to the MS-13 and, more specifically, her perceived disrespect for the gang.

Had the murder of Argueta been due to a "purely personal matter" between Garcia and Argueta, as Martinez claims (MBr. 43), there would have been no reason for Garcia to debrief Martinez, his clique leader, about the details of his love life and certainly no reason for Martinez to tell Garcia to "fix it." (T 767-68). Martinez had a vested interest in knowing what Argueta had done and ensuring she would suffer the consequences of her actions, because Garcia, one of his own gang members, had been intimidated and almost attacked or killed by rival 18th Street gang members at his own home. As the leader of the clique, Martinez could not let Argueta's disrespectful conduct toward Garcia and the MS-13 go unpunished. (T 766). As several of the cooperating witnesses testified at trial, the MS-13 attacks and sometimes kills those who disrespect the gang, and participation in violent acts is expected of MS-13 members, increases the respect accorded to that member, and can result in a promotion to a leadership position. (T 183, 330-31, 345, 492-93, 700, 1682, 1758, 1844-45). Thus, Martinez's assertion that "[t]here was no evidence to suggest that Cruzito would not have murdered Argueta if the men she sent to his home to assault him were not members of a rival gang" (MBr. 44) is simply contrary to the record.

Based on the fact that Martinez was a leader of the clique to which Garcia -- the person particularly threatened by

Argueta's actions -- belonged, and based on the evidence demonstrating that Martinez felt as though Argueta had disrespected his clique and his gang by sending rival gang members to Garcia's home, a rational jury could conclude that Martinez was motivated by a desire to further the MS-13's policy of retaliatory violence against those who offend the gang, in order to promote respect for the gang and to maintain or increase his position in it. See, e.g., Concepcion, 983 F.2d at 381 (holding that the "maintaining and increasing position" element is satisfied if a jury could conclude that a defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise); Farmer, 583 F.3d at 142 (finding that "[a] reasonable jury could infer from the[] facts that [the defendant] committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership") (internal quotations omitted). Cf. United States v. Pimentel, 346 F.3d 285, 295-96 (2d Cir. 2003) ("[T]he government is not required to prove that maintaining or increasing [a defendant's] position in the RICO enterprise was the defendant's sole or principal motive. . . . We have consistently held that the motive requirement is satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of

him by reason of his membership in the enterprise . . . ."); see also United States v. Tipton, 90 F.3d 861, 891 (4th Cir. 1996) (affirming Section 1959 convictions and noting that "the deeds were done by [the defendant] and other enterprise members . . . in part at least in furtherance of the enterprise's policy of treating affronts to any of its members as affronts to all, of reacting violently to them and of thereby furthering the reputation for violence essential to maintenance of the enterprise's place in the drug-trafficking business").

    2.  The Moreno Murder

As to Moreno's murder at the El Rancho Bar, the evidence the government presented at trial overwhelmingly established that Martinez and his MS-13 associates killed Moreno because he disrespected the MS-13 and its members, including Martinez, when he demanded that the MS-13 members pay their bill, prevented Calderon from leaving the bar, and pepper-sprayed Martinez. (T 1192-97). The evidence proved that after the initial altercation at El Rancho, Martinez and his MS-13 associates told Moreno that they were members of "the Mara" and would return to the bar, and Martinez told Moreno "this [won't] end here." (T 1087, 1136, 1191, 1731). Martinez felt as though the gang had been "mess[ed]" with. (T 1193).

Martinez also told other MS-13 members and associates, including Santos, about the problem he and the other MS-13

members had at El Rancho and vowed that he would seek revenge.
(T 817-18, 1193).  Thereafter, Martinez assembled a team of MS-
13 members to carry out the retaliatory murder, and he obtained
a Coronados clique weapon to be used in the murder.  (T 1196-98,
1741-42).  Moreover, as the cooperating witnesses' testimony
established, after the MS-13 members murdered Moreno and
returned to Michichi's truck, where Martinez waited, they all
excitedly yelled, "La Mara, La Mara!", "the Coronados and the
Sureños will be together forever," "nobody messes with the
Mara," and "the beast" had "eaten up" the bouncer.  (T 1206-07,
1748).  This evidence, in addition to evidence that MS-13
members believe that anyone who disrespects the MS-13 deserves
to be killed, was sufficient to support the jury's conclusion
that Martinez ordered Moreno's killing in order to maintain or
increase his position in the MS-13.  As the leader of the
Coronados clique, Martinez could not let Moreno's disrespectful
conduct -- which took place in front of other MS-13 members and
"implicitly threatened [his] position within the enterprise and
perhaps the reputation of the enterprise itself" -- go
unpunished.  See United States v. Santiago, 207 F. Supp. 2d 129,
156 (S.D.N.Y. 2002).

Moreover, even assuming arguendo that Martinez was
motivated in part by a desire for personal revenge (MBr. 39),
the fact that he viewed Moreno's actions as an affront to the

gang (see T 1191-93) demonstrates that he was acting, at least in part, for the gang "in furthering its policies of retaliatory violence against any who sufficiently antagonized any of its members, and in order to maintain his position in it." See Tipton, 90 F.3d at 891; see also United States v. Rivera, 273 Fed. App'x 55, 58 (2d Cir. 2008) ("The Government presented evidence that [the defendant's] motives for the murders were not only based on self-preservation, but also on preservation of the enterprise."); United States v. James, 239 F.3d 120, 124 n.5 (2d Cir. 2000) ("With respect to defendant's contention that [the] murder was an act of personal revenge and was not done in aid of defendant's racketeering enterprise, we agree with the district court that 'one of the motivations for this murder was tied to the association with the enterprise and the desire to maintain standing, if you will, in that . . . . for lack of a better way of putting it, community.' . . . [W]e conclude that a jury could find that [the] murder was not only an act of personal revenge, but was, also, tied to [defendant's] racketeering activities . . . ." (alterations and citations omitted)).

Martinez's actions after the murder -- chanting "La Mara! La Mara! La Mara" (T 1206) and making telephone calls to let other members of the gang know that "the problem . . . with the security guard had been fixed" (T 1748-49) -- also demonstrate that he was proud of the crime and wanted others

within the gang to be made aware of it.  See <u>United States v.</u>
<u>Whitten</u>, 610 F.3d 168, 180 (2d Cir. 2010) (citing evidence
indicating that the defendant was "proud" of his crimes and
"wanted others to be made aware of them" to support finding that
evidence presented on the "maintaining and increasing position"
element of the VICAR statue was sufficient).

    Characterizing the killing simply as "revenge for an
act of personal humiliation" (MBr. 40), Martinez observes that
the perpetrators waited until any potential witnesses had left
so that MS-13 members would suffer no blame and that no MS-13
member suggested that Martinez retaliate against Moreno and
concludes that the killing therefore was not for the purposes of
maintaining or increasing his position in MS-13.  (MBr. 40-41).
However, as to the first observation, the revenge was witnessed
by Martinez's accomplices and an employee at El Rancho (T 1128-
31) and would have become known beyond those immediately
involved, and as to the second, whether or not any member had
made such a suggestion, Martinez nonetheless could have thought
the murder necessary to avenge the disrespect to himself, a
leader of the Coronados clique, and to the MS-13 occasioned by
Moreno's act.

    3.  <u>The Quijada Murder</u>

    Cooperating witnesses Calderon and Carlito testified
that the decision to murder Quijada was made at a meeting of

members of the MS-13, which Martinez and Ortega attended. They both testified that a vote was taken of the MS-13 members in attendance and that it was unanimously decided that Quijada should be killed. (T 1227, 1776). The evidence further demonstrated that the official decision to murder Quijada was made after Quijada, who had been given one last chance to prove himself to the MS-13, refused to hold a gun Ortega handed him to kill a rival gang member, a task that is expected of any MS-13 member. (T 330, 1223-27, 1776). Quijada's refusal to engage in this act of violence for his gang resulted in the decision to kill him. (T 1226-27).

Martinez contends that because Quijada's killing was not officially sanctioned by the MS-13 leadership and actually resulted in "green lights" (order to kill on sight) being put on the members who took part in the murder, it actually decreased his standing in the MS-13. (MBr. 45). This argument is unavailing because the VICAR inquiry concerns not how a defendant's position in the enterprise was actually affected by virtue of his involvement in the crime but instead what the defendant's purpose was, with respect to his position, in engaging in the criminal activity in the first instance. See Farmer, 583 F.3d at 142 ("[T]he question is not whether [the defendant's] position in the [enterprise] was advanced in fact

by the murder he committed, but whether his purpose in committing the murder was to benefit his position.")

The government presented ample evidence from which a rational jury could conclude that Martinez's participation in the murder of Quijada was motivated by a desire to maintain or increase his position in the MS-13. As discussed above, the evidence established that Martinez was the leader of the Coronados clique of the MS-13 (T 694-95, 1183-84), members of the MS-13 were expected to "put in work" for the gang by, for example, seeking out and killing rival gang members (T 330), Quijada was becoming a problem for the MS-13 because "he didn't do the work that he was supposed to do" (T 1761; see also T 1124, 1226-27), and he failed the last test he was given by the MS-13 by his refusal to hold the gun while the MS-13 members were out looking for rival gang members to kill. (T 1223-27, 1776).

Based on all this evidence, a rational juror could have concluded that Martinez, as a leader of the MS-13, felt compelled to punish a member who was not following the rules of the gang in order to instill obedience in the gang's other members. Moreover, Carlito testified that when the group was discussing how to deal with Quijada after he failed to kill a rival gang member during his final test, Martinez said they should kill Quijada because he would likely "snitch" on the

group if he were arrested. (T 1776). The jury could have logically inferred from all of this evidence that Martinez's involvement in Quijada's murder was motivated by a desire to protect his position in the enterprise, a position he would lose if Quijada exposed Martinez's identity and criminal activity to the police.

Based on the evidence at trial, a rational jury could conclude, beyond a reasonable doubt, that at least one reason for Martinez's participation in the murders of Argueta, Moreno and Quijada was his desire to maintain or increase his position in the MS-13. Therefore, this Court should reject Martinez's insufficiency claim.

B.   Ortega Participated in the Murder of Quijada to
     Maintain and Increase His Position in the MS-13

To the extent that Ortega joins Martinez's argument in Point One and contends that the government presented insufficient evidence that Ortega killed Quijada to maintain or increase his position in the MS-13, as required by the VICAR statute, Ortega's motion should fail for the same reasons argued above. See above at 21-23, 30-33.

The evidence at trial established that Ortega was a member of the El Salvador-based STLS clique of the MS-13. (T 371, 1221, 1765-66, 2398; GX 284). In fact, Calderon testified that Ortega was "a big home boy from El Salvador []

coming to do an inspection of the cliques and . . . to see how the SLS clique was being run." (T 1220). The evidence further demonstrated that Ortega had participated in the discussions regarding Quijada's deficiencies as a gang member and, in fact, advocated for Quijada's murder. (T 1220-24, 1776). After Quijada failed his "test," Ortega reported to the other MS-13 gang members that Quijada would not hold the gun while they were out hunting for rival gang members and that he had to be killed. (T 1776). The testimony of the cooperating witnesses was corroborated by that of Special Agent Tariche of the FBI, who testified that, during his post-arrest interview of Ortega, Ortega informed him that "[Quijada] was breaking the rules of La Mara by not putting in work so he had to go." (T 2411).

In short, Quijada was not doing what was expected of him as a member of the MS-13 and was a liability to the MS-13. The jury could have reasonably inferred that Ortega advocated for and participated in Quijada's murder, at least in part, because that was what was expected of him as a member of the MS-13 and to prove that he, Ortega, unlike Quijada, was willing to kill for the MS-13. See, e.g., Concepcion, 983 F.2d at 381; Farmer, 583 F.3d at 142. Furthermore, Ortega had met most of his co-conspirators to Quijada's murder only that night (T 1765-66), so it would be reasonable for the jury to infer that Ortega wanted to prove himself to the MS-13 members he had just met.

In helping to kill Quijada, Ortega maintained and increased his position in the MS-13, as MS-13 members gain respect by participating in acts of violence. (T 183, 330-31, 345, 492-93, 1758).   In addition, a rational jury could conclude that Ortega's participation in Quijada's murder was motivated, at least in part, by a desire to instill obedience among the gang's members, as well as to promote respect for the gang and his position in it.

Therefore, this Court should reject Ortega's argument that the evidence was insufficient to prove that his participation in Quijada's murder was to maintain or increase his position in the MS-13.

1549431, Page43 of 203

POINT TWO

THE EVIDENCE WAS SUFFICIENT TO CONVICT
MARTINEZ OF MURDERING AND CONSPIRING TO MURDER ARGUETA

Martinez contends that there was insufficient evidence
to support his conviction for conspiracy to murder Argueta, the
murder of Argueta, and the related firearms offenses. (MBr. 46-
55). Martinez argues that a rational juror could not have
reasonably inferred, based on his statements to a fellow gang
member to "fix it" and "do what you have to do," that Martinez
joined a plan to kill Argueta. (MBr. 47, 53). Martinez's
arguments fail.[5]

The evidence presented at trial established, beyond a
reasonable doubt, that Martinez conspired to murder Argueta and
aided and abetted her murder, with knowledge that a firearm
would be used.[6] See above at 7-10, 23-27.

---

[5]    In Point II of his brief, Martinez challenges the
sufficiency of the evidence regarding his agreement to murder
Argueta and his participation in her murder. (MBr. 47-49, 54-
55). Martinez does not dispute the existence of the enterprise,
that the enterprise's activities affected interstate commerce,
or that he held a position in the enterprise. As discussed
above, in Point I, Martinez separately argues that the evidence
was insufficient to prove that he participated in the charged
murders to increase or maintain his position in the enterprise.

[6]    As noted above, the conviction must be upheld if "any
rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt." Newman, 773 F.3d at
451. In conducting its de novo review, this Court "must view
the evidence in the light most favorable to the Government,
crediting every inference that could have been drawn in the
Government's favor, and deferring to the jury's assessment of

The evidence presented at trial was sufficient to permit a rational jury to find beyond a reasonable doubt that Martinez conspired to murder Argueta and aided and participated in her murder. Santos, a former MS-13 associate, testified that, in early February 2010, she was at the home of a Coronados clique member nicknamed "Fox," along with MS-13 members Garcia, Guzman and Mejia. (T 764-65). In Santos's presence, the MS-13 members called Martinez, the Coronados leader, and advised him that Argueta had sent rival gang members over to Garcia's home. (T 766-67). The group discussed the fact that "she can't just disrespect them like that, like she can't just disrespect [Garcia] like that." (T 766). Martinez told Garcia, Guzman, Mejia and Fox to "fix it" and "do what [you] have to do." (T 768).

While Martinez argues that the above evidence was not sufficient to support his convictions for Argueta's murder, he ignores the fact that he made damning post-arrest admissions to the FBI. As the evidence at trial showed, in post-arrest statements concerning the murders of Argueta and Torres, Martinez told Special Agent Heslin of the FBI that an MS-13 member asked Martinez for a gun because he wanted to kill a woman he believed had set him up for an assault by rival gang

witness credibility and its assessment of the weight of the evidence." Id. (internal quotations omitted).

members.  (T 1064-65).  Martinez further admitted that he told
this MS-13 member that he (Martinez) did not have the gun but
directed this MS-13 member as to where to get the gun.
(T 1065).  Martinez advised Special Agent Heslin that this MS-13
member used the gun to commit a double homicide with two other
gang members.  (Id.).

Thus, considering the testimony of Santos and Special
Agent Heslin together, the evidence was overwhelming that
Martinez knew that Garcia wanted to murder Argueta, that
Martinez, as the Coronados leader, sanctioned the murder (thus
knowingly and intentionally joining the conspiracy), and that he
helped Garcia acquire the gun in order to commit the murder.
Although Martinez did not personally participate in the murder
of Argueta, he aided and abetted her murder by providing the
murder weapon, the silver .22 caliber gun that belonged to
Martinez's clique, was used to kill Moreno, and was recovered by
the NYPD at the Quijada crime scene.  (T 1196, 2193, 3043).

In addition to the substantial evidence described
above that Martinez explicitly sanctioned Argueta's murder and
provided the murder weapon, the evidence demonstrated that
Martinez conspired to murder Argueta and assisted in the
commission of that crime.  Detective Rivera of the SCPD
testified that Martinez told him, during a March 18, 2010
interview, that "[Argueta] was shot because she had tried to

have Cruzito [Garcia] killed a month earlier by the 18th Street Gang." (T 996). In a written statement Martinez provided to Detective Rivera, he stated in relevant part,

> About 2 months ago, Cruzito [Garcia] told me that a girl named Vanessa [Argueta] was trying to have him killed by members of the 18th Street gang. Cruzito is MS-13 CLS. CLS is Coronados Locos Salvatruchas. Cruzito told me that Vanessa was going to be killed with a pistol. He was going to get a gun to kill her.

(T 983, 1017; GX 115A). Martinez further admitted, "I saw the gun that was used to kill [Argueta] before she was killed. The gun was a small silver handgun. [This is the gun that I had this morning.]" (T 1016, 1018; GX 115A).[7] While Martinez did not disclose his involvement in Argueta's murder to Detective Rivera, he admitted that he knew in advance of her murder that there was a plan to kill her and that she would be shot to death with a particular gun.

Furthermore, cooperating witness Calderon testified that Martinez told him Argueta deserved to die "[b]ecause she had brought over members of a rival gang to Cruzito's place to kill him." (T 1261-62). In addition, telephone records showed constant communication between Martinez and Garcia, Guzman and

---

[7]     Martinez had written the last sentence, in Spanish, onto the written statement he provided to Detective Rivera. It read: "Esta es la pistol que yo teni esta mañana." Detective Rivera provided the English translation of that sentence when he testified. (T 1016).

Mejia on the day before the murder. (T 2522-24; GX 509). The evidence also showed that Martinez went to great lengths to assist Garcia, Guzman and Mejia after the murders of Argueta and Torres, by harboring them, arranging for their transportation out of New York City, and providing them with money and his telephone number, so that the MS-13 in El Salvador could contact Martinez to receive assurances that Garcia, Guzman and Mejia were loyal MS-13 members. (T 782-810, 1826). Martinez continued to send money to the three MS-13 members while they were in El Salvador. (T 809).

Viewing all of this evidence in the light most favorable to the government, a rational trier of fact could have concluded beyond a reasonable doubt that Martinez conspired to murder Argueta and aided and abetted in her murder. The jury's verdicts should not be disturbed.

POINT THREE

THE DISTRICT COURT DID NOT ABUSE ITS
DISCRETION IN EMPANELING AN ANONYMOUS JURY

The defendants claim that the district court erred in empaneling an anonymous jury, thereby undermining the presumption of innocence, because there was no evidence that the defendants or their associates intended to harm the cooperating witnesses or prospective jurors. (MBr. 55-61). The defendants are wrong.

I.   The Legal Standard

A district court has broad discretion to determine whether to grant an anonymous jury and whether to hold an evidentiary hearing concerning the proffered factual basis for an anonymous jury. See, e.g., United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012)(reviewing for abuse of discretion).

This Court has explained that empaneling an anonymous jury "may be warranted when the jury needs protection, as when the government has demonstrated a defendant's willingness to tamper with the judicial process, or when there has been extensive pretrial publicity in cases involving allegations of violent conduct." United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994) (quotation marks, citations, and alterations omitted). "In such circumstances, the use of an anonymous jury

does not infringe a defendant's constitutional rights, so long as the court conducts a careful <u>voir</u> <u>dire</u> designed to uncover any bias as to the issues or defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." <u>Aulicino</u>, 44 F.3d at 1116. In reviewing a challenge to the use of an anonymous jury, a court must "balance the defendant's interest in conducting an effective <u>voir</u> <u>dire</u> and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." <u>United States v. Amuso</u>, 21 F.3d 1251, 1264 (2d Cir. 1994). Accordingly, "[a]s a general rule, a district court may order the empaneling of an anonymous jury upon '(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'" <u>United States v. Stewart</u>, 590 F.3d 93, 124 (2d Cir. 2009) (quoting <u>United States v. Paccione</u>, 949 F.2d 1183, 1192 (2d Cir. 1991)).

With respect to the first factor, this Court has upheld the decision to empanel an anonymous jury where the government showed "a demonstrable history or likelihood of obstruction of justice on the part of the defendant or others

acting on his behalf or a showing that trial evidence will depict a pattern of violence by the defendants and his associates such as would cause a juror to reasonably fear for his own safety." United States v. Vario, 943 F.2d 236, 241 (2d Cir. 1991). Evidence that a defendant or his codefendants have engaged in obstruction of justice "has always been a crucial factor" in determining that a jury needs protection. Id. at 240; accord United States v. Quinones, 511 F.3d 289, 295 (2d Cir. 2007) ("We have identified strong reasons to believe that a jury needed protection in situations where the government demonstrated a defendant's willingness to tamper with the judicial process.").

The obstruction of justice need not relate to prior jury tampering efforts but may relate solely to efforts to tamper with witnesses or otherwise obstruct the judicial process. See id. at 295-96 (noting that the murder of a confidential information "threatened the judicial process both by eliminating a witness who could have provided incriminating evidence against defendants and by sending a powerfully frightening message to others of the terrible consequences awaiting anyone who cooperated in defendants' prosecution"); see also Thai, 29 F.3d at 801 (upholding decision to empanel anonymous jury where government made motion "based in large part on evidence of defendants' acts of intimidation toward their

crime victims, their attempts to kill certain of those victims, and the murder of [a victim] because of his refusal to retreat from his complaints to the police" and government proffered that the gang had many members who were not in custody).

The seriousness of the offense and extensive pretrial publicity are also relevant considerations. See, e.g., United States v. Kadir, 718 F.3d 115, 121 (2d Cir. 2013) (anonymous jury was warranted where defendants were charged with "serious crimes of terrorism" that might have caused jurors to be fearful, case received "extensive media coverage," and defendant had threatened witnesses); United States v. Thomas, 757 F.2d 1359, 1364 (2d Cir. 1985) (defendants were members of "large-scale organized crime" group that had murdered witnesses); Quinones, 511 F.3d at 296 ("Two other grounds cited by the government -- the seriousness of the crime and the likelihood of pretrial publicity -- reinforce the district court's decision to empanel an anonymous jury.")

Once the district court concludes there is strong reason to believe the jury needs protection, it must then take reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected. See Paccione, 949 F.2d at 1192. Such precautions include providing jurors with a "plausible and nonprejudicial reason for not disclosing their identities." Id. This Court

has approved the explanation that anonymity is being ordered to protect the jurors from the pressures of expected trial publicity. See Thomas, 757 F.2d at 1365 n.1; see also United States v. Tutino, 883 F.2d 1125, 1133 (2d Cir. 1989) (district court told jury that anonymity was "a common practice followed in many cases in the Federal Court" and was "in no way unusual"). Where an anonymous jury is used, the court should also be especially careful to conduct the voir dire so as to uncover potential juror bias. See Thai, 29 F.3d at 801 (district court used lengthy juror questionnaire to discover possible bias); see also Pica, 692 F.3d at 88 (holding that reasonable precautions included administration of detailed questionnaire).

II.  The District Court's Decision

        The district court granted the government's request for an anonymous jury at a December 12, 2012 status conference and oral argument. (GA 1-21). In its oral ruling, the court noted that it was relying in part on its prior opinion with respect to co-defendants in United States v. Prado, 2011 WL 3472509 (E.D.N.Y. Aug. 5, 2011) (granting government's motion for an anonymous and partially-sequestered jury), given the similarities between the two cases. (GA 5-6). The court noted that the parties agreed upon the appropriate standard: "[a] district court may order the [e]mpaneling of an anonymous jury

upon the strong reason to believe that the jury needs protection, and taking reasonable precautions to minimize any prejudicial effects on the defendant[s] and to insure that his fundamental rights are protected." (GA 7 (relying on United States v. Stewart, 590 F.3d 93, 124 (2d Cir. 2009))).

The district court found that "the jury needs to be protected in this case" based on the nature of the charges in the indictment against the defendants -- "extreme violent acts in connection with the racketeering enterprise of MS-13" (GA 6) -- as well as the activities of the enterprise, which included "alleged interference with respect to the Court system, including attacks on cooperating witnesses, including in the jail." (GA 6-7). The court considered the defendants' argument that they were not charged with acts of obstruction of justice, but it found that the defendants' participation in an enterprise "that clearly has shown its inclination and its ability to interfere with the judicial process" warranted an anonymous jury. (GA 7).

Similarly, the fact that the defendants were incarcerated did not alter the analysis, as "obviously, there are members of the MS-13 gang who are at liberty, and could engage in interference on behalf of the defendants or the gang during the course of the trial." (GA 7). The district court took into account that there had been "significant media

coverage" with respect to the indictment as a whole and that the court expected the media coverage to continue in connection with the trial. (GA 8).

The district court advised the parties that it would give the jury "a neutral explanation" for the precautionary measures and would ensure through a "detailed voir dire" that there would be no prejudice to the defendants from the use of an anonymous jury. (GA 8).

## III. Argument

The district court properly determined that an anonymous jury was warranted in the instant case and took reasonable measures to ensure that the defendants' fundamental rights were protected. The court correctly found that the jury needed to be protected, given that the defendants were charged with serious crimes of violence, including the murders of Argueta, Sandler, Moreno and Quijada, stemming from their alleged involvement in the MS-13, a racketeering enterprise alleged to be involved in a variety of violent criminal acts, including murder, attempted murder, narcotics trafficking, extortion, witness tampering and witness retaliation. (See trial indictment (MA 41-66)). See, e.g., Quinones, 511 F.3d at 296 ("[T]he seriousness of the crime . . . reinforce[s] the district court's decision to empanel an anonymous jury.")

Moreover, in its motion for an anonymous jury, the government listed numerous instances, charged both in earlier indictments in the instant case and other indictments in the Eastern District of New York, in which Long Island MS-13 members had attempted to interfere with the judicial process and had retaliated against individuals believed, correctly or incorrectly, to have cooperated with law enforcement authorities. The motion included the following examples, among others:

> (1) In or about and between November 2009 and December 2009, Group I defendant ELENILSON ORTIZ, together with others, attempted to intimidate, threaten or corruptly persuade John Doe #6 from testifying in a federal grand jury proceeding in Central Islip concerning an assault that ORTIZ and Group I defendants GIOVANNI PRADO and ERICK ALVARADO had participated in. 10-CR-074 (JFB), Third Superseding Indictment, Count 40. ORTIZ pled guilty to that charge.

> (2) In or about November 2010, ORTIZ and Group V defendant DAVID VALLE attempted to intimidate, threaten or corruptly persuade a federal witness from testifying concerning violent crimes committed by MS-13 gang members. Id., Count 67; 10-CR-074 (JFB), Fourth Superseding Indictment, Count 58.

> (3) In or about and between September 2010 and December 2010, Group I defendant FRANCISCO RAMOS, together with other MS-13 members conspired to commit the murders of three witnesses for the purpose of preventing them from testifying regarding

assaults committed by RAMOS and other MS-13 members. Id., Count 68.

(4) On April 18, 2011, Group I Defendant EMILIO SABALLOS pleaded guilty to count one of the third superseding indictment and admitted to attempting to intimidate witnesses on behalf of the MS-13 gang to prevent them from cooperating with the instant federal investigation. The individuals who SABALLOS admitted to having tampered with were the same witnesses who witnessed the assault of John Doe #6 that PRADO, ALVARADO and ORTIZ were charged with having committed. Id., Counts 36-38.

(5) On January 3, 2011, Group I Defendant JOSE SALAZAR ERAZO pleaded guilty to the commission of a baseball bat assault of a victim on behalf of the MS-13 that occurred on May 30, 2010. The victim of Erazo's assault was an individual who was related to a witness who observed the assault of John Doe #6 and ERAZO allocuted that the assault was done in retaliation for that earlier incident. 10-CR-074 (JFB), Second Superseding Indictment, Count 40.

(MA 82-83; see also GA 85, 89, 97-98, 102-03, 118).

In further support of its motion, the government informed the district court that a number of confidential sources had advised the government that, since the arrests of several MS-13 members, including Martinez, members from several cliques of the MS-13 were actively searching for a confidential informant -- Carla Santos -- who had assisted the government in the investigation of the murders of Argueta, Torres, Sandler, Moreno and Quijada, so they could kill her due to her cooperation with the government in this case. (MA 86-87).

Based on this and other information provided to the district court, it did not abuse its discretion in concluding that the MS-13 "clearly has shown its inclination and its ability to interfere with the judicial process," warranting an anonymous jury. (GA 7). See, e.g., Vario, 943 F.2d at 240 ("We are satisfied that two circumstances surrounding this case, the grand jury tampering charge and the expected publicity, justified the trial court's decision to empanel an anonymous jury.").

The fact that the defendants were not charged with any obstruction of justice crimes and were in custody did not diminish the district court's sound determination that the jury needed to be protected. See id. (noting that evidence that a defendant or his codefendants have engaged in obstruction of justice "has always been a crucial factor" in determining that a jury needs protection); see also Thai, 29 F.3d at 801 (finding that record "amply supported" the district court's empanelment of an anonymous jury; facts offered in support included that many gang members were not in custody). The government alleged in the indictment and in its motion for an anonymous jury that the MS-13 was a large-scale criminal enterprise with leaders and members located not only throughout Long Island and Queens, but also throughout the United States and Central America. (MA 41, 80). More specifically, the government noted that dozens, if

not hundreds, of MS-13 leaders and members remained at liberty on Long Island and had the means to continue to interfere with the judicial process. (MA 80, 91). Thus, the district court properly considered the fact that the MS-13 members at liberty could threaten the safety of jurors during the trial. (GA 7).

The district court also properly considered the extensive media coverage the indictment as a whole had received and the likelihood that the trial would generate additional media coverage. (GA 8). In its motion, the government provided citations to seven news articles in Newsday, a Long Island newspaper, regarding the indictments in this case, since April 2010. (MA 91).

As required by this Court's precedent, the district court took reasonable precautions to minimize any prejudicial effect on the defendants and to ensure that their fundamental rights were protected. The court used an extensive and detailed written questionnaire, consisting of 85 questions (GA 34-72), during the voir dire process, and thoroughly questioned the prospective jurors during the three days of voir dire to explore prospective jurors' biases (Docket Sheet, 10 CR 74 (JFB), Dkt. Nos. 1176-78). The court excused a prospective juror (Juror Number 325) who stated s/he was "[a] little" concerned about "security and [his/her] family" even though the juror was aware his/her identity would remain anonymous. (T 256). The voir

dire process "enable[d] the defendants to exercise their
challenges meaningfully, and to obtain a fair and impartial
jury." Tutino, 883 F.2d at 1133; cf. United States v. Barnes,
604 F.2d 121, 140 (2d Cir. 1979) ("As long as a defendant's
substantial rights are protected by a *voir dire* designed to
uncover bias as to issues in the cases and as to the defendant
himself, then reasonable limitations on the questioning should
not be disturbed on appeal.").

Furthermore, the district court gave the prospective
jurors a neutral and non-prejudicial explanation regarding the
need for anonymity. In the questionnaire, the prospective
jurors were advised,

> The Court is following the practice used in
> other cases in the federal courts of keeping
> the identities of the jurors confidential.
> The Court uses this procedure because this
> case is likely to attract attention in the
> media and among the public. Anonymity will
> assure that the jury will not be exposed to
> such prying and to opinions, commentaries
> and inquiries which might impair its ability
> to decide the case solely upon the evidence
> presented in court and upon the law as I
> instruct. It is important to ensure that
> the jury will in no way be influenced by the
> public, by the members of the media and
> their articles and reports. I wish to
> emphasize that I am taking these measures to
> protect your rights of privacy and to assist
> you in discharging your responsibility as
> jurors fairly and impartially.

(GA 34).

53

On the first day of <u>voir</u> <u>dire</u>, the district court advised the parties that because the questionnaire provided the jury with an explanation for jury anonymity, the court did not intend to repeat that instruction, unless one of the parties requested otherwise. (T 9). Neither the defendants nor the government requested that the court address the juror anonymity issue. (T 10). Once the jury was selected, the court repeated its earlier neutral and non-prejudicial explanation for jury anonymity during its preliminary instructions to the jury. (T 351-52).

For all of these reasons, this Court should conclude that the district court properly exercised its discretion in deciding to empanel an anonymous jury and took reasonable precautions to ensure that the defendants' fundamental rights were protected.

POINT FOUR

THE JURY INSTRUCTIONS ON COUNT TWENTY-ONE WERE NOT
ERRONEOUS AND THE EVIDENCE WAS SUFFICIENT TO CONVICT

The defendants argue that in light of the Supreme
Court's decision in Rosemond v. United States, 134 S. Ct. 1240
(2014), issued almost one year after the jury found them guilty
of Count Twenty-One for aiding and abetting the use of a firearm
during a crime of violence under 18 U.S.C. §§ 924(c)(1)(A)(ii)
and 2, the jury instructions were erroneous and their
convictions must be reversed. As we show below, the jury
instructions were proper, the evidence was sufficient, and
reversal therefore is not warranted.

I.   The Applicable Law

Section 924(c) establishes a five-year mandatory
minimum sentence for anyone who "uses or carries a firearm"
"during and in relation to any crime of violence or drug
trafficking crime" or who possesses a firearm "in furtherance of
any such crime."  18 U.S.C. § 924(c)(1)(A)(i).  The five-year
mandatory minimum term is increased to seven years if the
firearm is brandished.  18 U.S.C. § 924(c)(1)(A)(ii).

The federal aiding and abetting statute, 18 U.S.C.
§ 2, states that a person who "aids, abets, counsels, commands,
induces or procures" the commission of a federal offense is
"punishable as a principal."  18 U.S.C. § 2(a).  "[A] person is

liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." Rosemond, 134 S. Ct. at 1245.

In Rosemond, the Supreme Court addressed the affirmative act and intent requirements for aiding and abetting the offense of using or carrying a firearm during and in relation to a crime of violence or drug trafficking crime, which offense it described as a "double-barreled crime." Id. The Court held that the affirmative act requirement is satisfied if the defendant "facilitat[es] either the [underlying predicate crime] or the firearm use (or of course both)." 134 S. Ct. at 1247. It is not necessary that the defendant's acts "advance each element of the offense; all that matters is that they facilitated one component." Id. This standard expands the definition of aiding and abetting liability in 924(c) cases beyond this Court's prior holdings, which required an act in furtherance of the use of the firearm, not merely the underlying offense. See United States v. Rivera, 571 Fed. App'x 55, 59 n.5 (2d Cir. 2014)(unpublished).

As to intent, the element the defendants challenge in this appeal, the Supreme Court concluded that a defendant possesses the requisite intent when he or she commits the affirmative act "with advance knowledge that a confederate would

use or carry a gun during the crime's commission." <u>Rosemond</u>,
134 S. Ct. at 1243. Specifically, the intent requirement is
satisfied "when a person actively participates in a criminal
venture with full knowledge of the circumstances constituting
the charged offense." <u>Id.</u> at 1248-49. Accordingly, to aid and
abet a violation of Section 924(c), the defendant's intent must
extend to the "full scope" of the crime, namely the "predicate
crime plus gun use." <u>Id.</u> at 1248. When a defendant's
affirmative act facilitates only the predicate crime, such as a
carjacking, he nonetheless has the requisite intent if "he knows
that one of his confederates will carry a gun." <u>Id.</u> at 1249.

The "defendant's knowledge of a firearm must be
advance knowledge" sufficient to "enable[] him to make the
relevant legal (and indeed, moral) choice." <u>Id.</u> That means he
must have knowledge of the firearm "at a time [he] can do
something with it — most notably, opt to walk away." <u>Id.</u> at
1249-50. A person who "knows beforehand of a confederate's
design to carry a gun" meets this requirement. <u>Id.</u> at 1249. He
can "attempt to alter that plan or, if unsuccessful, withdraw
from the enterprise," but "deciding instead to go ahead with his
role in the venture . . . shows his intent to aid an armed
offense." <u>Id.</u> (emphasis in original). In contrast, a defendant
who "knows nothing of a gun until it appears at the scene . . .
may already have completed his acts of assistance" or, even if

not, "may at that late point have no realistic opportunity to
quit the crime." Id. If that is the case, "the defendant has
not shown the requisite intent to assist a crime involving a
gun." Id.

II. The Jury Instructions

Count Twenty-One charged the defendants, in relevant
part, as follows:

> 61. On or about March 17, 2010, within
> the Eastern District of New York, the
> defendants HERIBERTO MARTINEZ, also known as
> "Boxer," and CARLOS ORTEGA, also known as
> "Silencio" and "Silent," together with
> others, did knowingly and intentionally use
> and carry a firearm during and in relation
> to one or more crimes of violence, to wit:
> the crimes charged in Counts Nineteen
> [conspiracy to murder Quijada] and Twenty
> [murder of Quijada], and did knowingly and
> intentionally possess said firearm in
> furtherance of such crimes of violence,
> which firearm was brandished.
>
> (Title 18, United States Code, Sections
> 924(c)(1)(A)(ii), 924(c)(1)(C), 2 and 3551
> et seq.)

(OA 35-36). When instructing the jury on this count, the
district court referred the jury back to its earlier instruction
on the use of a firearm during a crime of violence, in Count
Five (OA 146), which provided as follows:

> Section 924(c) of Title 18 of the
> United States Code provides in pertinent
> part:
>
> Any person who during and in relation
> to any crime of violence or drug trafficking

crime for which the person may be prosecuted
in a court of the United States, uses or
carries a firearm, or who in furtherance of
any such crime possesses a firearm, shall be
guilty of a crime.

In order to prove the crime charged in
Count Five, the government must establish
the following two elements beyond a
reasonable doubt:

First, that the defendant committed a
crime of violence;

And second, that the defendant either
knowingly and intentionally used or carried
a firearm during and in relation to the
commission of the crime of violence, or
knowingly and intentionally possessed a
firearm in furtherance of that crime, or
aided and abetted another person doing so.

(OA 143).

With respect to the second element, the district court

further instructed:

As for the second element, the
government must prove beyond a reasonable
doubt that the defendant, either knowingly
and intentionally, used or carried a firearm
during and in relation to the commission of
the relevant crimes of violence, or
knowingly and intentionally possessed a
firearm in furtherance of the crimes.

. . .

To prove that the defendant used a
firearm during and in relation to the
underlying crime, the government [must] show
that he actively employed the firearm in
some way to further the underlying crime.

. . .

As I told you, the second element may also be satisfied by proof that the defendant possessed the firearm in furtherance of a crime of violence . . . .

To possess a firearm in furtherance of a crime means that the firearm helped forward, advance or promote the commission of the crime. The mere possession of the firearm at the scene of the crime is not sufficient. The firearm must have played some part in furthering the crime . . . .

Finally . . . you must find that the defendant carried or possessed the firearm knowingly and intentionally. I have already instructed you on what is meant by "knowing and intentionally."

(OA 143-44).

As for the law on aiding and abetting, the district court read Section 2, Title 18, United States Code to the jury (OJA 141) and further instructed it as follows:

Before a defendant may be held responsible for aiding and abetting others in the commission of a crime, it is necessary that the Government prove beyond a reasonable doubt that the defendant knowingly and deliberately associated himself in some way with the crime charged and participated in it with the intent to commit the crime.

In order to be found guilty of aiding and abetting the commission of a crime, the Government must prove beyond a reasonable doubt that the defendant:

First, **knew that the crime charged was to be committed or was being committed**;

> Second, knowingly did some act for the purpose of aiding, commanding or encouraging the commission of that crime; and
>
> Third, **acted with the intention of causing the crime charged to be committed.**
>
> Before the defendant may be found guilty as an aider or an abettor to the crime, the Government must also prove beyond a reasonable doubt that someone committed each of the essential elements of the offense charged as detailed for you in the instructions for the crime the defendant is alleged to have been aided and abetted.
>
> Merely being present at the scene of the crime, or merely knowing that the crime is being committed or is about to be committed, is not sufficient conduct for the jury to find that a defendant aided and abetted the commission of that crime.
>
> The Government must prove that the defendant knowingly and deliberately associated himself with the crime in some way as a participant, **someone who wanted the crime to be committed**, not as a mere spectator.

(OA 141-42 (emphasis added)).

## III. The Jury Instructions Were Proper and the Evidence Was Sufficient to Support the Defendants' Convictions

### A. There Was No Plain Error

Ortega concedes that he did not object to the district court's instructions on Count Twenty-One. (OBr. 12; see also T 3064-3105, 3110-14). The defendants' claim that the jury instructions were erroneous due to the Supreme Court's subsequent decision in Rosemond therefore is subject to plain

error review. See Fed. R. Crim. P. 52(b); Johnson v. United States, 520 U.S. 461, 466-67 (1997).[8] The defendants cannot establish plain error. "Under this deferential standard, we will vacate a judgment only if we find that the District Court made a mistake that is clear and obvious, affected substantial rights, and seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Danielson, 199 F.3d 666, 671 (2d Cir. 1999) (internal quotation marks omitted).

The district court committed no error. The jury instructions on Count Twenty-One were proper when given and are correct under Rosemond. The court instructed the jury that, to

---

[8] Ortega argues that the Court should apply a modified plain error analysis, pursuant to United States v. Viola, 35 F.3d 37(2d Cir. 1994), abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997). In Viola, this Court established a modified plain error rule for claims based upon a "supervening decision" that "alters settled law." Id. at 42-43. In those situations, this Court held, the government must show that the error did not affect the defendant's substantial rights. Id. However, more recently, this Court has noted that the Supreme Court's subsequent decision in Johnson "has called into doubt the continuing viability of the modified plain-error approach." United States v. Stewart, 433 F.3d 273, 294 n.5 (2d Cir. 2006); see also United States v. Botti, 711 F.3d 299, 308 (2d Cir. 2013) (Johnson "called into question the modified plain error standard of review that this Court established in Viola."). As is argued below in more detail, regardless of which side bears the burden, the defendants' substantial rights were not affected.

find a defendant guilty of aiding and abetting, the government had to prove beyond a reasonable doubt that the defendant:

> First, knew that the crime charged was to be committed or was being committed;

> Second, knowingly did some act for the purpose of aiding, commanding or encouraging the commission of that crime; and

> Third, acted with the intention of causing the crime charged to be committed.

(OA 141-42). The third element -- "acted with the intention of causing the crime charged to be committed" -- satisfies Rosemond's intent requirement because it requires the defendant's "state of mind [to] extend[] to the entire crime." 134 S. Ct. at 1248. The "crime charged" in Count Twenty-One was the Section 924(c) violation. Thus, for the jury to find either defendant guilty on Count Twenty-One as an aider and abettor, the jury necessarily had to find that the defendant acted with the intention that (1) a "crime of violence" would be committed; and (2) someone would "use[] or carr[y] a firearm during and in relation to the commission of the crime of violence" or "possess[] a firearm in furtherance of that crime." (OA 143 (instructing jury on the two elements of a Section 924(c) offense)).

The district court's instruction that the defendant must have "acted with the intention of causing **the crime charged** to be committed" satisfies Rosemond's requirement that "the

intent must go to the specific and entire crime charged — so here, to the full scope (predicate plus gun use) of § 924(c)." 134 S. Ct. at 1248. Unlike the district court's instruction in Rosemond, which required the jury to find only that "(1) the defendant knew his cohort used a firearm in the drug trafficking crime, and (2) the defendant knowingly and actively participated in the drug trafficking crime," id. at 1244 (internal quotation marks omitted), the instruction in the instant case required the jury to find beyond a reasonable doubt that the defendant had "the intention of causing **the crime charged** to be committed." The "crime charged" in Count Twenty-One was not only a crime of violence but also a crime of violence involving a gun.

While the district court's instruction did not explicitly state that the jury had to find that the defendant had "advance knowledge" or "foreknowledge" of a confederate's design to carry or use a gun, id. at 1249, this was implicit in the district court's instructions. As the Supreme Court noted in Rosemond, "What matters for purposes of gauging intent, and so what the jury instructions should convey, is that the defendant has chosen, with full knowledge, to participate in the illegal scheme . . . ." Id. at 1250. The court's instructions here satisfied that standard. A defendant cannot act "with the intention of causing the [Section 924(c) offense] to be committed" (OA 141), without knowing that the offense will be

committed with a gun. Furthermore, the court instructed the jury that, with respect to aiding and abetting liability, "[t]he Government must prove that the defendant knowingly and deliberately associated himself with the crime (here, § 924(c)) in some way as a participant, **someone who wanted the crime to be committed**, not as a mere spectator." (OA 141-42)(emphasis added). This language also satisfied Rosemond; it "convey[ed] . . . that the defendant has chosen, with full knowledge, to participate in the illegal scheme . . . ." 134 S. Ct. at 1250. Considered as a whole, the instructions did not mislead the jury regarding the correct legal standard or fail to inform the jury of the law. See United States v. Naiman, 211 F.3d 40, 51 (2d Cir. 2000) (when appellate court reviews jury instructions de novo, it will reverse a conviction only if all of the instructions, taken as a whole, caused the defendant prejudice); see also United States v. Park, 421 U.S. 658, 674 (1975) (jury instructions are adequate when they fairly advise jurors of the government's burden).

Ortega's claim that the district court's instructions "allowed the jury to convict [him] even if they found that he only gained the knowledge that a gun was brandished during the crime" (OBr. 17) is wrong. Given the district court's instructions, the jury could have convicted each defendant only if it found that the evidence proved beyond a reasonable doubt

that each defendant acted "with the intention of causing the [Section 924(c) offense] to be committed." (OA 141). The jury further had to find that each defendant "knowingly and deliberately associated himself with the crime [here, § 924(c)] in some way as a participant, **someone who wanted the crime to be committed**, not as a mere spectator." (Id. at 141-42)(emphasis added). Implicit in the district court's instructions was that the defendant had a "realistic opportunity to quit the crime," yet chose to go ahead.

Thus, the district court's instructions forced the jury to determine Ortega's intent as to the entire crime. If the evidence had shown that Ortega had first learned of the gun when it was displayed on the beach moments before Quijada was murdered (which, as discussed below, was not the case), based on the instructions, the jury would have had to consider whether, at that moment on the beach, Ortega acted "with the intention of causing the [Section 924(c) offense] to be committed" and as "someone who wanted the crime to be committed." (OA 141-42). As the Rosemond court noted, "[I]f a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge. In any criminal case, after all, the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a

crime's commission." 134 S. Ct. at 1250 n.9. Considered as a whole, there was no error -- much less plain error -- in the jury instructions regarding aiding and abetting liability for a Section 924(c) offense. See United States v. Thomas, 274 F.3d 655, 667 (2d Cir. 2001) (en banc) (explaining that an error is "plain" if "it is so egregious and obvious that a trial judge and prosecutor would be derelict in permitting it in a trial held today").

B.  Any Error Does Not Warrant Reversal

Moreover, even assuming, arguendo, that the district court erred and the error was plain, the defendants cannot meet their burden of showing that the error affected their "substantial rights." An error affects substantial rights if it was "prejudicial," meaning that it "affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734 (1993).

Because there was overwhelming evidence of the defendants' guilt on Count Twenty-One, they cannot satisfy their burden. Under Rosemond, the government would have had to show that the defendant's intent extended to the "full scope" of the crime, namely the "predicate crime plus gun use." Id. at 1248. If a defendant's affirmative act facilitates only the predicate crime (here, the murder of a fellow gang member), he nonetheless has the requisite intent if "he knows that one of his

confederates will carry a gun." Id. at 1249. The "defendant's knowledge of a firearm must be advance knowledge" sufficient to "enable[] him to make the relevant legal (and indeed, moral) choice." Id. That means he must have knowledge of the firearm "at a time [he] can do something with it — most notably, opt to walk away." Id. at 1249-50.

The evidence at trial established, beyond a reasonable doubt, that both defendants knew that the MS-13 members were carrying a gun on the night of Quijada's murder and intended to use the gun to kill Quijada. In fact, earlier that same night, a group of MS-13 members, including Ortega, took Quijada out to look for rival 18th Street gang members to kill. (T 1224-25, 1771-72). Unbeknownst to Quijada, this was his final opportunity to prove himself a worthy MS-13 gang member, that is, one who was willing to engage in acts of violence for the MS-13. (T 1222-26, 1761-63). If he did not pass the test, he would be killed. (Id.). Carlito testified that when the group returned to Amaya's apartment, without Quijada, "[Ortega] said that he had wanted to give [Quijada] the gun, but [Quijada] didn't want to pick it up." (T 1776). Martinez agreed that Quijada should be killed because he could not be trusted and might "snitch" on fellow gang members. (Id.).

The group, including Martinez and Ortega, decided they had to kill Quijada that night, so Marroquin called Quijada,

claiming they had spotted some rival gang members. (T 1227, 1776-77). A group of MS-13 members, including Martinez and Ortega, left in Michichi's truck to pick up Quijada to take him to the beach in Far Rockaway. (T 1239, 1777-78). Before they left, they spent ten to fifteen minutes in a parking lot near 22-30 Mott Avenue. (OA 109-10). Carlito testified that he believed "they were loading the gun." (Id. at 110). Later that night, after Quijada's murder, Amaya told Carlito that when the group arrived at the beach, Amaya took out the gun and tried to shoot Quijada but the gun jammed. (T 1239-40, 1785-86). Quijada started to run, and the group chased him. (T 1240-41, 1785-86). Amaya gave Martinez the gun, took the machete from Martinez and used it to stab Quijada numerous times, including in the back, stomach and eye. (T 1240, 1786-87).

On the beach, NYPD officers found Quijada's bloody body covered with stab wounds, the blade of a kitchen knife, a switchblade knife, a silver .22 caliber gun, and a machete. (T 1978-79, 1985, 2113, 2176, 2193, 2200; GX 405.2, 405.49, 405.51, 405.71, 406.7, 406.10, 417.6). On the back seat floor of Michichi's truck, officers found a blue nylon bag inside of which was a cell phone box containing dozens of bullets. (T 2125-31; GX 407.1-407.26, 414A, 414B).[9] Ballistics expert

---

[9] Calderon testified that the .22 caliber gun used to kill Moreno (the bouncer) was the same gun Quijada was supposed

Charles Hopkins testified that the casings found at the Argueta-Torres crime scene, the casing found at the Moreno crime scene and the test-fired casings were all fired from the silver .22 caliber gun that NYPD detectives recovered from the Quijada crime scene. (T 3043). Moreover, testimony from cooperating witnesses established that the silver .22 caliber gun belonged to Martinez's clique and was the gun Quijada was supposed to use that night to kill rival gang members during his "test" but that Quijada refused to touch. (T 1065, 1196, 1266).

The defendants' own statements to law enforcement agents made clear that they knew the MS-13 members present at the beach to kill Quijada had a gun with them and that the gun was to be used to kill Quijada. Martinez admitted that Amaya tried to shoot Quijada at the beach but that the gun did not work, so Martinez hit Quijada in the face or head with the machete at the beach and also kicked Quijada, causing Quijada to fall so that he could not get away. (T 2300-02; GX 404). Martinez further stated that Amaya and the other MS-13 members were stabbing Quijada. (T 2301-02). Ortega admitted that "Baby

---

to use the night he was killed and that, on both occasions, the gun was stored inside a cell phone box that was kept inside a blue backpack. (T 1217-19, 1265-68). Carlito testified that the night they killed Moreno, Carlito pulled a .22 caliber gun out of a backpack stored under the rear driver's side seat of Michichi's truck and the backpack also contained bullets. (T 1738-40).

Blue [Quijada] didn't want to put work in and the decision was
that he had to be 'done.' . . . We went to the beach . . . One
of the guys tried to fire the gun, but it didn't work . . . so
then, Payaso [Amaya] 'hit' him with the machete, into 'shreds.'"
(T 2423; GX 250B).

This evidence, as well as other evidence presented at
trial, overwhelmingly established that both defendants knew that
their confederates had a gun when they lured Quijada to the
beach to kill him. Thus, the evidence satisfied Rosemond. Cf.
United States v. Adams, --- F.3d ----, 2015 WL 3649602 (7th Cir.
June 12, 2015) ("[Defendant] admitted planning that one or more
of the conspirators would be armed. His intent thus 'reache[d]
beyond a simple drug [theft], to an armed one.' If this had been
a prosecution for aiding and abetting, there would not have been
a problem under Rosemond.") (quoting Rosemond, 134 S. Ct. at
1248). Certainly, a rational jury could have concluded that the
defendants knew that the MS-13 gang members had a gun with them
when they took Quijada to the beach and that both defendants
intended for Quijada to be killed with the gun. The evidence
reveals that the only reason Quijada was not shot to death was
because the gun jammed and the gang members had to resort to an
alternative: butchering Quijada with knives and a machete.
(T 1266, 1786). Given the various and diverse wounds on
Quijada's body (T 1486-88, 1498-1507; GX 408.8, 408.63, 408.67,

408.73, 409A) and the four weapons found at the crime scene
(T 1985, 2113, 2173, 2176, 2193, 2200; GX 405.2, 405.49, 405.51,
405.71, 406.7, 406.10, 417.6), the jury could further rationally
conclude that all of the gang members at the beach, including
Ortega and Martinez, took part in the gruesome stabbing.  The
defendants' continued participation in the murder of Quijada,
even after the gun jammed, further supports a finding that the
defendants' intent extended to the "full scope" of the crime,
namely the "predicate crime plus gun use."  See Rosemond, 134 S.
Ct. at 1248; see also id. at 1250 n.9 ("Of course, if a
defendant continues to participate in a crime after a gun was
displayed or used by a confederate, the jury can permissibly
infer from his failure to object or withdraw that he had such
knowledge."); United States v. Bentley, 571 Fed. App'x 760, 763
(11th Cir. 2014) (per curiam) (affirming conviction where
defendant, after observing his co-defendant brandishing a
firearm upon entering a store, proceeded to smash the glass
display cases with an axe and place jewelry from those cases
into a backpack).

Thus, because the evidence presented at trial easily
satisfied the Rosemond "foreknowledge" standard, the defendants
cannot show that the outcome of their trial would have been
different if the district judge had instructed the jury on the

Rosemond standard.[10]  Should this Court apply the modified plain

error standard, the government has met its burden of showing

that the alleged error did not affect the defendant's

substantial rights.  See United States v. Viola, 35 F.3d 37, 42

(2d Cir. 1990).

Last, the alleged error did not "seriously affect the

fairness, integrity or public reputation" of the defendants'

trial.  Olano, 507 U.S. at 736.  The Supreme Court has explained

that a court of appeals should exercise its discretion to

correct an error "in those circumstances in which a miscarriage

of justice would otherwise result."  United States v. Young, 470

U.S. 1, 15 (1985).  The Supreme Court has found that an error in

failing to instruct the jury on an element of the offense did

not justify correction under the fourth part of the plain error

test when the proof of the element was "overwhelming" and

"essentially uncontroverted" at trial.  See United States v.

Cotton, 535 U.S. 625, 635 (2002) (quoting Johnson, 520 U.S. at

---

[10]     For the same reasons, the defendants' claim that there
was insufficient evidence to support their convictions on Count
Twenty-One, because the government failed to prove that they
knew in advance that a gun would be used, fails. (OBr. 18-21
(Point II); MBr. 61 (joining in Ortega's arguments)).  Viewing
the evidence in the light most favorable to the government,
drawing all permissible inferences in the government's favor,
and deferring to the jury's assessment of witness credibility
and its assessment of the weight of the evidence, Newman, 773
F.3d at 451 (quotations omitted), the evidence overwhelmingly
supports the verdicts.

470); see also United States v. Joyner, 313 F.3d 40, 46 (2d Cir. 2002).

In the instant case, as detailed above, the government presented overwhelming evidence at trial that the defendants possessed the requisite advance knowledge that one of their confederates would carry a gun to kill Quijada. Rosemond, 134 S. Ct. at 1249. The evidence overwhelmingly established that Ortega, Martinez and the other MS-13 members took Quijada to the beach to kill him, that the group had carried the gun earlier in the evening when they gave Quijada a last chance to engage in an act of violence for the gang, that one of the gang members attempted to shoot Quijada with the gun at the beach, but it jammed, that after the gun jammed, all the MS-13 members at the beach participated in the stabbing murder of Quijada, that a gun was recovered by the NYPD at the Quijada crime scene, and that the gun belonged to Martinez's clique and had been used in the murders of Argueta and Moreno. The evidence overwhelmingly supported the government's theory. Thus, even if the district court erred in not instructing the jury on the Rosemond "foreknowledge" standard, the error did not "seriously affect the fairness, integrity or public reputation" of the defendants' trial. The defendants' convictions on Count Twenty-One should be affirmed.

74

<u>CONCLUSION</u>

For the reasons set forth above, the judgments should be affirmed in all respects.

Dated: Brooklyn, New York
July 8, 2015

Respectfully submitted,

KELLY T. CURRIE,
<u>Acting United States Attorney</u>,
<u>Eastern District of New York</u>.

By:   _____/s/_____
JOHN J. DURHAM
Assistant U.S. Attorney

PETER A. NORLING,
JOHN J. DURHAM,
CARRIE CAPWELL,
RAYMOND A. TIERNEY,
<u>Assistant United States Attorneys</u>,
    (<u>Of Counsel</u>).

<u>CERTIFICATE OF COMPLIANCE WITH RESPECT TO TYPE-VOLUME</u>
<u>LIMITATION,TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1.  This brief contains 16,429 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). Although this does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), an order of this Court dated June 26, 2015 permits our filing a brief of up to 18,000 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated:  Brooklyn, New York
        July 8, 2015

                        _____/s/_____
                        Assistant U.S. Attorney
                        Peter A. Norling

A P P E N D I X

TABLE OF CONTENTS

Page

Excerpts from Transcript of Proceedings,
 United States v. Martinez et al., 10-CR-74 (JFB):

 December 19, 2012....................................... GA   1

 February 4, 2013....................................... GA  22

 February 6, 2013....................................... GA  25

Instructions For Potential Jurors Special Panel,
 United States v. Martinez et al., 10-CR-74 (JFB),
 Dated January 28, 2013................................. GA  28

Superseding Indictment,
 United Stated v. Martinez et al., 10-CR-74 (JFB):

 July 15, 2010.......................................... GA  73

 March 3, 2011.......................................... GA  86

 October 13, 2011....................................... GA 104

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,       :      10 CR 0074

        v.                      :      U.S. Courthouse
                                       Central Islip, N.Y.
HERBERTO MARTINEZ               :
VIDAL ESPINAL and
CARLOS ORTEGA,                  :
                                       TRANSCRIPT OF PROCEEDINGS
        Defendants.            :
                                       December 19, 2012

-------------------------------X

BEFORE:

        HONORABLE JOSEPH F.  BIANCO, U.S.D.J.



APPEARANCES:

For the Government:    LORETTA E. LYNCH
                       United States Attorney
                       100 Federal Plaza
                       Central Islip, New York 11722
                       By:  JOHN DURHAM, ESQ.
                            RAYMOND TIERNEY, ESQ.
                            Assistants, U.S. Attorney


For the Defendants:    ELIZABETH MACEDONIO, ESQ.
                       For Martinez

                       JOHN CARMAN, ESQ.
                       For Espinal

                       MARYANN RANTALA, ESQ.
                       IRA LONDON, ESQ. (Via telephone)
                       For Ortega

Court Reporter:        HARRY RAPAPORT, C.S.R.
                       United States District Court
                       100 Federal Plaza
                       Central Islip, New York 11722
                       (631) 712-6105

```
                                                              2
 1
 2              THE CLERK:  Criminal cause, 10 CR 0074, United
 3   States against Herberto Martinez and Vidal Espinal and
 4   Docket number CR 12-293, United States against Carlos
 5   Ortega.
 6              (Interpreters present are J Carlos Venant and
 7   Dagoberto Orrantia).
 8              THE CLERK: State appearance for the record.
 9              MR. DURHAM:  John Durham and Raymond Tierney for
10   the United States.
11              Good afternoon.
12              MR. CARMAN:  John Carman for Mr. Espinal.
13              Good afternoon.
14              MS. MACEDONIO:  Good afternoon.
15              Elizabeth Macedonio, your Honor, for
16   Mr. Martinez.
17              MS. RANTALA:  Good afternoon, your Honor,
18   Maryann Rantala for Mr. Ortega.
19              MR. LONDON:  Ira B London on telephone.
20              THE COURT:  Are you able to hear all right?
21              MR. LONDON:  Perfectly, your Honor.
22              THE COURT:  I should note we have the Spanish
23   interpreter interpreting for the three defendants.  I ask
24   he be sworn and state his name for the record.
25              (Interpreters sworn.)
```

3

1      THE COURT:  As you know, we are here for a

2   status conference and for arguments with respect to the

3   pending motions.

4      I want to hear with respect to the pending

5   motions first.  Obviously there is a pending motion to

6   suppress before Judge Spatt, and I assume it is ongoing.

7      MR. DURHAM:  Yes, your Honor.

8      We actually completed the hearing this morning.

9   Ms. Macedonio wanted the opportunity to submit, and is

10  going to do so by Friday, and we will respond by

11  Wednesday, and we anticipate Judge Spatt will rule

12  quickly.

13      THE COURT:  Putting that aside, the three

14  motions before me, is, one, the government's motion to

15  join Mr. Ortega with Mr. Martinez and Mr. Espinal for

16  purposes of a trial.

17      The government's motion for an anonymous and

18  partially sequestered jury.  And there was a motion that

19  was filed, I guess in the first round of motions for

20  severance between Mr. Martinez and Mr. Espinal.  There

21  were Bruton issues, which are still pending.

22      And we can address those one by one and give

23  anyone a chance to add anything to the papers before the

24  Court rules on that.

25      With respect to the motion to join Mr. Ortega, I

4

1    did not see any written opposition to that. I assume

2    there is no written opposition from your clients,

3    Ms. Macedonio and Mr. Carman; is that correct?

4            MS. MACEDONIO: Yes, your Honor.

5            MR. CARMAN: Yes, your Honor.

6            THE COURT: That motion to join Mr. Ortega for

7    purposes of the trial is granted. I will just state again

8    that there is no opposition, but just so the record is

9    clear, the government laid out the standard under Rule 13,

10   as well as Rule 8(b), and it is clear to the Court that

11   based upon the commonality of proof, as well as charges,

12   one of the murders all three of the defendants are charged

13   in, and another one of the -- also the enterprise proof

14   would be obviously overlapping with respect to the

15   defendants. And Mr. Ortega could have been properly

16   joined to the superseding indictment, other than the fact

17   that the grand jury had expired.

18           So, for all the reasons set forth in the

19   government's brief, and with the consent of the

20   defendants, Mr. Ortega is joined for purposes of the

21   trial.

22           And I will move to the anonymous jury issue.

23           Anything the government wishes to add to the

24   papers?

25           MR. DURHAM: No, your Honor.

5

```
 1            If the Court has any questions we are prepared
 2   to respond.  But the issue is fully before the Court.
 3   There doesn't seem to be any material differences between
 4   the parties with respect to the law.  We agree on what the
 5   factors are.  We obviously come to different conclusions
 6   how those factors should be applied.  We do not have any
 7   extra argument we wish to make to the Court at this time.
 8            THE COURT:  Okay.
 9            Anything additional from defense counsel?
10            MS. MACEDONIO:  No, your Honor.
11            MR. CARMAN:  No, your Honor.
12            MR. LONDON:  No, your Honor.
13            THE COURT:  I will place the Court's ruling on
14   the record with respect to that.  And I may issue a
15   written opinion as well.  But I will place an oral ruling
16   on the record now.
17            I'm granting the government's motion for an
18   anonymous jury.  The partial sequestration -- is there a
19   problem with the ear phones?
20            THE INTERPRETER:  I'm sorry, your Honor.
21            (Whereupon, at this time there was a pause in
22   the proceedings.)
23            THE COURT:  The motion is granted for the
24   following reasons:
25            First, I rely in part on the prior opinion that
```

6

1    the Court issued with respect to the co-defendants in this
2    case in United States versus Prado, 2011 Westlaw 3472509
3    Eastern District of New York, August 5th of 2011.  In that
4    opinion the Court in detail describes both the standard
5    and the reasons for the granting of the anonymous jury,
6    the partial sequestration.
7            With respect to those issues, again, I think it
8    is very similar to the defendants in this case.  And I
9    will briefly state the reasons now.
10           With respect to the standard, as the government
11   notes, there is no disagreement with regard to the
12   standard.  A District Court may order the impaneling of an
13   anonymous jury upon the strong reason to believe that the
14   jury needs protection, and taking reasonable precautions
15   to minimize any prejudicial effects on the defendants, and
16   to insure that his fundamental rights are protected,
17   United States versus Stuart, page 124, Second Circuit,
18   2009.  Under that standard I believe an anonymous jury is
19   appropriate in this case, as the government in detail in
20   its motion lays out.
21           Here it is alleged that these defendants
22   committed extreme violent acts in connection with the
23   racketeering enterprise of MS-13, the government lists in
24   its papers numerous charges relating to alleged
25   interference with respect to the Court system, including

7

1   attacks on cooperating witnesses, including attacks in the

2   jail.  And it is clear that based upon the allegations in

3   the indictment with respect to the enterprise itself as

4   well as to specific instances of interference with the

5   judicial process, that this is a case that warrants both

6   an anonymous jury and partial sequestration.  I don't

7   believe that it is a close question in this case given the

8   nature of the charges against the defendants, as well as

9   the activities of the enterprise itself, including

10  obstruction of justice.

11         With respect to the arguments against having an

12  anonymous jury, the fact that these defendants are not

13  charged themselves with acts of obstruction of justice, I

14  don't believe is sufficient in and of itself to avoid the

15  use of the anonymous jury here.  They are charged with

16  participating in an enterprise that clearly has shown its

17  inclination and its ability to interfere with the judicial

18  process.  And for that reason, apart from any particular

19  allegation against these defendants in terms of being

20  personally involved in that activity, the jury needs to be

21  protected in this case.  Similarly notwithstanding the

22  fact that they are incarcerated, obviously, there are

23  members of the MS-13 gang who are at liberty, and could

24  engage in interference on behalf of the defendants or the

25  gang during the course of the trial.

8

1          With respect to the fact of media coverage, I

2   agree with the government, although there hasn't been as

3   much media coverage as there has been in other cases that

4   courts have granted anonymous juries.  And certainly there

5   has been, at least on Long Island, significant media

6   coverage with respect to this indictment as a whole.  And

7   the Court expects that such media coverage will continue

8   in connection with the trial.

9          So, for all those reasons, I believe that an

10  anonymous jury is warranted, and partial sequestration is

11  warranted as well with respect to what the law requires

12  with respect to that as outlined in Prado, and the Court

13  will follow the same procedures as set forth in that case

14  in order to minimize any attempt at prejudice.

15         The Court will give a neutral explanation for

16  precautionary measures to the jury, and will insure

17  through a detailed voir dire that there is no prejudice

18  resulting from the use of an anonymous jury and a

19  partially sequestered jury.

20         For the request of partial sequestration, like

21  in other cases where the marshals drive the jurors back

22  and forth to the courthouse, here the request by the

23  government is more minimal than that, which is simply to

24  allow the jurors to park in the employee lot and use the

25  employee entrance in going back and forth to court.  And I

9

1    don't think that will unnecessarily alarm them in any way.

2    And along with the Court's neutral explanation I don't

3    think there will be any prejudice to the defendants from

4    such a procedure; which is fairly modest and

5    understandable, apart from issues of security.

6              So, the Court will employ those precautions.

7    And I believe it is warranted under the law for the

8    reasons just stated.

9              Now, the last one is the motion to sever based

10   upon Bruton.

11             Do you want to speak to that, Ms. Macedonio?

12             MS. MACEDONIO:  No, your Honor.

13             Before we moved on, I wanted to ask questions

14   about the partial sequestration of the jury.

15             I understand they are coming in through the

16   employee entrance and they will be leaving that way.

17             Is there any particular path the Court decided

18   with respect to lunch and recess with respect to that?

19             THE COURT:  I don't think the government was

20   requesting that they eat lunch in the jury room or

21   anything like that.  I wasn't going to impose any

22   restrictions on their ability to eat lunch in the

23   building, or leave for lunch.  The government is not

24   making a request with regard to that, is it?

25             MR. DURHAM:  No, your Honor.

10

1          Different judges in the courthouse -- I know

2     Judge Seybert during an anonymous jury, she cordoned off a

3     portion of the cafeteria, not completely, but a section

4     where the jurors can eat lunch.

5          Judge Spatt had an MS-13 trial and he ordered

6     lunch for the jury in the jury room similar to that during

7     deliberations.  We have not made a further request for

8     that.  I think allowing them to eat lunch in the cafeteria

9     would be acceptable.

10          THE COURT:  Yes.

11          I think it depends on the case, obviously.  But

12     I wasn't planning on any such restrictions with respect to

13     this case.

14          MS. MACEDONIO:  As part of my objections to the

15     government's motion for an anonymous jury, I had suggested

16     that perhaps we use the jury questionnaire.  And I don't

17     know if your Honor had a chance to consider that now or is

18     that for after the motions?

19          THE COURT:  We can discuss it now.

20          It was not my inclination to utilize a jury

21     questionnaire in this case.  I think that obviously all

22     the questions that are specifically geared to their

23     knowledge based on publicity or otherwise of the MS-13

24     gang, or the charges, all have been covered.  But my

25     inclination was to cover it orally, and I think it can be

11

1    done efficiently in that manner.  And we can cover it that

2    way, all the same areas that a questionnaire could.

3              I'm not ruling on it at this point.  If you

4    wanted to submit a proposed questionnaire I'll take a look

5    at it.  But I would think that whatever questions you

6    would want to ask in a questionnaire, I don't think that

7    it couldn't be done orally.

8              MS. MACEDONIO:  I will do that, your Honor.

9              THE COURT:  All right.

10             Why don't we move to the Bruton issue.

11             Does the government want to add anything to its

12   papers on that?

13             MR. DURHAM:  No, your Honor, I don't believe so.

14             The issue was a little more complicated before

15   there was a third defendant in this group who made a

16   similar severance motion.  At this point I think it is

17   pretty straightforward.

18             Mr. Espinal made limited post-arrest statements,

19   and none of which implicate Mr. Martinez or Mr. Ortega, so

20   we submit there is not a Bruton issue there.

21             With respect to Mr. Martinez, he made several

22   statements.  He made oral as well as written admissions.

23   But with respect to the written statements that inculpate

24   his co-defendants, they were all in Spanish.  They will

25   have to be translated into English anyway.

12

1           So the government's proposal is we would

2    prepare, and Bruton-ize English typewritten statements

3    that can actually go in evidence at trial.  And even in

4    the absence of a Bruton issue we would have to put

5    translations into evidence rather than Spanish.  So I

6    think a Bruton-ized typewritten English translation,

7    accompanied with instructions from the Court would resolve

8    those problems.

9           We don't have those translations done yet.  We

10   are awaiting a ruling from the Court.  And we feel we can

11   prepare those in a week or so.

12           THE COURT:  Okay.

13           Anything further that defense counsel wishes to

14   add on the severance?

15           MR. CARMAN:  No thank you, your Honor.

16           MS. MACEDONIO:  No thank you, your Honor.

17           THE COURT:  The Court will place on the record

18   the ruling with respect to that.

19           The standard is quite settled.  There is no real

20   argument as to what the standard is under severance

21   motions based on Bruton against the United States,

22   391 Us 123, A 1968 case.  The Supreme Court in the

23   subsequent division of Richardson against Marsh (ph), 481

24   US 2, page 211, 1987, the Supreme Court made clear that

25   the confrontation clause is not violated by the admission

13

1   of a non-testifying defendant's confession with a proper

2   limiting instruction when the confession is redacted to

3   eliminate not only the defendant's name, but any reference

4   to his or her existence.  And the Second Circuit opined

5   that Richardson made it clear in many cases including

6   United States versus Tutino, 883 F.2d, 11 25, Second

7   Circuit 1989, that a redacted statement in which the names

8   of co-defendants are replaced by neutral pronouns with no

9   indication to the jury that the original statement

10  contained actual names, and when a statement standing

11  alone does not otherwise connect co-defendants to the

12  crimes may be admitted without violating a co-defendant's

13  Bruton rights.  Applying that standard the Court has to

14  make it clear that -- in determining whether or not the

15  redactions will satisfy that standard, first whether the

16  redacted statement provides the jury with any indication

17  that the original statement contained actual names; and,

18  second, whether the statement on its own points the

19  codefendant to the crimes.  And that is set forth in

20  United States versus Jass (ph), 569 F.3d 47, Second

21  Circuit 2009.

22          Applying that standard to this case, the Court

23  denies the motion to sever based upon Bruton.  I agree

24  with the government's analysis, first with respect to

25  Mr. Espinal, he made only an oral post-arrest statement

14

1    that does not implicate the other defendants on trial

2    here.  So that no redaction would be necessary with

3    respect to his statements, and, therefore, the Bruton

4    issue is not implicated with respect to his statements.

5            With respect to Mr. Martinez, and, again, I'm

6    assuming in the motion that Judge Spatt does not suppress

7    the statement; if he does the issue is moot.  But assuming

8    the motion is not granted I do not believe that it

9    warrants severance.

10           As Mr. Durham outlined in his brief, and as well

11   today, there is no question in my mind based upon the

12   nature of the statement, in this case that it can be

13   redacted to comply with Second Circuit and Supreme Court

14   case law, and the agent testifying about the oral

15   statement, is the one that makes reference to the criminal

16   statement.  And as Mr. Durham pointed out, the witness

17   statements, especially since they have to be translated

18   from Spanish into English, can remove any references to

19   the codefendant, and he can substitute pronouns to fully

20   comply with the law.

21           Obviously, I will review those once they are

22   submitted to make sure they don't create any issues under

23   the standard I have just set forth.

24           So, for those reasons the motion to sever is

25   denied as well.

15

1        Now, I will ask the government put in the

2   proposed redacted versions by the end of next week.

3        MR. DURHAM:  If we can have to the end of the

4   following week, your Honor?  I don't know if the Spanish

5   interpreters are working next week.

6        THE COURT:  January 4th?

7        MR. DURHAM:  Yes, your Honor.  Thank you.

8        And I would like to put on the record that

9   Mr. Ortega also made post-arrest statements, and it was

10  not addressed in the party's briefing.  They were

11  submitted before he was joined in the case.  He did make

12  oral and written admissions implicating the co-defendants,

13  and we will follow the same procedure.  We will instruct

14  the witnesses not to reference the statement by this

15  codefendant.  We will so instruct our witnesses.  And we

16  will prepare a typewritten English translation of the

17  written statements redacting references to the

18  co-defendants.

19        THE COURT:  Have those statements been provided

20  to other counsel in the case?

21        MR. DURHAM:  I thought we had, but they are

22  shaking their heads no.  I will send copies today.

23        THE COURT:  Okay.

24        Obviously, if you feel that that statement

25  raises additional issues, especially once you see the

16

 1   government's proposed redaction, you can write me a letter

 2   to address that particular statement.

 3              Why don't we move now to the issue of the date

 4   of the trial?

 5              I think Ms. Macedonio and Mr. Carman, you know

 6   from speaking to the government that we wanted to move the

 7   trial date to jury selection on January 28th to start, and

 8   start the trial on February 4th to insure that counsel for

 9   Mr. Ortega, Mr. London, who is coming into the case, to

10   make sure that there is additional time to prepare for the

11   trial, and to make additional motions they wanted to make.

12              But I wanted to make sure that the week

13   postponement of the trial is acceptable to both you and

14   your clients.

15              Mr. Carman.

16              MR. CARMAN:  Yes, your Honor.

17              THE COURT:  Ms. Macedonio?

18              MS. MACEDONIO:  Yes, your Honor.

19              It is acceptable to me.  And after discussing it

20   with Mr. Martinez, it is acceptable to him as well.

21              THE COURT:  Okay.

22              And I have the waiver before me for speedy

23   trial.  Obviously, Ms. Rantala, it is acceptable to you as

24   well?

25              MS. RANTALA:  Yes.

17

1      MR. LONDON:  How long do you think the jury

2  selection will take?

3      THE COURT:  I think it will be done in two or

4  three days, and we can begin the trial the following

5  Monday.

6      I don't know if anyone has a different view on

7  that.

8      MR. DURHAM:  I think we can hopefully get this

9  done by Wednesday, the jury selection.  And we hope to get

10  the opening statements on February 4th.

11      THE COURT:  The government is estimating four to

12  six weeks for trial?

13      MR. DURHAM:  Yes, your Honor.

14      THE COURT:  We will be sitting, of course,

15  Monday through Thursday, and not on Fridays.

16      All right.

17      Mr. London?

18      MR. LONDON:  Yes.

19      THE COURT:  Let me confirm with the defendants.

20      You heard the lawyers agreeing to adjourn the

21  start of the case from January 4th, to jury selection on

22  January 28th, to allow additional time for preparation of

23  the case.  By signing this waiver you are agreeing to

24  exclude the time on the speedy trial clock to January 28th

25  to allow additional preparation.

18

1          Acceptable to you, Mr. Martinez?

2          THE DEFENDANT MARTINEZ:  Yes.

3          THE COURT:  Mr. Espinal.

4          THE DEFENDANT ESPINAL:  Yes.

5          THE COURT:  Mr. Ortega?

6          THE DEFENDANT ORTEGA:  Yes.

7          THE COURT:  We are adjourning the start of the

8    trial for jury selection on January 28th.

9          I exclude the time under the Speedy Trial Act in

10   the interests of justice.  It was already excluded to

11   January 14th.  I now exclude it to January 28th to allow

12   defense counsel additional time to prepare the case for

13   trial.

14         I find the ends of justice are served by

15   granting the continuance.  And I'm so ordering the waiver.

16         MR. LONDON:  Your Honor, there is a status

17   conference on this case on January 17th; is that correct?

18         MR. DURHAM:  That is the date we set for the

19   suppression hearing with respect to Mr. Ortega's

20   statements.

21         MR. LONDON:  All right.

22         THE COURT:  You are available to do it on that

23   day?

24         MR. LONDON:  I am.

25         MR. DURHAM:  While we are on that subject, your

19

1  Honor, we had set the date for the suppression hearing
2  anticipating defense counsel will be filing a motion and
3  an affidavit from the client setting forth the issues to
4  be addressed.  I just ask from Ms. Rantala to have that
5  done.

6         THE COURT:  Did we set a date for that?
7         MR. DURHAM:  We initially had a motion schedule,
8  and I thought she wanted two additional weeks, which are
9  now past.  I don't object to it, but I would like it
10  sufficiently in advance of the hearing to have a chance to
11  respond in writing to any legal issues as well.

12         THE COURT:  Ms. Rantala and Mr. London, can you
13  put that in by January 4th?

14         MS. RANTALA:  That should be fine, your Honor.

15         MR. LONDON:  Yes, your Honor.

16         THE COURT:  If the government wishes to respond
17  in advance of the hearing, I would say by the 14th.

18         MR. DURHAM:  Yes, your Honor.  Thank you.

19         THE COURT:  Any other logistical or substantive
20  issues you wish to address today?

21         MS. RANTALA:  Logistical issues as far as the
22  timing of the trial during the day.  What are you
23  anticipating?

24         THE COURT:  9:30 to 4:30.  We usually take lunch
25  around 12:45 to 2:00 o'clock.

20

1        MS. RANTALA:  Thank you.

2        MR. DURHAM:  I don't know if other defense

3   counsel have anything, but we were talking about dates in

4   terms of scheduling.

5        The government will provide the initial 3500 and

6   exhibits by January 11th, 2013.  The government will

7   submit the voir dire requests, and if defense counsel have

8   voir dire requests by January 18th, 2013.

9        On that date the government will also submit a

10  redacted trial indictment, which will remove obviously

11  other defendants and other charges not applicable to this

12  trial.

13       We will also add Mr. Ortega to the counts where

14  he is joined in the charges with the codefendants.

15       The government will submit requests to charge by

16  January 25th, 2013.  And defendant's opposition or

17  additional requests will be due February 8th, 2013.

18       THE COURT:  Is that acceptable to everybody?

19       MS. MACEDONIO:  Thank you, Judge, yes.

20       MR. LONDON:  It is.

21       MR. CARMAN:  Yes, your Honor.

22       THE COURT:  I adopt that schedule in its

23  entirety.

24       Any other issues?

25       MR. DURHAM:  No, your Honor.  Thank you.

21

1          MS. MACEDONIO:  Not for Mr. Martinez.  Thank

2     you, Judge.  Have a nice holiday.

3          THE COURT:  You, too.

4          MS. RANTALA:  Nothing for Mr. Ortega.

5          THE COURT:  Thank you, everybody.  Have a good

6     holiday.

7

8

9          (End of proceedings.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 1

```
 1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
 2
   --------------------------------X
 3  UNITED STATES OF AMERICA,
                          : 10-CR-74
 4                          (JFB)
     -against-             : United States Courthouse
 5                          Central Islip, New York
    HERIBERTO MARTINEZ,
 6  CARLOS ORTEGA,
                          : February 4, 2013
 7       Defendants.       : 9:30 a.m.
   --------------------------------X
 8
    BEFORE:
 9       HONORABLE JOSEPH F. BIANCO
         UNITED STATES DISTRICT COURT JUDGE
10
11
    APPEARANCES:
12
    For the Government:   LORETTA E. LYNCH
13                        UNITED STATES ATTORNEY
                          BY: JOHN J. DURHAM, AUSA
14                        CARRIE N. CAPWELL, AUSA
                          RAYMOND A. TIERNEY, AUSA
15                        610 Federal Plaza
                          Central Islip, New York 11722-4454
16
17  For Defendant:        ELIZABETH E. MACEDONIO, ESQ.
    Martinez              ARNOLD J. LEVINE, ESQ.
18
19  For Defendant:        IRA D. LONDON, ESQ.
    Ortega                MARIANNE S. RANTALA, ESQ.
20
21  Court Reporter:       STEPHANIE PICOZZI
                          OWEN WICKER
22                        United States District Court
                          100 Federal Plaza
23                        Central Islip, New York 11722
                          (631) 712-6104
24
25  Proceedings recorded by computerized stenography.
       Transcript produced by CAT.
```

Page 2

```
 1   1        THE COURT:  United States v. Heriberto Martinez.
 2   2    Counsel, please state your appearances.
 3   3        MR. DURHAM:  John Durham.  With me at counsel
 4   4    table, Assistant United States Attorneys Raymond Tierney
 5   5    and Carrie Capwell.
 6   6        MS. MACEDONIO:  Elizabeth Macedonio and Arnold
 7   7    Levine for Mr. Martinez.
 8   8        MS. RANTALA:  Marianne Rantala and Ira London
 9   9    for Mr. Ortega.
10  10        THE COURT:  We have the interpreters here
11  11    interpreting for both defendants.  I'm going to ask first
12  12    our interpreter on staff here identify herself for the
13  13    record.
14  14        INTERPRETER GRAY:  Maya Gray, certified Spanish
15  15    Federal Court interpreter.
16  16        THE COURT:  Good morning.
17  17        (Interpreters sworn.)
18  18        THE COURT:  Your name?
19  19        INTERPRETER HONTORIO:  James Hontorio; I do so
20  20    affirm.
21  21        INTERPRETER VENANT:  J. Carlos Venant.
22  22        THE COURT:  As you know, we are here to continue
23  23    the jury selection process.  So the record is clear,
24  24    jurors came in last week, it ended up being on several
25  25    days because we were not able to have them all come in on
```

Page 3

```
 1   1    Monday.  They filled out the questionnaires.  The
 2   2    questionnaires were copied, provided to counsel and they
 3   3    submitted letters to the Court indicating which jurors
 4   4    they agreed should be removed.  So based upon that letter,
 5   5    the jurors who both sides agreed should be removed based
 6   6    upon the questionnaires were told not to come in today so
 7   7    they are not here today.  Everyone else is here.
 8   8        The ones there was disagreement on are here as
 9   9    well as all the other jurors who filled out the
10  10    questionnaires.
11  11        I am told that we have ten jurors missing.  We
12  12    have right now 102 downstairs waiting to be called up.
13  13    But I wanted to discuss the logistics of the selection
14  14    process so everyone is on the same page.
15  15        I did provide you with the script that I intend
16  16    to use today.  I'm willing to hear any discussions on any
17  17    other questions or any other things you want me to cover.
18  18        As you can see, I basically remind them of the
19  19    length of the trial, explain to them what we are going to
20  20    be doing.  I will then introduce everybody, ask them if
21  21    they recognize anybody.
22  22        I thought it would be helpful even though I give
23  23    a summary of the case, I will read it as it appears in the
24  24    questionnaire.  Then at that point we will put 40 people
25  25    in these chairs here starting in the front with seat
```

Page 4

```
 1   1    number 1, which is the chair in front of the jury box,
 2   2    going left to right.  The reason we have 40 is based upon
 3   3    having six alternates and assuming all the peremptories
 4   4    are utilized, that would be the number we would need to
 5   5    have enough to have 12 jurors and six alternates.
 6   6        The Court intends once we seat the 40, I think
 7   7    rather than go through all the questionnaires there is
 8   8    disagreement on, I think we should wait until we see if
 9   9    they are seated.  If we get to a person who is on this
10  10    list, I will ask the lawyers to come up to sidebar and I
11  11    will hear the objection.
12  12        I did go through many of them.  Based upon some
13  13    of the answers to the questions, I know what the
14  14    objections are but I think it will be more efficient to
15  15    wait.  If it's not a juror one side has a disagreement
16  16    over, I intend to ask them three questions, is there
17  17    anything they want to bring to my attention regarding
18  18    their ability to serve as a fair and impartial juror in
19  19    this case, just in case they have thought about something
20  20    since last week or there is something not asked on the
21  21    questionnaire they are concerned about.  I will ask them
22  22    again just about the nature of the charges or anything
23  23    else that would affect their ability to be a fair and
24  24    impartial juror in this case.
25  25        Then there is the bottom line question which is
```

Page 5

1  question 3 on page 6, if you are selected as juror in this
2  case, will you be able to keep an open mind until all the
3  evidence and arguments have been presented and decide the
4  case fairly and impartially based only on the evidence
5  presented at trial and the law as I explain it to you.
6  Once they answer those three questions, I will then ask
7  the lawyers if they have any follow-up.
8      I want the follow-up to be filtered through me
9  rather than have the lawyers stand up and question the
10  jurors. I think it's a better process if they are
11  filtered through me.
12      At that point we will approach sidebar quickly.
13  If they fail to fill something out, left the question
14  blank, you want them to answer it or if there is some
15  other follow-up you want, you can let me quickly know at
16  sidebar, I will do that and then we will move to the next
17  juror. And, obviously, you can reserve your challenges
18  for cause to the end rather than have another sidebar and
19  make a challenge for cause. I think it's better to get
20  through all 40, then I will hear challenges for cause
21  other than the ones we will talk about before I question
22  them based upon your objection already. But for everyone
23  else we will wait until everyone is done. I will hear the
24  challenges for cause, then do the peremptory challenges.
25      If all the peremptory challenges are not used,

Page 6

1  then the highest number jurors drop off. If one
2  peremptory challenge is not used, then juror number 40
3  drops out of the equation.
4      Any questions about the logistics?
5      MR. LONDON: Just one, Judge. I have a joint
6  request for additional peremptories. Do you want that now
7  or can it wait?
8      THE COURT: Can you discuss this with the
9  government?
10      MS. MACEDONIO: We have not.
11      THE COURT: Discuss it with them first and see
12  if there can be agreement on that, then I will hear that
13  issue.
14      In terms of your clients' right to be present
15  for questioning of jurors, I don't know if you discussed
16  that. Want to take a moment with them? They have the
17  right to be present during all parts of the jury selection
18  including if they wanted to at sidebars. For security
19  reasons, if they do want to be present at sidebars, we
20  will have to have a procedure so the Marshals can deal
21  with that.
22      First I want to see if they want to be present
23  at sidebar. If you haven't discussed it, discuss it with
24  them and let me know.
25      MR. LONDON: Mr. Ortega waves.

Page 7

1      MS. MACEDONIO: Mr. Martinez waves his presence
2  at the sidebar at jury selection and during the course of
3  the trial.
4      THE COURT: Mr. London, did you discuss it?
5      MR. LONDON: Want us to do that now?
6      THE COURT: Yes.
7      (Pause.)
8      MR. LONDON: He waves during the trial as well,
9  Judge.
10      THE COURT: Mr. Martinez and Mr. Ortega, as you
11  heard, you have the right, constitutional right, to be
12  present at all sidebar conferences with jurors and/or with
13  respect to the lawyers, that's during jury selection and
14  during the course of the trial. Your lawyers indicated to
15  me that you are waiving or giving up your right to be
16  physically present at the sidebars. I want to make sure
17  that is your decision.
18      Mr. Martinez?
19      DEFENDANT MARTINEZ: Yes.
20      THE COURT: Mr. Ortega, is that your decision?
21      DEFENDANT ORTEGA: Yes.
22      THE COURT: If at any point you change your mind
23  on that, you can let me know. If at some point during
24  jury selection or the trial you decide you wish to be
25  present at the sidebar, if you let me know, as I said, I

Page 8

1  will arrange for that to occur.
2      You understand that?
3      DEFENDANT MARTINEZ: Yes.
4      DEFENDANT ORTEGA: Yes.
5      MS. MACEDONIO: Your Honor, I have had the
6  opportunity to discuss the additional peremptory challenge
7  with Mr. Durham and defense proposes we will get two
8  additional peremptories and the government will get one.
9      THE COURT: Is that acceptable to you, Mr.
10  London, as well?
11      MR. LONDON: Yes.
12      THE COURT: That's acceptable to the government?
13      MR. DURHAM: Yes.
14      THE COURT: I will approve the additional
15  peremptory challenges. So the defense will have a total
16  of 12, the government will have seven.
17      So the law on this under Rule 24B, there is no
18  provision for giving the government additional peremptory
19  challenges, only refers to the defense. In a case called
20  United States v. Bruno, the Second Circuit indicated that
21  a Court can condition granting the additional challenges
22  to the defense on agreement that the government receive
23  some additional challenge or challenges as well but that's
24  why I asked if they had discussed it, to see if there was
25  any agreement on that. And given they have reached an

Page 9

1  1    agreement on that, it's reasonable and I will adopt it.
2  2         Are there any other logistical or substantive
3  3    issues you want to raise before I bring the panel up?
4  4         MR. DURHAM: In light of the fact we have
5  5    additional peremptory challenges, will you be seating 43?
6  6         THE COURT: Yes. We will get some more chairs
7  7    over there.
8  8         We do have another panel coming in this
9  9    afternoon to fill out the questionnaire in case we don't
10 10   have enough jurors. My hope is we will have enough even
11 11   with the ones there is disagreement on. I think we have
12 12   plenty of jurors.
13 13        Are there any other issues before we bring the
14 14   panel up?
15 15        MR. DURHAM: Not from the government.
16 16        MS. MACEDONIO: No, thank you, Judge.
17 17        MS. RANTALA: Nothing we can think of at the
18 18   moment.
19 19        THE COURT: On the issue and the fact they are
20 20   anonymous, as you saw in the questionnaire, there was an
21 21   instruction that explains that to them. I was going to
22 22   leave that alone. If as part of my intro to them you want
23 23   me to say something more, a warning instruction, I'm happy
24 24   to do that. Again, I thought it made sense not to
25 25   highlight that this morning.

Page 10

1  1         Does anyone want to take a break? We will go to
2  2    about -- take five or ten minutes to get them up here,
3  3    probably go to 11:45, take a ten-minute break or so and go
4  4    to 1:00 and break for lunch at 1:00.
5  5         If you need a quick break, you can take it.
6  6         (At this time, a recess was taken.)
7  7         THE COURT: One thing I wanted to place on the
8  8    record. At some point this morning the door was unlocked.
9  9    When everybody came in, at some point that door became
10 10   locked this morning. There was nobody out there to come
11 11   in. I don't think there is any issue with the public
12 12   access.
13 13        So the record is clear we are using the
14 14   ceremonial courtroom here because of the size of the jury
15 15   panel and at some point the door became locked. I have
16 16   been told by the CSO he assures me it is unlocked now. We
17 17   were obviously dealing with logistical issues this
18 18   morning. There is a transcript of the proceeding so I
19 19   don't think anything further needs to be done on that.
20 20        I will hear from anybody if they disagree.
21 21        MS. MACEDONIO: No, thank you, Judge.
22 22        THE COURT: Mr. London?
23 23        MR. LONDON: No, Judge.
24 24        THE COURT: The government?
25 25        MR. DURHAM: No, your Honor. Thank you.

Page 11

1  1         THE COURT: Let's bring the panel up.
2  2         (The prospective jury enters the courtroom.)
3  3         THE COURT: Everyone can be seated.
4  4         We will call the case United States v. Heriberto
5  5    Martinez and Carlos Ortega.
6  6         Is the government ready?
7  7         MR. DURHAM: Yes.
8  8         THE COURT: Defense ready?
9  9         MS. MACEDONIO: Yes.
10 10        MS. RANTALA: Yes.
11 11        THE COURT: I want to welcome you all to the
12 12   United States District Court for the Eastern District of
13 13   New York. I'm Joseph Bianco and I will be presiding over
14 14   the trial in this case.
15 15        As you know from filling out the questionnaires
16 16   last week, we are here this morning to select a jury in a
17 17   criminal case. The first order of business is for you to
18 18   take the oath as potential jurors so I will ask that all
19 19   of you please stand.
20 20        (Prospective jury sworn.)
21 21        THE COURT: Be seated.
22 22        We are about to begin the actual process of
23 23   selecting the jurors who will hear and decide this case.
24 24   The trial will begin on February 11, 2013, next Monday,
25 25   and is anticipated to take approximately six weeks. The

Page 12

1  1    trial will be taking place Monday through Thursday except
2  2    for holidays and it will take place 9:30 to 4:30 each day.
3  3    To be safe, we are requesting that jurors on this case be
4  4    available to the end of March 2013.
5  5         First, I want to thank you for being here today.
6  6    Your presence reflects your commitment to your civil
7  7    responsibilities. I recognize some of you are
8  8    significantly inconvenienced by your service. Jury
9  9    service, however, as you know, is one of the highest and
10 10   most important duties of citizenship. Our system of
11 11   justice depends on you.
12 12        I, like all my fellow judges, am grateful to you
13 13   for your service. I also want to thank you for your
14 14   patience last week in filling out the questionnaires to
15 15   assist in the jury selection process.
16 16        The purpose of this procedure is to select a
17 17   panel of 12 fair and impartial jurors and six fair and
18 18   impartial alternate jurors to try this case. So this
19 19   morning, I will be asking you some additional questions
20 20   including possibly follow-up questions based upon your
21 21   responses to the questionnaire. I apologize in advance
22 22   for asking you personal questions which I must for the
23 23   purpose of selecting a fair and impartial jury panel.
24 24        My questions and your responses to my questions
25 25   enable me to determine if any prospective juror should be

Page 230

```
 1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
 2
 -----------------------------------X
 3   UNITED STATES OF AMERICA,
                              :   10-CR-74
 4       -against-                (JFB)
                              :   United States Courthouse
 5                                Central Islip, New York
     HERIBERTO MARTINEZ,      :
 6   CARLOS ORTEGA,
                              :   February 6, 2013
 7       Defendants.              9:30 a.m.
 -----------------------------------X
 8
     BEFORE:
 9       HONORABLE JOSEPH F. BIANCO
         UNITED STATES DISTRICT COURT JUDGE
10
11
     APPEARANCES:
12
     For the Government:   LORETTA E. LYNCH
13                         UNITED STATES ATTORNEY
                           BY:  JOHN J. DURHAM, AUSA
14                         CARRIE N. CAPWELL, AUSA
                           RAYMOND A. TIERNEY, AUSA
15                         610 Federal Plaza
                           Central Islip, New York 11722-4454
16
17   For Defendant:        ELIZABETH E. MACEDONIO, ESQ.
     Martinez              ARNOLD J. LEVINE, ESQ.
18
19   For Defendant:        IRA D. LONDON, ESQ.
     Ortega                MARIANNE S. RANTALA, ESQ.
20
21   Court Reporter:       STEPHANIE PICOZZI
                           OWEN WICKER
22                         United States District Court
                           100 Federal Plaza
23                         Central Islip, New York 11722
                           (631) 712-6104
24
25   Proceedings recorded by computerized stenography.
     Transcript produced by CAT.
26   Stephanie Picozzi, OCR, RPR
```

Page 231

```
 1        THE COURT:  Calling case 10-CR-74, United States
 2   v. Martinez and Ortega.
 3        MR. DURHAM:  John Durham, Raymond Tierney and
 4   Carrie Capwell for the government.
 5        MS. MACEDONIO:  Elizabeth Macedonio and Arnold
 6   Levine for Mr. Martinez.
 7        MS. RANTALA:  Marianne Rantala and Ira London on
 8   behalf of Mr. Ortega.
 9        THE COURT:  Defendants are present.
10        A couple of things from yesterday before we talk
11   about today.  The first is I did go back, as I said I
12   would, to juror number 211.  Based on the objection made
13   by Mr. London and I reviewed his questionnaire again and
14   I'm going to keep him as a juror.  With respect to the
15   fact he is a retired police officer, on questions 73A and
16   B, he indicated he would be able to evaluate law
17   enforcement fairly and impartially.  For B he indicated he
18   would be able to follow my instruction that he is not to
19   give more or less credence.
20        As both sides know I pressed him orally at
21   sidebar on that issue and notwithstanding Mr. London's
22   observing a blink, it was my view observing his demeanor
23   that he was confident he could do that.  I believe again
24   based on his demeanor he was sincere and there is no basis
25   to strike him.
```

Stephanie Picozzi, OCR, RPR

Page 232

```
 1        With respect to other people with a law
 2   enforcement background, if I had a concern, I did excuse
 3   them but for him I was confident that he could fairly and
 4   impartially evaluate the evidence in the case.  He will
 5   remain.
 6        There was one other thing.  It's come to my
 7   attention that Mr. Venant during the sidebars there was
 8   some socializing with the defendants, during the sidebar.
 9   Let me preface this and say you have been coming to my
10   court and have always conducted yourself very
11   professionally.  I want that to be stated up front.  So as
12   not to distract people, I ask we not have that
13   socializing.
14        I think that's all I had.
15        MR. DURHAM:  I feel like I need to make somewhat
16   of a record on that.
17        My understanding is that the conversation that
18   occurred went beyond socializing.  I'm not privy to all
19   the details.  There is an investigation being conducted by
20   other members of my office regarding the conversations
21   that were taking place.
22        It's my understanding there were specific
23   discussions about witnesses in this case and possible
24   motivations for testifying and cooperating with the
25   government.  I too have worked with Mr. Venant for many
26
```

Stephanie Picozzi, OCR, RPR

Page 233

```
 1   years.  He is a skilled interpreter, always conducted
 2   himself professionally.  However, given the conversations
 3   that are alleged to have occurred here, we would ask that
 4   Mr. Venant be removed, that the Court use another
 5   interpreter for the remainder of this trial.
 6        THE COURT:  No, I'm not going to do that.  I'm
 7   not aware of any of those types of -- the Marshals brought
 8   to my attention the conversations he was discussing things
 9   with the defendants but I don't believe there is any
10   evidence to suggest that he has done anything improper.
11        Obviously, I know from signing the vouchers
12   defense lawyers use him to go to the jails, therefore, he
13   is familiar with the defendants for many, many years for
14   meetings.  So my concern at this point is simply that as
15   an interpreter, he shouldn't be socializing with the
16   defendants.
17        Obviously, if the government has any evidence
18   that there is anything more to it than that, the Marshals
19   or whoever has that evidence can bring it to my attention.
20   I haven't seen any evidence to suggest he has done
21   anything improper so I don't believe there is any basis
22   for removal.  It's a very drastic thing to do for his
23   livelihood to say the least as an interpreter.
24        I understand there are additional jurors that
25   are agreed upon should be excused today downstairs.  Is
26
```

Stephanie Picozzi, OCR, RPR

Page 350

1 1 that juror communicates it to fellow jurors, more than one
2 2 of you may be affected.
3 3    Third. Please do not, while you are serving as
4 4 jurors in this case, have any conversations with the
5 5 parties, the attorneys or any witness in this case,
6 6 whether in the courtroom, in the hallways, in the
7 7 elevator, cafeteria, outside or anywhere else. By this I
8 8 mean not only to avoid talking about the case. Do not
9 9 talk at all, even to say good morning or to acknowledge
10 10 them in any way, even with a head nod.
11 11    The reason for that is obvious. Someone seeing
12 12 a juror in conversation with a party, lawyer or witness
13 13 might think that something improper was being discussed.
14 14 To avoid even the appearance of impropriety then, have no
15 15 conversation or communications of any type.
16 16    The lawyers, as officers of the Court, are
17 17 particularly sensitive to this. So I can tell you that
18 18 when the lawyers pass you in the halls without even
19 19 acknowledging your presence, they do not mean to be rude.
20 20 They are simply following my instruction.
21 21    Fourth. Do not read or listen to anything
22 22 touching on this case in any way. I anticipate there will
23 23 be press coverage on this case. Should you see an article
24 24 in a newspaper or on the internet, you should not read it
25 25 at all.
26

Owen Wicker, RPR

Page 352

1 1 their articles and reports.
2 2    I wish to emphasize that I'm taking these
3 3 measures to protect your rights of privacy and to assist
4 4 you in discharging your responsibility as jurors fairly
5 5 and impartially.
6 6    Fifth. Do not try to do any research or make
7 7 any investigation about the case on your own. Do not go
8 8 to any place that may pertain to the case. You should not
9 9 Google anything relating to this case. Do no
10 10 investigation whatsoever of any type.
11 11    You should not call a lawyer friend and say,
12 12 hey, Judge Bianco made this ruling. Why did he do that?
13 13 What's the law on that? That's outside research.
14 14    Your decision as jurors is only allowed to be
15 15 based on the evidence in this courtroom and nothing else.
16 16 So do not do any type of investigation or research on your
17 17 own.
18 18    Finally, do not form any opinion until all the
19 19 evidence is in. Keep an open mind until you start your
20 20 deliberations at the end of the case.
21 21    Sometimes jurors ask if they can take notes. If
22 22 you wish, the answer is yes. So on Monday morning in the
23 23 jury room, we'll leave note pads and pens for each of you
24 24 if you wish to use them. I express no view on that. It's
25 25 a personal decision as jurors whether you like to take
26

Owen Wicker, RPR

Page 351

1 1    Should you hear something on TV or the radio,
2 2 you should immediately turn it off.
3 3    Also, to avoid you inadvertently seeing
4 4 something about the case, I am going to ask you that you
5 5 not read Newsday or watch News 12 during the trial because
6 6 I do anticipate that, at a minimum, there will be articles
7 7 about the trial in Newsday or something on Channel 12. So
8 8 please do no read Newsday or watch Channel 12.
9 9    If you inadvertently stumble upon some media
10 10 coverage or other information, please report it to the
11 11 Court. Do not report it to the other jurors.
12 12    As you know from the questionnaire, because this
13 13 case is likely to attract attention in the media among the
14 14 public, the Court is following the practice used in other
15 15 cases in federal courts of keeping the identities of the
16 16 jurors confidential. Anonymity will assure that the jury
17 17 will not be exposed to such prying and to opinions,
18 18 commentaries and inquiries which might impair its ability
19 19 to decide the case solely upon the evidence presented in
20 20 the court and upon the law as I instruct you.
21 21    For the same reason, if you drive to the
22 22 courthouse, you will be permitted to park in the employee
23 23 parking lot in the back of the courthouse. It is
24 24 important to ensure that the jury will in no way be
25 25 influenced by the public, by the members of the media and
26

Owen Wicker, RPR

Page 353

1 1 notes or not.
2 2    But if you do take notes, you should leave them
3 3 in the jury room and -- leave them at night in the jury
4 4 room. Do not take them home with you.
5 5    You should also remember that the notes are for
6 6 your own personal use. Also, the notes are simply to help
7 7 your memory.
8 8    I do not want you to place too much emphasis on
9 9 jurors' notes. As you know, a person's notes could be
10 10 wrong.
11 11    At the conclusion of the case when you
12 12 deliberate, notes which any juror may take may not be
13 13 given any greater weight or influence in the determination
14 14 of the case than the recollection or impression of other
15 15 jurors, whether from notes or memory, with respect to
16 16 evidence presented or what conclusions, if any, should be
17 17 drawn from such evidence.
18 18    When you deliberate at the end of the case, any
19 19 difference between a juror's recollection and another
20 20 juror's notes should be settled by having to ask the court
21 21 reporter read back the transcript of the testimony. Every
22 22 word said in the court gets recorded, and it's the court's
23 23 records rather than any juror's notes on which you are to
24 24 base your determination of the facts and your verdict.
25 25    Now, first, we'll start on Monday. The
26

Owen Wicker, RPR

Page 254

```
 1   1         THE COURT:  If you are selected as a juror in
 2   2   this case, will you be able to keep an open mind until all
 3   3   of the evidence and arguments have been presented and then
 4   4   decide the case fairly and impartially based only on the
 5   5   evidence presented at trial and the law as I explain it to
 6   6   you?
 7   7         PROSPECTIVE JUROR:  Yes.
 8   8         THE COURT:  Thank you.
 9   9         Seat 41, juror 357, anything you want to bring
10  10   to my attention regarding your ability to serve as a fair
11  11   and im -- wait.
12  12         Seat 40, juror 323, anything you want to bring
13  13   to my attention regarding your ability to serve as a fair
14  14   and impartial juror in this case?
15  15         PROSPECTIVE JUROR:  No.
16  16         THE COURT:  Anything about the nature of the
17  17   charges or anything else about the case that would affect
18  18   your ability to be a fair and impartial juror in this
19  19   case?
20  20         PROSPECTIVE JUROR:  No.
21  21         THE COURT:  If you are selected as a juror in
22  22   this case, will you be able to keep an open mind until all
23  23   of the evidence and arguments have been presented and then
24  24   decide the case fairly and impartially based only on the
25  25   evidence presented at trial and the law as I explain it to
26
```

Stephanie Picozzi, OCR, RPR

Page 255

```
 1   1   you?
 2   2         PROSPECTIVE JUROR:  Yes.
 3   3         THE COURT:  Thank you.
 4   4         Seat 41, juror 357, is there anything you want
 5   5   to bring to my attention regarding your ability to serve
 6   6   as a fair and impartial juror in this case?
 7   7         PROSPECTIVE JUROR:  No.
 8   8         THE COURT:  Anything about the nature of the
 9   9   charges or anything else about the case that would affect
10  10   your ability to be a fair and impartial juror in this
11  11   case?
12  12         PROSPECTIVE JUROR:  No.
13  13         THE COURT:  If you are selected as a juror in
14  14   this case, will you be able to keep an open mind until all
15  15   of the evidence and arguments have been presented and then
16  16   decide the case fairly and impartially based only on the
17  17   evidence presented at trial and the law as I explain it to
18  18   you?
19  19         PROSPECTIVE JUROR:  Yes.
20  20         THE COURT:  Thank you.
21  21         Seat 42, juror 325, anything you want to bring
22  22   to my attention regarding your ability to serve as a fair
23  23   and impartial juror in this case?
24  24         PROSPECTIVE JUROR:  Yes.
25  25         THE COURT:  Approach.
26
```

Stephanie Picozzi, OCR, RPR

Page 256

```
 1   1         (Prospective juror comes to sidebar.)
 2   2         PROSPECTIVE JUROR:  I'm not quite sure I can be
 3   3   fair and impartial in this case.  I am concerned about
 4   4   security and my family.
 5   5         THE COURT:  You said you are not sure.
 6   6         PROSPECTIVE JUROR:  I am quite sure I can serve
 7   7   fairly and impartially.  I am concerned about that.
 8   8         THE COURT:  You understand you are anonymous in
 9   9   the case?  You understand that?
10  10         PROSPECTIVE JUROR:  I do.
11  11         THE COURT:  You are still concerned?
12  12         PROSPECTIVE JUROR:  A little.
13  13         THE COURT:  I'm going to excuse you then.  Stay
14  14   in the box for now.  I will excuse you in a moment.
15  15         (Prospective juror leaves sidebar.)
16  16         THE COURT:  Seat 43, juror 327, anything you
17  17   want to bring my attention regarding your ability to serve
18  18   as a fair and impartial juror in this case?
19  19         PROSPECTIVE JUROR:  Yes.
20  20         (Prospective juror comes to sidebar.)
21  21         PROSPECTIVE JUROR:  To be honest, I have a trip
22  22   scheduled in March.
23  23         THE COURT:  What's the date in March?
24  24         PROSPECTIVE JUROR:  March 17.  To be honest, I
25  25   can't guarantee my personal feelings would...
26
```

Stephanie Picozzi, OCR, RPR

Page 257

```
 1   1         THE COURT:  I will excuse you.  Stay in your
 2   2   seat for now.
 3   3         (Prospective juror leaves the sidebar.)
 4   4         THE COURT:  Based upon the discussions at
 5   5   sidebar, I'm going to excuse juror number 359, seat 239.
 6   6   Go back down to the first floor jury room.  They will give
 7   7   you further instructions.  Juror number 325 in seat 492.
 8   8   Juror number 327 seat 43.
 9   9         Let's fill those seats.
10  10         THE CLERK:  Seat 23 is going to be 259.
11  11         THE COURT:  259?
12  12         THE CLERK:  259.
13  13         274 seat 42.  And 364 seat 43.  364?  376, 376
14  14   in seat 43.
15  15         THE COURT:  So the record is clear, when no one
16  16   responded for 364, it's why we called another number.
17  17         Seat 23, juror 259, anything you want to bring
18  18   to my attention regarding your ability to serve as a fair
19  19   and impartial juror in this case?
20  20         PROSPECTIVE JUROR:  No.
21  21         THE COURT:  Anything about the nature of the
22  22   charges or anything else about the case that would affect
23  23   your ability to serve as a fair and impartial juror in
24  24   this case?
25  25         PROSPECTIVE JUROR:  No.
26
```

Stephanie Picozzi, OCR, RPR

GA028

**INSTRUCTIONS FOR POTENTIAL JURORS-SPECIAL PANEL**

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y,

**PANEL OF JANUARY 22, 2013**   ★   **JAN 28 2013**   ★

LONG ISLAND OFFICE

Please note that you are currently assigned as a potential juror to the case indicated on the

questionnaire. The jury selection for this case is currently scheduled for   (Feb4, 2013)

__Continue to follow instructions for your name &   participant number (nine digit #)__

You are instructed to call the 1- 800-587-6775 number after 5:00 p.m. every night for reporting
instructions.

At that time, you will receive one of three messages:

1)   The date and time to report to the Courthouse, or

2)   To call back again the next business day after 5:00 p.m., or

3)   That your service is over.

Please note that since we are working with an automated system, we can not change all the
wording on the messages.  If the message you receive includes a reminder that you are on
telephone standby for two weeks, **that message does not apply to you.  You are assigned to
this case until further notice.**

GA029

Juror Number 3~~00~~

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ **JAN 28 2013** ★

———————————————————X

UNITED STATES OF AMERICA,

LONG ISLAND OFFICE

-against-

HERIBERTO MARTINEZ and
CARLOS ORTEGA,

10 Cr. 074 / 12 Cr. 293 (JFB)

Defendants.

———————————————————X

**Honorable Joseph F. Bianco**
**United States District Judge**
**United States District Court**
**Eastern District of New York**
**100 Federal Plaza**
**Central Islip, New York 11722**

<u>**THIS PAGE IS THE QUESTIONNAIRE COVER SHEET:**</u>
<u>**PLEASE TEAR OFF THIS PAGE**</u>
<u>**AND TAKE IT WITH YOU.**</u>

<u>**YOU WILL NEED THE NUMBER AT THE TOP OF THIS FORM**</u>
<u>**FOR THE JURY SELECTION.**</u>

1

Juror Number 300

## UNITED STATES v. HERIBERTO MARTINEZ AND CARLOS ORTEGA

### JUROR QUESTIONNAIRE

THE ANSWERS TO THE QUESTIONS ON THIS PAGE WILL BE
DISCLOSED ONLY TO THE APPROPRIATE COURT PERSONNEL
AS DIRECTED BY THE PRESIDING JUDGE

Please print the following information:

Name:

Home Address:

Home Phone:

Job & Department:

Business Address:

Business Phone (including extensions):

I hereby certify that the foregoing information, and all of the answers contained in
this questionnaire, are true, correct, and complete to the best of my knowledge.

Date: January __, 2013

SIGNATURE_____

2

GA031

Juror Number 300

## JUROR QUESTIONNAIRE
## PRELIMINARY INSTRUCTIONS

You will be identified by your juror number, which is stamped at the upper right hand corner of each page of this questionnaire. DO NOT WRITE YOUR NAME ON ANY PAGE EXCEPT PAGE TWO. Write only on the front pages of this questionnaire. Do not write anything on the reverse side of this document.

Upon your oath or affirmation, you must give true and complete answers to all questions. These questions are not meant to ask unnecessarily about personal matters. Rather, these questions will help the Court determine whether you can be fair and impartial in deciding this case and will also provide information about you as a juror to help the parties select a jury.

**Remember there are no "right" or "wrong" answers;** there are only truthful answers. Part of the selection process depends on your ability and promise to follow the law as it is explained by the Court. Thus, some of the questions include descriptions of legal principles and ask whether you can conscientiously follow them.

THE COURT INSTRUCTS YOU NOT TO DISCUSS THE QUESTIONS AND ANSWERS WITH FELLOW JURORS. IT IS VERY IMPORTANT THAT YOUR ANSWERS BE YOUR OWN INDIVIDUAL ANSWERS. Further, the Court instructs you not to discuss anything about the case with anyone: not the defendants, the lawyers, your fellow jurors, your family, your friends, or anyone else. Please try to write as legibly as possible.

3

GA032

Juror Number 300

## SUMMARY OF THE CHARGES

This case, <u>United States v. Heriberto Martinez and Carlos Ortega</u>, is a criminal case in which the defendants have been charged with federal crimes. This is not a death penalty case.

The defendants are charged in an indictment with criminal offenses. Specifically, the indictment in this case alleges that the defendants are members of La Mara Salvatrucha, also known as the MS-13, and that they committed a variety of crimes as part of that criminal enterprise, including, variously, racketeering, racketeering conspiracy, murder, assault, attempted murder and conspiracy to commit murder in aid of racketeering, accessory after the fact, and related firearms charges. The murders at issue in this case include the murders of Vanessa Argueta and Diego Torres in Central Islip on February 5, 2010, the murder of David Sandler in Brentwood on February 17, 2010, the murder of Nestor David Varillas Moreno on March 6, 2010 and the murder of Mario Alberto Canton Quijada in Far Rockaway on March 17, 2010. Firearms were used in connection with these murders. An indictment listing the criminal charges against a defendant is simply the document used to advise a defendant of the accusations against him. The indictment is not evidence.

You must evaluate the evidence against each defendant separately. The fact that these defendants are being tried together does not mean that the evidence against each of them is the same. Our law simply permits defendants to be tried together in order to save judicial resources. The law presumes all defendants are innocent. The defendants have pleaded not guilty to all charges in the Indictment. It is the government that has the burden of proof under our system of law. The prosecution must come forward with proof beyond a reasonable doubt that a defendant has committed the charged crimes before a defendant can be found guilty. The defendants have

4

no obligation to produce any evidence or do anything else at trial. This is because the law presumes a defendant to be innocent of the charges brought against him.

If you are selected as a juror in this case, it will be your duty to determine whether, based solely on the evidence presented at trial, the government has proved, beyond a reasonable doubt, that the defendants are guilty of the crimes charged.

You will notice that each defendant has two lawyers and that the lawyers will confer with one another and discuss certain matters. This behavior is both appropriate and encouraged as it saves everyone, including you, a lot of time.

DO NOT make any attempt to learn about this matter from sources outside of the courtroom, such as the news media or the internet. If in fact you inadvertently stumble upon some media coverage or other information, please report this to the Court. Please do everything you can to avoid and ignore any information you do not hear in this courtroom. If you are selected to serve on the jury, you will judge this case solely on the evidence presented at trial.

5

## QUESTIONNAIRE AND JURY SELECTION

The purpose of this questionnaire is to assist the court and the parties in selecting a jury of individuals that can be fair and impartial. The Court is following the practice used in other cases in the federal courts of keeping the identities of the jurors confidential. The Court uses this procedure because this case is likely to attract attention in the media and among the public. Anonymity will assure that the jury will not be exposed to such prying and to opinions, commentaries and inquiries which might impair its ability to decide the case solely upon the evidence presented in court and upon the law as I instruct. It is important to ensure that the jury will in no way be influenced by the public, by the members of the media and their articles and reports. I wish to emphasize that I am taking these measures to protect your rights of privacy and to assist you in discharging your responsibility as jurors fairly and impartially.

To ensure that your rights of privacy will be respected, only page two of the questionnaire asks you to state your name and other identifying information. That page will be detached from the questionnaire when you have completed it and will be locked securely in the office of the Clerk of the Court. That page will not be available to anyone, including the presiding Judge, the parties to the case and the lawyers. Should special circumstances or other good cause require, and provided that the prior approval of the presiding Judge is obtained, that information may be made available to such person or persons as the presiding Judge deems necessary. On the remaining pages of the questionnaire, you are instructed not to give names or addresses or any information that will permit anyone, even the presiding Judge, to identify you.

6

Juror Number 300

## PART I: HARDSHIP

Jury selection will begin on February 4, 2013, and the trial is expected to begin on February 11, 2013. Once testimony begins we anticipate the case should last approximately six weeks. Trial will be in session, generally speaking, Monday through Thursday from 9:30 a.m. to 4:30 p.m. To be on the safe side, therefore, we are requiring that the jurors who serve on this case must be available through the end of March 2013. The trial will recess for national and major religious holidays. Jurors will receive a printed schedule of trial dates upon final selection of the jury.

If you are selected as a juror, you will be required to be present for the taking of testimony for as long as the case lasts. You will not be sequestered, meaning you will go home every day after court.

The Court views service on a jury in a federal criminal trial to be one of the highest duties a citizen owes to the United States. Mere inconvenience or the usual financial hardships of jury service will not be sufficient to excuse a prospective juror.

1.    (a) Do you have an unusual financial hardship or other serious problem that would prevent you from serving as a juror in this case?

Yes _____ No _____

If yes, please explain:
_____
_____

**Note**: If you have travel plans that prevent you from serving on the jury specify whether you have already purchased non-refundable tickets or hotel accommodations. You may be asked to provide documentation to the Court prior to being released from jury service.

7

Juror Number 300

## PART II: BACKGROUND
### (Questions 2 through 36)

Part II asks questions about you and your background, and very general questions about your family.

2. Do you have any difficulty reading or understanding English?

   Yes _____ No _____

   If yes, please explain:
   _____
   _____
   _____

3. Besides English, what other languages, if any, do you read or understand?
   _____

4. Do you have any physical or medical condition (such as hearing, eyesight, back problems, or medication you are taking), or any emotional problem, that would make it unusually difficult for you to serve as a juror in this case?

   Yes _____ No _____

   If yes, please describe:
   _____
   _____
   _____

5. What is your age: _____

6. Are you: Male _____ Female _____

7. (a) If born in the United States, in what state? If born outside the United States, in what country? _____

   (b) If raised in the United States, in what state? If raised outside the United States, in what country?
   _____

8. Are you:

   Married _____          Living with a Partner _____
   Single _____           Divorced/Separated _____
   Window/Widower _____

8

Juror Number 300

9.    (a) In what religion were you raised, if any?

_____

(b) How often do you attend a place of worship?

Regularly    _____         Seldom      _____

Occasionally  _____        Never       _____

(c) Do you have any personal, religious or philosophical beliefs that would interfere with your ability to deliberate or otherwise serve as a juror?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

10.   How long have you lived at your present residence?

_____

11.   Do you:

Own a home? _____
Rent? _____
Live in a dwelling owned by relatives? _____
Live in a dwelling with your family or others? _____
If so, who do you live with? _____

Other living situation?

_____

12.   What County do you live in?

_____

13.   Have you personally been affected by street gang violence? Yes _____ No _____

If yes, please explain (without identifying where you live):

_____
_____
_____

9

Juror Number 300

14.  Are you (check any and all that apply):

Employed full-time? _____        Retired? _____
Employed part-time? _____        Disabled and unable to work? _____
Work at home? _____              Student? _____
Homemaker? _____                 If a student, what area of study? _____
Unemployed/laid off? _____

15.  If you are employed by another, please answer the following:

(a) Without mentioning the name of your employer, what type of work do you do?
_____

(b) How long have your worked in your present job?
_____

(c) Do you supervise others in your job?

Yes _____  No _____  If yes, how many? _____

(d) For how long have you been a supervisor?
_____

(e) Which best describes your employer:

_____ Federal government
_____ State or local government
_____ Large business or organization (more than 250 employees)
_____ Medium-sized business or organization (50 to 250 employees)
_____ Small business or organization (fewer than 50 employees)

16.  If you are self-employed, answer the following:

(a) Without mentioning the name of your business, what type of business is it? What is your job title? What are your duties?
_____
_____
_____

(b) How long have you been self-employed?
_____

(c) Do you have any employees? Yes _____ No _____

If yes, approximately how many? _____

10

## Juror Number 300

17. If you are retired or unemployed, what type of work was your last employment?

_____
_____
_____

18. What other occupations have you had in the last ten years?

_____
_____
_____

19. What is your annual income level? If you are married and your spouse/life partner is employed, please include his/her income:

| | |
|---|---|
| Less than $25,000 | _____ |
| $25,000 - $50,000 | _____ |
| $50,000 - $100,000 | _____ |
| $100,000-$150,000 | _____ |
| Over $150,000 | _____ |

20. (a) How far did you go in school? Check the highest level completed.

| | |
|---|---|
| Elementary School: | _____ |
| High School: | _____ |
| College: | _____ |
| Post Graduate: | _____ |

(b) If you earned a degree after high school, please list the institution(s) at which you studied and major area of study (Example: Stony Brook University, BA, History Major, 1988)

_____
_____
_____

21. If you are married or have a life partner, please answer the following questions about your spouse/life partner's employment:

(a) Is your spouse/life partner employed?     Yes _____     No _____
If yes, in what type of work?

_____

(b) How long has your spouse/life partner been at his/her present job?

_____

(c) If your spouse/life partner is retired or not employed, please indicate and also describe the type of work he or she did during his/her last period of employment:

_____

11

Juror Number 300

22. (a) Have you or any member of your family or close friends ever been employed by or otherwise affiliated with a law enforcement agency? (This would include a state, federal, county and local police department, the U.S. Attorney's Office, the District Attorney's Office, the Bureau of Alcohol, Tobacco and Firearms, the Department of Homeland Security, the Secret Service, the Federal Bureau of Investigation, the Drug Enforcement Administration, the Internal Revenue Service, all federal, state, county and municipal prosecutor's offices and medical examiner's offices.

Yes _____ No _____

If yes, when, where and what agency? (Do not name the person referenced but state his/her relationship to you.)

_____
_____
_____

(b) Are you, a close friend or a member of your family presently planning to apply for a position in law enforcement, including corrections?

Yes _____ No _____

If yes, what is the relationship of that person and what agency?

_____
_____
_____

23. (a) Are you or do you have any close relatives or friends who are judges, law clerks, court attendants, court clerks, other types of court personnel, probation officers, or persons connected with any correctional institution, jail or penitentiary?

Yes _____ No _____

If yes, please explain (without naming the person):

_____
_____
_____

(b) Have you or a family member ever worked for, or had business dealings other than routine activity (like paying taxes or receiving Social Security Benefits, Medicaid, Medicare, etc.) with, any federal, state, or city government or any of their agencies?

Yes _____ No _____

12

GA041

Juror Number 300

If yes, please explain (without naming the person):

_____

_____

_____

(c) If yes, is there anything about those experiences that would interfere with your ability to render a fair and impartial verdict in this case?

Yes _____ No _____

If yes, please explain:

_____

_____

_____

24.   Have you or any of your relatives or close friends worked for a criminal defense lawyer or private investigator?

Yes _____ No _____

If yes, for how long and please explain his/her/their relationship to you (without naming the person):

_____

_____

_____

25.   If you have any children/grandchildren, please answer the following:

| AGE | SEX | EDUCATION LEVEL | TYPE OF EMPLOYMENT |
|-----|-----|-----------------|--------------------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

26.   (a) Were you ever in the military service (including reserves, National Guard or ROTC)?

Yes _____ No _____

13

GA042

Juror Number 300

(b) What branch?

_____

(c) What was the highest rank you achieved?

_____

(d) What type of work did you perform in the service?

_____

(e) Where did you serve?

_____

(f) Any service in the military police? Yes _____ No _____

(g) Were you assigned to combat duty? Yes _____ No _____

If yes, where?

_____

(h) Have you ever participated in a court martial? Yes _____ No _____

If yes, please explain your role.

_____

_____

_____

(i) Year of discharge from military? _____

(j) Was an honorable discharge received? Yes _____ No _____

(k) Would your military experience prevent you from evaluating the evidence presented in this case in a fair and impartial manner?

Yes _____ No _____

If yes, please explain:

_____

_____

_____

(l) If you have a child, spouse or partner who served in the military, is there anything about their experience that would prevent you from evaluating the evidence presented in this case in a fair and impartial manner?

14

Juror Number 300

Yes _____ No _____

If <u>yes</u>, please explain:

_____
_____
_____

27.  (a) In the past ten years, have you or any immediate family member ever participated in any group that lobbies or takes public positions on social or legal issues (for example, the National Rifle Association, abortion rights or animal rights, etc.)?

Yes _____ No _____

(b) If <u>yes</u>, please describe the type of group (without specifically naming it) and the length of your/his/her involvement in the group.

_____
_____
_____

(c) If yes, would that experience prevent you from evaluating the evidence presented in this case in a fair and impartial manner?

Yes _____ No _____

If <u>yes</u>, please explain:

_____
_____
_____

28.  (a) Have you, a family member, or close friend ever attended law school or been a lawyer?

Yes _____ No _____

(b) Do you have any opinions about lawyers that would make it difficult for you to render a fair and impartial verdict?

Yes _____ No _____

If <u>yes</u>, please explain:

_____
_____
_____

15

Juror Number 300

29.    (a) Do you have any special knowledge of firearms or ballistics?

Yes _____ No _____

(b) Do you have any strong feelings about firearms that would affect your ability to be fair and impartial in this case?

Yes _____ No _____

If yes, please explain: _____
_____
_____

30.    (a) List any newspapers and magazines or periodicals that you subscribe to or read, whether in hard copy or on the Internet. Indicate how frequently you read these periodicals. (e.g., daily, often, occasionally, rarely)

_____
_____
_____

(b) List any news programs that you watch on the television or on the Internet.  Indicate how frequently you watch these news programs. (e.g., daily, often, occasionally, rarely)

_____
_____
_____

(c) List any television programs that you watch for pleasure on a regular basis.

_____
_____
_____

(d) List any websites you regularly visit?

_____
_____
_____

31.    As a result of your exposure to the media, is there any reason why you cannot be fair and impartial in this case?

Yes _____ No _____ If yes, please explain:

_____
_____

16

Juror Number 300

32.    (a) List any hobbies and special interests that you have: (In other words how do you spend your free time?)

_____

_____

_____

33.    In terms of your political outlook, do you usually think of yourself as:

Very conservative        _____        Very liberal                        _____
Somewhat liberal          _____        Middle of the road/moderate   _____
Somewhat conservative  _____

34.    Please check the answer which best describes whether you generally "hold your ground" when you feel you are correct, or whether you are swayed by the strong influence of others:

_____ Always hold my ground
_____ Generally hold my ground
_____ Usually hold my ground but open to the opinions of others
_____ Sometimes swayed by others
_____ Often swayed by others
_____ Always swayed by others

35.    (a) Have you ever been:

(i) a juror in a civil case?          Yes _____ No _____
(ii) a juror in a criminal case?    Yes _____ No _____
(iii) a grand juror?                    Yes _____ No _____

(b) Have you ever been a juror in a case where the jury was unable to reach a verdict?

Yes _____ No _____

(c) If you have served on a jury, please provide the following information:

| Date | State or Federal | Grand Jury or Trial Jury | Criminal or Civil | Nature of Case (Slip And Fall – Robbery) | Was there a verdict (yes/no) |
|------|------------------|--------------------------|-------------------|------------------------------------------|------------------------------|
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |

17

Juror Number 300

(d) Is there anything about your prior jury service that would impact your ability to be a fair and impartial juror in this case?

Yes _____ No _____

If <u>yes</u>, please explain:

_____
_____
_____

36.   (a) Have you ever filed a complaint with the police or District Attorney's Office against anyone?

Yes _____ No _____

If <u>yes</u>, please describe the circumstances:

_____
_____
_____

(b) Is there anything about that situation that would impact your ability to be a fair and impartial juror in this case?

Yes _____ No _____

If <u>yes</u>, please explain:

_____
_____

(c) Were you satisfied with the way the police and/or District Attorney's Office handled your complaint?

Yes _____ No _____

If <u>no</u>, please explain:

_____
_____

18

Juror Number 300

## PART III : EXPERIENCES AND BELIEFS
### (Questions 37 through 68)

Part III asks questions about experiences you may have had and opinions you may have formed. Again, there are no right or wrong answers. Please be as thoughtful and candid as possible.

37.   Based upon the description of this case provided at the beginning of this questionnaire, do you believe you have knowledge about the events charged in the Indictment?

Yes _____   No _____

If yes, please explain:

_____

_____

_____

38.   After learning about the nature of the charges in this case, can you be fair and impartial in assessing the evidence and rendering your verdict?

Yes _____   No _____

If no, please explain:

_____

_____

_____

39.   Do you have an opinion about whether the defendants are guilty of the crimes with which they are charged?

Yes _____   No _____   If yes, please explain:

_____

_____

40.   (a) What recent criminal trials, if any, have you followed in the newspapers, magazines, or on TV?

_____

_____

_____

(b) Do you have any opinions, feelings or beliefs as a result of those trials that would make it difficult for you to evaluate the evidence fairly and impartially in accordance with the Court's instructions?

Yes _____   No _____

19

Juror Number 300

If <u>yes</u>, please explain:

_____

_____

_____

41.   (a) Have you ever been a victim of racial, ethnic or religious prejudice or discrimination?

Yes _____ No _____

If <u>yes</u>, please explain the circumstances:

_____

_____

_____

(b) If you have experienced racial, ethnic or religious prejudice, do you believe it would affect your ability to be fair, or would it make it difficult for you to render a fair and impartial verdict?

Yes _____ No _____

If <u>yes</u>, please explain:

_____

_____

_____

42.   (a) Have you or has a family member or close friend ever been a witness to or the victim of a crime?

Yes _____ No _____

If <u>yes</u>, please explain the circumstances:

_____

_____

(b) Did you or your family member or close friend report that crime to the police or other law enforcement agency?

Yes _____ No _____

(c) Did law enforcement personnel respond to the report appropriately?

Yes _____ No _____

If <u>no</u>, please explain the circumstances:

_____

_____

20

Juror Number 300

(d) Were you, or was your family member or friend, called to testify?

Yes _____ No _____

(e) Is there anything about this experience that would make it difficult for you to evaluate the evidence fairly and impartially in accordance with the Court's instructions?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

43.    (a) As a general proposition, do you tend to believe that a member of law enforcement, such as a police officer or federal agent, who testifies in court is (check one):

_____ More likely to tell the truth than other witnesses
_____ About as likely to tell the truth as other witnesses
_____ Less likely to tell the truth than other witnesses

(b) Do you have any opinions or beliefs concerning law enforcement in general – including, the Federal Bureau of Investigation, the Department of Homeland Security, the Bureau of Alcohol, Tobacco and Firearms, the New York City Police Department, the Nassau County Police Department, the Suffolk County Police Department, and the Department of Justice – that would make it difficult for you to evaluate the evidence fairly and impartially in accordance with the Court's instructions?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

(c) Do you believe that any group does not receive fair treatment from police, prosecutors, or any other law enforcement agency?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

21

Juror Number 300

(d) Do you believe that any group receives preferential treatment from police, prosecutors, or any other law enforcement agency?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

(e) Can you put aside such opinions or beliefs as may have been described above, and evaluate this case based upon the evidence presented during the trial, in accordance with the Court's instructions?

Yes _____ No _____

If no, please explain:

_____
_____
_____

44.   Have you ever appeared or testified as a witness in any investigation or legal proceeding?

Yes _____ No _____

If yes, please explain the nature of the proceeding:

_____
_____

45.   (a) Are you or is anyone close to you, including family or friends, now under subpoena or about to be subpoenaed in any criminal case?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

(b) Have you ever been questioned or subpoenaed in any matter by the New York City Police Department, any state or local law enforcement agency, the Department of Justice or any United States investigative agency such as the Federal Bureau of Investigation, the Drug Enforcement Administration, the Department of Homeland Security, the Nassau County Police Department, the Suffolk County Police Department, the Internal Revenue Service or the Bureau of Alcohol, Tobacco and Firearms?

Yes _____ No _____

Juror Number 300

(c) If yes, do you believe that you were fairly treated in connection with such matter?

Yes _____ No _____

If no, please explain:

_____
_____
_____

(d) Have you ever been involved, or do you expect to become involved, in any legal action or dispute with the United States or any agency, officer, or employee of the United States, including U.S. Immigration and Customs Enforcement (formerly the Immigration and Naturalization Service), the Internal Revenue Service, or with the City of New York or any agency, officer or employee of the City of New York, including the New York City Police Department, or have you had any financial interest in such a dispute?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

(e) If you answered "yes" to (a), (b), or (d), above, or if you answered "no" to (c), above, is there anything about these facts that would make it difficult for you to sit as a fair and impartial juror in this case?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

46.   (a) Have you, or has a family member or close friend, ever been involved in or been the target of a criminal investigation?

Yes (self) _____ Yes (family/friend) _____ No _____

If yes, without mentioning names, please generally describe the circumstances surrounding the criminal investigation(s) and your relationship(s) to the person(s) involved:

_____
_____
_____

23

Juror Number 300

(b) Have you, or has a family member or close friend, ever been charged with a crime?

Yes (self) _____ Yes (family/friend) _____ No _____

If yes, without mentioning names, please generally describe the circumstances surrounding the criminal investigation(s) and your relationship(s) to the person(s) involved:

_____
_____
_____

(c) If you answered "yes" to (a) or (b) above, how would you rate the fairness of the police or prosecutors?

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| (Very fair) | | (Neutral) | | (Very unfair) |

(d) Have you or a family member or close friend ever been falsely accused of a crime?

Yes _____ No _____

If yes, please explain the circumstances:

_____
_____
_____

(e) Do you have, or have you ever had, a close friend or family member in prison?

Yes _____ No _____

If yes, without mentioning names, please explain:

_____
_____
_____

(f) Have you ever visited or toured a prison or jail facility?

Yes _____ No _____

If yes, without mentioning names, please explain:

_____
_____
_____

24

Juror Number 300

(g) If you answered "yes" to (a), (b), (d) or (e) above, is there anything about these facts that would make it difficult for you to sit as a fair and impartial juror in this case?

Yes _____ No _____

If yes, please explain:

_____

_____

47.   You may hear evidence at the trial about the sale, possession of illegal drugs including marijuana. Can you be fair and impartial in accessing the evidence and rendering your verdict after hearing such testimony?

Yes _____ No _____

If no, please explain:

_____

_____

_____

48.   The Judge presiding over this case is The Honorable Joseph F. Bianco. Do you know, or does any relative or friend know, or have any connection with, Judge Bianco?

Yes _____ No _____

If yes, please explain:

_____

_____

49.   This case is being prosecuted by the United States Attorney's Office for the Eastern District of New York. The United States Attorney for this District is Loretta E. Lynch. Do you know, or does any relative or friend know, or have any connection, with Loretta E. Lynch or anyone associated with her office?

Yes _____ No _____

If yes, please explain:

_____

_____

50.   (a) Do you or does any relative or close friend know or have any connection with any of the following prosecutors, or their relatives or friends?

        Assistant United States Attorney John J. Durham
        Assistant United States Attorney Raymond A. Tierney
        Assistant United States Attorney Carrie N. Capwell

25

Juror Number 300

Yes _____   No _____

If yes, please explain:

_____
_____

(b) Have you seen, heard, or read anything about any of these prosecutors?

Yes _____   No _____

If yes, what have you seen, heard, or read?

_____
_____
_____

(c) Do you or does any relative or close friend know or have any connection to any of the following law enforcement officers or their relatives or friends?

> James Lopez, Special Agent, FBI
> Reynaldo Tariche, Special Agent, FBI
> Michael Nigro, Detective, Nassau County Police Department
> George Davis, Investigator, Nassau County Sheriff's Department

Yes _____   No _____

If yes, please explain:

_____
_____

(d) Do you or does any relative or close friend know anyone who works in the federal courthouses in Central Islip or Brooklyn?

Yes _____   No _____

If yes, please explain:

_____
_____

51.   (a) Do you or does any relative or close friend know or have any connection to the defendants, or their relatives or friends?

> Heriberto Martinez, also known as "Boxer"
> Carlos Ortega, also known as "Silencio"

Yes _____   No _____

26

Juror Number 300

If <u>yes</u>, please explain:

_____

_____

52.   (a) Do you or does any relative or close friend know or have any connection with any of the
following defense attorneys and their assistant or their relatives or friends?

Elizabeth E. Macedonio, Esq.
Arnold Levine, Esq.
Ira D. London, Esq.
Marianne S. Rantala Esq.

Yes _____   No _____

If <u>yes</u>, please explain:

_____

_____

(b) Have you seen, heard or read anything about any of these defense attorneys?

Yes _____   No _____

If <u>yes</u>, what have you seen, heard or read?

_____

_____

(c) Is there anything in what you have seen, heard or read about the prosecutors, law enforcement
personnel, the defendants, or defense attorneys and their assistant, that would prevent you from
rendering a fair and impartial verdict in this case?

Yes _____   No _____

If <u>yes</u>, please explain:

_____

_____

(d) Do you have any feelings, beliefs, or opinions regarding criminal defense lawyers and
their role within the criminal justice system?

Yes _____   No _____

If <u>yes</u>, please explain:

_____

_____

53.   Do you have any bias, sympathy, or prejudice with reference to the defendants that would
make it difficult for you to render a fair and impartial judgment based solely on the
evidence presented at trial?

Juror Number 300

Yes _____  No _____

If yes, please explain:

_____
_____
_____

54.   Do you agree that you are fulfilling your duty as a juror by voting for acquittal, if there is reasonable doubt as to guilt, just as you would be fulfilling your duty as a juror by voting for conviction, if there was no such reasonable doubt?

Yes _____  No _____

If yes, please explain:

_____
_____
_____

55.   The names of the homicide victims in this case and the dates and locations of their deaths are as follows:

| Name | Date of Death | Crime Scene |
|---|---|---|
| Vanessa Argueta | February 5, 2010 | Connetquot Avenue & Windsor Place, Islip, NY |
| Diego Torres | February 5, 2010 | Connetquot Avenue & Windsor Place, Islip, NY |
| David Sandler | February 17, 2010 | Timberland Drive & Second Avenue, Brentwood, NY |
| Nestor Moreno | March 6, 2010 | El Rancho Bar – Fulton Avenue, Hempstead, NY |
| Mario Quijada | March 17, 2010 | Beach 12th St. & the Boardwalk, Far Rockaway, NY |

(a) Did you, a family member, or a close friend, know any of these individuals or members of their families?

Yes _____  No _____

If yes, please explain how you knew the person (without providing a specifics that would reveal your identity):

_____
_____
_____

(b) If yes, is there anything about your familiarity with this person (people) that would make it difficult for you to render a fair and impartial judgment based solely on the evidence presented at trial?

Yes _____  No _____

28

Juror Number 300

If <u>yes</u>, please explain:

_____

_____

_____

(c) Are you familiar with any of the locations listed as the crime scenes?

Yes _____ No _____

If <u>yes</u>, please explain how you are familiar with that area(s) (without providing a specific address or otherwise revealing your identity):

_____

_____

_____

(d) If <u>yes</u>, is there anything about your familiarity with the area(s) that would make it difficult for you to render a fair and impartial judgment based solely on the evidence presented at trial?

Yes _____ No _____

If <u>yes</u>, please explain:

_____

_____

_____

56.  (a) List any books, magazines, movies, television programs or internet sites that you have read, watched or visited about organized street gangs, La Mara Salvatrucha, or MS-13.

_____

_____

_____

(b) Is there anything in what you have seen, heard or read about street gangs, La Mara Salvatrucha, or MS-13, that would make it difficult for you to render a fair and impartial verdict in this case?

Yes _____ No _____

If <u>yes</u>, please explain:

_____

_____

_____

(c) Do you, your relatives or close friends know anyone, or have you/they ever had contact with anyone, reputed to have ties to any street gang, La Mara Salvatrucha or MS-13?

Yes _____ No _____

29

Juror Number 300

If <u>yes</u>, please explain:

_____

_____

_____

(d) Have you or any member of your family or close friend ever been affected by MS-13 or any other street gang?

Yes _____ No _____

If <u>yes</u>, please explain:

_____

_____

_____

(e) If you or your family or close friend have ever had personal experiences with MS-13, do you believe those experiences are likely to affect your ability to be fair and impartial in this matter?

Yes _____ No _____

If <u>yes</u>, please explain:

_____

_____

_____

57.   Would the fact that the defendants are Hispanic cause you to doubt your ability to serve fairly in this case?

Yes _____ No _____

If <u>yes</u>, please explain:

_____

_____

_____

58.   (a) Have you or your community been impacted by an influx of immigrants since you have lived in your community?

Yes _____ No _____

If <u>yes</u>, please explain:

_____

_____

_____

(b) If yes, was the impact for the better or for the worse?

_____

_____

_____

(c) If yes, and the immigrants who have impacted you or your community are either Hispanic, would that affect your ability to be fair and impartial in this matter?

Yes _____   No _____

If yes, please explain:

_____

_____

_____

59.   Do you believe that immigrants, legal or otherwise, are entitled to the same legal protections given to American citizens?

Yes _____   No _____

Please explain:

_____

_____

_____

60    Do you believe that Hispanics are more likely to commit crimes than non-Hispanics?

Yes _____   No _____

If yes, please explain:

_____

_____

_____

61.   Will you be able to consider evidence about racketeering, racketeering conspiracy, murder, assault, attempted murder and conspiracy to commit murder in aid of racketeering, and related firearms charges fairly and impartially and in accordance with the instructions of the Court?

Yes _____   No _____

If no, please explain:

_____

_____

_____

31

GA060

Juror Number 300

62.   Has anyone you have known been murdered?

Yes _____ No _____

If yes:
(a) What was that person's relationship to you?
_____

(b) Were all persons responsible for the murder prosecuted?
_____

(c) Do you believe the outcome was fair? If not, why not?
_____
_____
_____

63.   Do you have any bias, sympathy, or prejudice with reference to the United States
      government that would make it difficult for you to render a fair and impartial judgment
      based solely on the evidence presented at trial?

Yes _____ No _____

If yes, please explain:
_____
_____
_____

64.   Do you have any religious, philosophical, moral or other belief that might make you
      unable to render a "guilty" or "not guilty" verdict?

Yes _____ No _____

If yes, please explain:
_____
_____
_____

65.   Is there any reason that you might fail to fairly and impartially evaluate all the evidence
      in this case without fear or favor toward either the government or the defendant?

Yes _____ No _____

If yes, please explain:
_____
_____
_____

32

Juror Number 300

66.     Is there any other matter that you should call to the court's attention that may have any bearing on your qualifications as a juror or that may affect your ability to render an impartial verdict based solely on the evidence and the court's instructions on the law?

Yes _____  No _____

If yes, please describe:

_____
_____
_____

67.     You may hear testimony from or about the people listed on Attachment A during the trial. Please turn to Attachment A at the end of this packet and circle the names of any person that you know or have any connection with.

68.     You may hear testimony about locations listed on Attachment B during the trial. Please turn to Attachment B at the end of this packet and circle the names of any locations that you know about, have any connection with, or have visited.

Juror Number 300

## PART IV : LEGAL PRINCIPLES
### (Questions 69 through 82)

Part IV explains some of the fundamental legal principles on which the Court will give instructions during the trial. If you believe you cannot follow these principles, you are duty bound to let the Court know now.

69.   (a) Every defendant is presumed innocent and cannot be convicted unless the jury, unanimously and based solely on the evidence in the case, decides that his guilt has been proven beyond a reasonable doubt. The burden of proving guilt rests entirely with the government. It never shifts to the defendant at any time. The defendant has no burden of proof at all.

Would you have any difficulty following these rules?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

(b) Under the law, a defendant need not testify. If a defendant does not testify, the jury may not consider that fact in any way in reaching a decision as to whether a defendant is guilty or not guilty. Would you have any difficulty following this rule of law?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

(c) A defendant has no obligation to testify. Should a defendant decide to testify, that does not shift the burden of proof to the defendant or diminish the obligation of the government to prove the defendant's guilt beyond a reasonable doubt. The government always carries this burden of proof in a criminal trial. Will you have any difficulty following this rule of law?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

34

Juror Number 300

70. The defendants are charged with illegal activity, including murder, carried out as part of an enterprise called La Mara Salvatrucha or MS-13. Is there anything about the nature of these charges that would interfere with your ability to decide this case based solely on the evidence related to the specific charges alleged in the Indictment, meaning whether the government has proved the defendants to be guilty beyond a reasonable doubt?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

71. An indictment itself is not evidence. It merely describes the charges made against the defendant. It is an accusation. It may not be considered by you as any evidence of the defendants' guilt. Are you able to follow this rule of law?

Yes _____ No _____

If no, please explain:

_____
_____
_____

72. The defendants are charged with a number of separate crimes. Under the law, you must consider each alleged crime separately. You must find the defendant not guilty of each of the alleged crimes you are considering, unless the evidence that has been presented in court proves him guilty of each alleged crime beyond a reasonable doubt. Would you have any difficulty following these rules?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

Juror Number 300

73.  Several witnesses in this case will be law enforcement officers.

(a) Do you hold any beliefs or opinions that would prevent you from evaluating the testimony of a law enforcement officer fairly and impartially?

Yes _____  No _____

If yes, please explain:

_____
_____
_____

(b) A law enforcement witness's testimony is not to be given any more or less credence than any other witness's testimony. Would you be able to follow the Court's instructions in this regard?

Yes _____  No _____

If no, please explain:

_____
_____
_____

74.  You may hear that law enforcement officers secretly conducted visual, photographic and video surveillance during the investigation of this case. These investigative techniques are lawful. Do you have any feelings about the use of secret visual surveillance that might affect your ability to consider such evidence fairly?

Yes _____  No _____

If yes, please explain:

_____
_____
_____

75.  Some of the evidence in this trial may come from searches performed by law enforcement officers. These searches were lawful. Do you have any feelings about searches conducted by law enforcement officers that would make it difficult for you to consider such evidence fairly?

Yes _____  No _____

If yes, please explain:

_____
_____
_____

36

Juror Number 300

76. You may hear evidence that a witness or witnesses in this case acted in an undercover capacity at the direction of the FBI and secretly recorded conversations with others. This is lawful. Do you have any feelings about undercover investigations conducted by law enforcement officers that would make it difficult for you to consider such evidence fairly?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

77. Some of the evidence that may come before the jury will include photographs of the victims' bodies showing wounds and other injuries. Would you be able to view such photographs and assess them as part of the evidence?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

78. Some government witnesses may testify that they participated in serious crimes, including murder. These witnesses, who may be referred to during trial as cooperating witnesses, may have lengthy criminal histories, may have pleaded guilty to crimes and may be testifying pursuant to agreements with the government in hopes that their own sentences will be reduced. Use of these witnesses is lawful. The Court will give you guidance on how to evaluate the testimony of cooperating witnesses.

(a) Do you hold any beliefs or opinions that would affect your ability to evaluate testimony from such witnesses fairly and impartially?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

(b) Would you be able and willing to fairly and impartially assess the testimony of such a witness, in accordance with the Court's instructions?

Yes _____ No _____

Juror Number 300

If <u>no</u>, please explain:

_____

_____

_____

79.   It is the law that the testimony of a single witness, even a cooperating witness, can be
      sufficient to convict a defendant of a charged crime, if the jury finds that the testimony of
      that witness establishes proof beyond a reasonable doubt.

      Do you have any opinion or belief about the law or cooperating witnesses that would
      prevent you from applying this rule of law?

      Yes _____   No _____

      If <u>yes</u>, please explain:

      _____

      _____

      _____

80.   Under the law, the facts are for the jury to determine and the law is for the Judge to
      determine. You are required to accept the law as the Judge explains it to you even if you
      do not like the law or disagree with it, and you must determine the facts according to
      those instructions.

      Would you have any difficulty following the Judge's instructions?

      Yes _____   No _____

      If <u>yes</u>, please explain:

      _____

      _____

      _____

81.   Under the law, the question of punishment, if any, should not enter your deliberations on
      guilt or innocence.  This is not a death penalty case. Would you have any difficulty
      following this rule?

      Yes _____   No _____

      If <u>yes</u>, please explain:

      _____

      _____

      _____

Juror Number 300

82. Under the law, emotions such as sympathy, bias and prejudice must not enter into the deliberations of the jurors as to whether the guilt of the defendant has been proven beyond a reasonable doubt. Would you have any difficulty following this rule?

Yes _____   No _____

If yes, please explain:

_____

_____

_____

Juror Number 300

### PART V : CONCLUSION
### (Questions 83 through 85)

You, as jurors, must decide this case based solely on the evidence presented here within the four walls of the courtroom. This means that during the trial you must not conduct any independent research about this case, the matters in the case, and the individuals involved in the case. In other words, you cannot consult dictionaries or reference materials, search the internet, websites, blogs, or use any other electronic tools to obtain information about this case or to help you decide the case. You may not try to find out information from any source outside the confines of this courtroom.

Until you retire to deliberate, you may not discuss this case with anyone, not even your fellow jurors. After you retire to deliberate, you may begin discussing the case with your fellow jurors, but only in the jury room and only when all of you are present. You may not communicate with your fellow jurors about the case through any form of electronic technology. You cannot discuss the case with anyone else until you have returned a verdict and the case is at an end. Many of you use cell phones, BlackBerries, the internet or other tools of technology. You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends. You may not communicate with anyone about the case on your cell phone through e-mail, BlackBerry, iPhone, text messaging, or on Twitter, through any blog or website, through any internet chat room, or by way of any social networking websites, including Facebook, Myspace, LinkedIn, and YouTube.

Juror Number 300

83.   Will you have any difficulty following this instruction?

Yes _____ No _____

If yes, please explain:

_____
_____
_____

84.   Is there any other matter that you should call to the Court's attention that may have any bearing on your qualifications as a juror or that may affect your ability to render an impartial verdict based solely on the evidence and the Court's instructions on the law?

Yes _____ No _____

If yes, please describe:

_____
_____
_____

85. Is there any matter you would prefer to discuss privately with the Judge?

Yes _____ No _____

GA070

Juror Number 300

### United States v. Heriberto Martinez and Carlos Ortega
### 10 Cr. 074 (JFB)

## ATTACHMENT A
Names of People Who Might Testify or Who May Be Discussed During Trial
*Please circle the name of any person listed below that you*
*know or have any connection with.*

Roger Alvarado, also known as "Michichi"
Jeremias Amaya, also known as "Payaso"
Milton Aponte
Vanessa Argueta
Jose Pastor Avila
Francis Braun
Dennis Broderick
Santos Joel Calderon, also known as "Gasparin"
Gerard Catanese
Robert Chase
Daniel Cheswick
Benjamin Cintron
Andrea Coleman
Manuel Correa
George Davis
Michael DeMartino
Robert DePietro
Donald Doller
Vidal Espinal, also known as "Demente"
Eugene Dunn
Oscar Ferrufino
Aaron Galan
Juan Garcia, also known as "Cruzito"
Mark Garry
Christopher Ghee
Tony Guevara
Adalberto Ariel Guzman, also known as "Gringo"
Odette Hall
Gwen Harleman
Emily Head
Jennifer Hernandez
Jessica Herrera
Mario Alphonso Herrera-Umanzor
Edward Heslin
Charles Hopkins
Thomas Jacob
Steven Jacobs
Gary Jambor
Christopher Kamnik
Timothy Kelly
Jonathan Kramer

42

Juror Number 300

Ronald Leli
James Lopez
Joseph Marino
Steve Markowski
Diego Marroquin, also known as "Little Lonely"
Carlos Martinez, also known as "Carlito"
Gerard McAlvin
John McKenna
Rene Mejia, also known as "Zorro"
Olivia Mendoza
Keith Menotti
Salvatore Mingoia
Nestor David Varillas Moreno
David Moser
Daniel Mulvanerty
Michael Nigro
George Norris
Craig O'Connor
John Oliva
Eduardo Orellana
Jose Gustavo Orellana-Torres
Oscar Ortega
Karen Oswald
Mario Alberto Canton Quijada
Richard Rinaldi
Jodi Rios
Ralph Rivera
Josue Otoniel Rubi-Gonzalez
Makarios Salkey
Leonel Sanchez
David Sandler
Carla Santos
Zoilo Santos
Jose Silva
Roy Sineo
Jimmy Sosa
Wayne Stackhouse
Janet Talavera
Reynaldo Tariche
Diego Torres
Jesus Valentin
Ruben Vasquez
Genaro Venegas
Sonya Ventura
Timothy Villani
Jose Yanes
Marvin Yanez
Ricardo Yanis
Thomas Zaveski

GA072

Juror Number 300

**United States v. Heriberto Martinez and Carlos Ortega**
**10 Cr. 074 (JFB)**

## ATTACHMENT B

Locations That Might Be Discussed During Trial

*Please circle the name of any location listed below that you*
*know about, have any connection with, or have visited.*

El Rancho Bar & Grill, Hempstead, NY

El Mariachi Loco, Hempstead, NY

Vicinity of Timberline Drive & Second Avenue, Brentwood, NY

Vicinity of Windsor Place & Connetquot Avenue, Central Islip, NY

Vicinity of Beach 12th Street & the Boardwalk, Far Rockaway, NY

Park/reservoir near Seaford-Oyster Bay Expressway and Norcross Avenue in Bethpage, NY

Vicinity of I.U. Willet's Road, east of the Meadowbrook Parkway in Old Westbury, NY

Vicinity of Lowell Avenue in Central Islip, NY

NB:JJD
F:#2010R00014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

GIOVANNI PRADO,
    also known as "Joker,"
ERICK ALVARADO,
    also known as "Gato Seco,"
ELENILSON ORTIZ,
    also known as "Shorty,"
EFRAIN ZUNIGA,
    also known as "Panico,"
YONIS ACOSTA-YANES,
    also known as "Brujita,"
DIEGO NINOS,
    also known as "Veneno" and
    "Mico,"
SERGIO MEJIA-BARRERA,
    also known as "Pelon,"
EMILIO SABALLOS,
    also known as "Caballo,"
WALTER FLORES-REYES,
    also known as "Scrappy,"
DAVID VALLE,
    also known as "Niño" and
    "Oreo,"
LOUIS RUIZ,
    also known as "Chucky,"
FRANCISCO RAMOS,
    also known as "Cruiser,"
CESAR LANDAVERDE,
    also known as "Flaco" and
    "Rebelde,"
HERIBERTO MARTINEZ,
    also known as "Boxer,"
VIDAL ESPINAL,
    also known as "Demente,"
ROGER ALVARADO,
    also known as "Michichi,"
CARLOS MARTINEZ,
    also known as "Carlito,"

RECEIVED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y

★ JUL 1 5 2010 ★

LONG ISLAND OFFICE

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 10-074 (S-2)(JFB)
(T. 18, U.S.C., §§
924(c)(1)(A)(i),
924(c)(1)(A)(ii),
924(c)(1)(A)(iii),
924(j)(1), 1512(b)(1),
1512(b)(2)(A), 1513(b)(2),
1959(a)(1), 1959(a)(3),
1959(a)(4), 1959(a)(5),
1959(a)(6), 1962(c),
1962(d), 1963, 2 and 3551
et seq.; T. 21, U.S.C., §§
841(b)(1)(C) and 846)

---

JOSE GUSTAVO ORELLANA-TORRES,
    also known as "Diablito" and
    "Gustavo Jefferson Orellana-
    Torres,"
MARIO ALPHONSO HERRERA-UMANZOR,
    also known as "Perdido,"
JIMMY SOSA,
    also known as "Junior,"
JEREMIAS EXEQUIEL AMAYA,
    also known as "Payaso," and
JOSE SALAZAR ERAZO,

        Defendants.

- - - - - - - - - - - - - - - - - - X

THE GRAND JURY CHARGES:

              INTRODUCTION

    At all times relevant to this Superseding Indictment,
unless otherwise indicated:

              The Enterprise

    1.   La Mara Salvatrucha, also known as the "MS-13,"
(hereinafter the "MS-13" or the "enterprise") was a gang
comprised primarily of immigrants from Central America, with
members located throughout Long Island, New York, Queens, New
York and elsewhere.  Members and associates of the MS-13 have
engaged in acts of violence, including murder, attempted murder,
robbery and assault, as well as other criminal activity,
including narcotics trafficking, robbery, witness tampering and
witness retaliation.

    2.   The defendants GIOVANNI PRADO, also known as
"Joker," ERICK ALVARADO, also known as "Gato Seco," ELENILSON

2

---

ORTIZ, also known as "Shorty," EFRAIN SUNIGA, also known as
"Panico," YONIS ACOSTA-YANES, also known as "Brujita," DIEGO
NINOS, also known as "Veneno" and "Mico," SERGIO MEJIA-BARRERA,
also known as "Pelon," EMILIO SABALLOS, also known as "Caballo,"
WALTER FLORES-REYES, also known as "Scrappy," DAVID VALLE, also
known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky,"
FRANCISCO RAMOS, also known as "Cruiser," CESAR LANDAVERDE, also
known as "Flaco" and "Rebelde," HERIBERTO MARTINEZ, also known as
"Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO,
also known as "Michichi," CARLOS MARTINEZ, also known as
"Carlito," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito"
and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and
JOSE SALAZAR ERAZO were members and associates of the MS-13.

    3.   The MS-13, including its leadership, membership and
associates, constituted an "enterprise" as defined by Title 18,
United States Code, Section 1961(4), that is, a group of
individuals associated in fact.  The enterprise constituted an
ongoing organization whose members functioned as a continuing
unit for a common purpose of achieving the objectives of the
enterprise.  The enterprise was engaged in, and its activities
affected, interstate and foreign commerce.

3

---

           Purposes of the Enterprise

    4.   The purposes of the enterprise included the
following:

        a.   Promoting and enhancing the prestige,
reputation and position of the enterprise with respect to rival
criminal organizations.

        b.   Preserving and protecting the power,
territory and criminal ventures of the enterprise through the use
of intimidation, threats of violence and acts of violence,
including assault and murder.

        c.   Keeping victims and rivals in fear of the
enterprise and its members and associates.

        d.   Enriching the members and associates of the
enterprise through criminal activity, including robbery and
narcotics trafficking.

        e.   Ensuring discipline within the enterprise and
compliance with the enterprise's rules by members and associates
through threats of violence and acts of violence.

          Means and Methods of the Enterprise

    5.   Among the means and methods by which the defendants
and their associates conducted and participated in the conduct of
the affairs of the enterprise were the following:

        a.   Members of the MS-13 and their associates
committed, attempted to commit and threatened to commit acts of

4

violence, including murder, attempted murder, robbery and
assault, to enhance the enterprise's prestige and protect and
expand the enterprise's criminal operations.

b.    Members of the MS-13 and their associates
used and threatened to use physical violence against various
individuals, including members of rival criminal organizations
and MS-13 members who violated the enterprise's rules.

c.    Members of the enterprise and their
associates used, attempted to use, and conspired to use robbery
and narcotics trafficking as means of obtaining money.

COUNT ONE
(Racketeering)

6.    The allegations contained in paragraphs one through
five are realleged and incorporated as if fully set forth in this
paragraph.

7.    In or about and between April 2001 and the date of
this Superseding Indictment, both dates being approximate and
inclusive, within the Eastern District of New York and elsewhere,
the defendants GIOVANNI PRADO, also known as "Joker," EFRAIN
ZUNIGA, also known as "Panico," YONIS ACOSTA-YANES, also known as
"Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," EMILIO
SABALLOS, also known as "Caballo," VIDAL ESPINAL, also known as
"Demente," ROGER ALVARADO, also known as "Michichi," CARLOS
MARTINEZ, also known as "Carlito," JOSE GUSTAVO ORELLANA-TORRES,
also known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"
MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY

5

Eastern District of New York and elsewhere, the defendants EFRAIN
ZUNIGA, also known as "Panico," and YONIS ACOSTA-YANES, also
known as "Brujita," together with others, did knowingly and
intentionally conspire to distribute and possess with intent to
distribute a controlled substance, which offense involved a
substance containing cocaine, a Schedule II controlled substance,
in violation of Title 21, United States Code, Sections 841(a)(1)
and 846.

RACKETEERING ACT THREE
(Attempted Murder of John Doe #1)

10.    On or about June 28, 2008, within the Eastern
District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, also
known as "Payaso," together with others, did knowingly and
intentionally attempt to cause the death of another person, to
wit: John Doe #1, an individual whose identity is known to the
Grand Jury, in violation of New York Penal Law Sections
125.25(1), 110.00 and 20.00.

RACKETEERING ACT FOUR
(Conspiracy to Murder John Doe #2)

11.    On or about August 2008, such date being
approximate and inclusive, within the Eastern District of New
York, the defendants EFRAIN ZUNIGA, also known as "Panico," YONIS
ACOSTA-YANES, also known as "Brujita," and DIEGO NINOS, also
known as "Veneno" and "Mico," together with others, did knowingly
and intentionally conspire to cause the death of another person,
to wit: John Doe #2, an individual whose identity is known to the

7

SOSA, also known as "Junior," and JEREMIAS EXEQUIEL AMAYA, also
known as "Payaso," together with others, being persons employed
by and associated with the MS-13, an enterprise that engaged in
and the activities of which affected, interstate and foreign
commerce, knowingly and intentionally conducted and participated,
directly and indirectly, in the conduct of the affairs of the MS-
13 through a pattern of racketeering activity, as that term is
defined by 18 U.S.C. § 1961(1) and (5), consisting of the
racketeering acts set forth below.

RACKETEERING ACT ONE
(Conspiracy to Distribute Cocaine)

8.    In or about and between January 2003 and May 2010,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants GIOVANNI
PRADO, also known as "Joker," and EMILIO SABALLOS, also known as
"Caballo," together with others, did knowingly and intentionally
conspire to distribute and possess with intent to distribute a
controlled substance, which offense involved a substance
containing cocaine, a Schedule II controlled substance, in
violation of Title 21, United States Code, Sections 841(a)(1) and
846.

RACKETEERING ACT TWO
(Conspiracy to Distribute Cocaine)

9.    In or about and between April 2008 and November
2008, both dates being approximate and inclusive, within the

6

Grand Jury, in violation of New York Penal Law Sections 125.25(1)
and 105.15.

RACKETEERING ACT FIVE
(Conspiracy to Murder John Doe #3)

12.    On or about October 11, 2008, within the Eastern
District of New York, the defendants YONIS ACOSTA-YANES, also
known as "Brujita," and DIEGO NINOS, also known as "Veneno" and
"Mico," together with others, did knowingly and intentionally
conspire to cause the death of another person, to wit: John Doe
#3, an individual whose identity is known to the Grand Jury, in
violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT SIX
(Murder of Dexter Acheampong and
Conspiracy to Murder Rival Gang Members)

13.    The defendant JOSE GUSTAVO ORELLANA-TORRES, also
known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"
committed the following acts, either one of which alone
constitutes Racketeering Act Six:

A.    Murder

14.    On or about May 26, 2009, within the Eastern
District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES,
also known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"
together with others, with intent to cause the death of another
person, to wit: Dexter Acheampong, did cause his death, in
violation of New York Penal Law Sections 125.25(1) and 20.00.

8

NB:JJD
F.#2010R00014

RECEIVED
U.S. DISTRICT COURT EDNY
★ JUL 1 5 2010 ★
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

GIOVANNI PRADO,
    also known as "Joker,"
ERICK ALVARADO,
    also known as "Gato Seco,"
ELENILSON ORTIZ,
    also known as "Shorty,"
EFRAIN ZUNIGA,
    also known as "Panico,"
YONIS ACOSTA-YANES,
    also known as "Brujula,"
DIEGO NINOS,
    also known as "Veneno" and
    "Mico,"
SERGIO MEJIA-BARRERA,
    also known as "Pelon,"
EMILIO SABALLOS,
    also known as "Caballo,"
WALTER FLORES-REYES,
    also known as "Scrappy,"
DAVID VALLE,
    also known as "Niño" and
    "Oreo,"
LOUIS RUIZ,
    also known as "Chucky,"
FRANCISCO RAMOS,
    also known as "Cruiser,"
CESAR LANDAVERDE,
    also known as "Flaco" and
    "Rebelde,"
HERIBERTO MARTINEZ,
    also known as "Boxer,"
VIDAL ESPINAL,
    also known as "Demente,"
ROGER ALVARADO,
    also known as "Michichi,"
CARLOS MARTINEZ,
    also known as "Carlito,"

SUPERSEDING
INDICTMENT

Cr. No. 10-074 (S-2)(JFB)
(T. 18, U.S.C., §§
924(c)(1)(A)(i),
924(c)(1)(A)(ii),
924(c)(1)(A)(iii),
924(j)(1), 1512(b)(1),
1512(b)(2)(A), 1513(b)(2),
1959(a)(1), 1959(a)(3),
1959(a)(4), 1959(a)(5),
1959(a)(6), 1962(c),
1962(d), 1963, 2 and 3551
et seq.; T. 21, U.S.C., §§
841(b)(1)(C) and 846)

---

JOSE GUSTAVO ORELLANA-TORRES,
    also known as "Diablito" and
    "Gustavo Jefferson Orellana-
    Torres,"
MARIO ALPHONSO HERRERA-UMANZOR,
    also known as "Perdido,"
JIMMY SOSA,
    also known as "Junior,"
JEREMIAS EXEQUIEL AMAYA,
    also known as "Payaso," and
JOSE SALAZAR ERAZO,

                Defendants.

- - - - - - - - - - - - - - - - - -X

THE GRAND JURY CHARGES:

INTRODUCTION

    At all times relevant to this Superseding Indictment,
unless otherwise indicated:

The Enterprise

    1. La Mara Salvatrucha, also known as the "MS-13,"
(hereinafter the "MS-13" or the "enterprise") was a gang
comprised primarily of immigrants from Central America, with
members located throughout Long Island, New York, Queens, New
York and elsewhere. Members and associates of the MS-13 have
engaged in acts of violence, including murder, attempted murder,
robbery and assault, as well as other criminal activity,
including narcotics trafficking, robbery, witness tampering and
witness retaliation.

    2. The defendants GIOVANNI PRADO, also known as
"Joker," ERICK ALVARADO, also known as "Gato Seco," ELENILSON

2

---

ORTIZ, also known as "Shorty," EFRAIN ZUNIGA, also known as
"Panico," YONIS ACOSTA-YANES, also known as "Brujula," DIEGO
NINOS, also known as "Veneno" and "Mico," SERGIO MEJIA-BARRERA,
also known as "Pelon," EMILIO SABALLOS, also known as "Caballo,"
WALTER FLORES-REYES, also known as "Scrappy," DAVID VALLE, also
known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky,"
FRANCISCO RAMOS, also known as "Cruiser," CESAR LANDAVERDE, also
known as "Flaco" and "Rebelde," HERIBERTO MARTINEZ, also known as
"Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO,
also known as "Michichi," CARLOS MARTINEZ, also known as
"Carlito," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito"
and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and
JOSE SALAZAR ERAZO were members and associates of the MS-13.

    3. The MS-13, including its leadership, membership and
associates, constituted an "enterprise" as defined by Title 18,
United States Code, Section 1961(4), that is, a group of
individuals associated in fact. The enterprise constituted an
ongoing organization whose members functioned as a continuing
unit for a common purpose of achieving the objectives of the
enterprise. The enterprise was engaged in, and its activities
affected, interstate and foreign commerce.

3

---

Purposes of the Enterprise

    4. The purposes of the enterprise included the
following:

    a. Promoting and enhancing the prestige,
reputation and position of the enterprise with respect to rival
criminal organizations.

    b. Preserving and protecting the power,
territory and criminal ventures of the enterprise through the use
of intimidation, threats of violence and acts of violence,
including assault and murder.

    c. Keeping victims and rivals in fear of the
enterprise and its members and associates.

    d. Enriching the members and associates of the
enterprise through criminal activity, including robbery and
narcotics trafficking.

    e. Ensuring discipline within the enterprise and
compliance with the enterprise's rules by members and associates
through threats of violence and acts of violence.

Means and Methods of the Enterprise

    5. Among the means and methods by which the defendants
and their associates conducted and participated in the conduct of
the affairs of the enterprise were the following:

    a. Members of the MS-13 and their associates
committed, attempted to commit and threatened to commit acts of

4

violence, including murder, attempted murder, robbery and
assault, to enhance the enterprise's prestige and protect and
expand the enterprise's criminal operations.

      b.    Members of the MS-13 and their associates
used and threatened to use physical violence against various
individuals, including members of rival criminal organizations
and MS-13 members who violated the enterprise's rules.

      c.    Members of the enterprise and their
associates used, attempted to use, and conspired to use robbery
and narcotics trafficking as means of obtaining money.

### COUNT ONE
### (Racketeering)

    6.   The allegations contained in paragraphs one through
five are realleged and incorporated as if fully set forth in this
paragraph.

    7.   In or about and between April 2001 and the date of
this Superseding Indictment, both dates being approximate and
inclusive, within the Eastern District of New York and elsewhere,
the defendants GIOVANNI PRADO, also known as "Joker," EFRAIN
ZUNIGA, also known as "Panico," YONIS ACOSTA-YANES, also known as
"Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," EMILIO
SABALLOS, also known as "Caballo," VIDAL ESPINAL, also known as
"Demente," ROGER ALVARADO, also known as "Michichi," CARLOS
MARTINEZ, also known as "Carlito," JOSE GUSTAVO ORELLANA-TORRES,
also known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"
MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY

SOSA, also known as "Junior," and JEREMIAS EXEQUIEL AMAYA, also
known as "Payaso," together with others, being persons employed
by and associated with the MS-13, an enterprise that engaged in,
and the activities of which affected, interstate and foreign
commerce, knowingly and intentionally conducted and participated,
directly and indirectly, in the conduct of the affairs of the MS-
13 through a pattern of racketeering activity, as that term is
defined by 18 U.S.C. § 1961(1) and (5), consisting of the
racketeering acts set forth below.

### RACKETEERING ACT ONE
### (Conspiracy to Distribute Cocaine)

    8.   In or about and between January 2003 and May 2010,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants GIOVANNI
PRADO, also known as "Joker," and EMILIO SABALLOS, also known as
"Caballo," together with others, did knowingly and intentionally
conspire to distribute and possess with intent to distribute a
controlled substance, which offense involved a substance
containing cocaine, a Schedule II controlled substance, in
violation of Title 21, United States Code, Sections 841(a)(1) and
846.

### RACKETEERING ACT TWO
### (Conspiracy to Distribute Cocaine)

    9.   In or about and between April 2008 and November
2008, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendants EFRAIN
ZUNIGA, also known as "Panico," and YONIS ACOSTA-YANES, also
known as "Brujita," together with others, did knowingly and
intentionally conspire to distribute and possess with intent to
distribute a controlled substance, which offense involved a
substance containing cocaine, a Schedule II controlled substance,
in violation of Title 21, United States Code, Sections 841(a)(1)
and 846.

### RACKETEERING ACT THREE
### (Attempted Murder of John Doe #1)

    10.  On or about June 28, 2008, within the Eastern
District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, also
known as "Payaso," together with others, did knowingly and
intentionally attempt to cause the death of another person, to
wit: John Doe #1, an individual whose identity is known to the
Grand Jury, in violation of New York Penal Law Sections
125.25(1), 110.00 and 20.00.

### RACKETEERING ACT FOUR
### (Conspiracy to Murder John Doe #2)

    11.  In or about August 2008, such date being
approximate and inclusive, within the Eastern District of New
York, the defendants EFRAIN ZUNIGA, also known as "Panico," YONIS
ACOSTA-YANES, also known as "Brujita," and DIEGO NINOS, also
known as "Veneno" and "Mico," together with others, did knowingly
and intentionally conspire to cause the death of another person,
to wit: John Doe #2, an individual whose identity is known to the

Grand Jury, in violation of New York Penal Law Sections 125.25(1)
and 105.15.

### RACKETEERING ACT FIVE
### (Conspiracy to Murder John Doe #3)

    12.  On or about October 11, 2008, within the Eastern
District of New York, the defendants YONIS ACOSTA-YANES, also
known as "Brujita," and DIEGO NINOS, also known as "Veneno" and
"Mico," together with others, did knowingly and intentionally
conspire to cause the death of another person, to wit: John Doe
#3, an individual whose identity is known to the Grand Jury, in
violation of New York Penal Law Sections 125.25(1) and 105.15.

### RACKETEERING ACT SIX
### (Murder of Dexter Acheampong and
### Conspiracy to Murder Rival Gang Members)

    13.  The defendant JOSE GUSTAVO ORELLANA-TORRES, also
known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"
committed the following acts, either one of which alone
constitutes Racketeering Act Six:

    A.    Murder

    14.  On or about May 26, 2009, within the Eastern
District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES,
also known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"
together with others, with intent to cause the death of another
person, to wit: Dexter Acheampong, did cause his death, in
violation of New York Penal Law Sections 125.25(1) and 20.00.

B.   Conspiracy to Murder

15.   In or about May 2009, such date being approximate
and inclusive, within the Eastern District of New York, the
defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito"
and "Gustavo Jefferson Orellana-Torres," together with others,
did knowingly and intentionally conspire to cause the death of
rival gang members, in violation of New York Penal Law Sections
125.25(1) and 105.15.

RACKETEERING ACT SEVEN
(Attempted Murder of John Doe #4)

16.   On or about July 5, 2009, within the Eastern
District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES,
also known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"
together with others, did knowingly and intentionally attempt to
cause the death of another person, to wit: John Doe #4, an
individual whose identity is known to the Grand Jury, in
violation of New York Penal Law Sections 125.25(1), 110.00 and
20.00.

RACKETEERING ACT EIGHT
(Attempted Murder of John Doe #5)

17.   On or about November 21, 2009, within the Eastern
District of New York, the defendant GIOVANNI PRADO, also known as
"Joker," together with others, did knowingly and intentionally
attempt to cause the death of another person, to wit: John Doe
#5, an individual whose identity is known to the Grand Jury, in

9

violation of New York Penal Law Sections 125.25(1), 110.00 and
20.00.

RACKETEERING ACT NINE
(Tampering with Witnesses)

18.   In or about and between January 2010 and March
2010, both dates being approximate and inclusive, within the
Eastern District of New York, the defendant EMILIO SABALLOS, also
known as "Caballo," together with others, did knowingly and
intentionally use intimidation, threaten, corruptly persuade and
engage in misleading conduct towards John Doe #6 and John Doe #7,
individuals whose identities are known to the Grand Jury, with
the intent to influence, delay and prevent the testimony of John
Doe #6 and John Doe #7 in an official proceeding, to wit: an
Eastern District of New York grand jury investigation, and to
cause and induce such persons to withhold testimony from said
official proceeding, in violation of Title 18, United States
Code, Sections 1512(b)(1), 1512(b)(2)(A) and 2.

RACKETEERING ACT TEN
(Murder and Conspiracy to Murder David Sandler)

19.   The defendants MARIO ALPHONSO HERRERA-UMANZOR,
also known as "Perdido," JIMMY SOSA, also known as "Junior," and
ROGER ALVARADO, also known as "Michichi," committed the following
acts, either one of which alone constitutes Racketeering Act Ten:

10

A.   Murder

20.   On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, with intent to cause the death of another person, to
wit: David Sandler, did cause his death, in violation of New York
Penal Law Sections 125.25(1) and 20.00.

B.   Conspiracy to Murder

21.   In or about February 2010, such date being
approximate and inclusive, within the Eastern District of New
York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known
as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER
ALVARADO, also known as "Michichi," together with others, did
knowingly and intentionally conspire to cause the death of
another person, to wit: David Sandler, in violation of New York
Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT ELEVEN
(Attempted Murder of John Doe #8)

22.   On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, did knowingly and intentionally attempt to cause the
death of another person, to wit: John Doe #8, an individual whose

11

identity is known to the Grand Jury, in violation of New York
Penal Law Sections 125.25(1), 110.00 and 20.00.

RACKETEERING ACT TWELVE
(Murder and Conspiracy to Murder Nestor Moreno)

23.   The defendants VIDAL ESPINAL, also known as
"Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS
MARTINEZ, also known as "Carlito," committed the following acts,
either one of which alone constitutes Racketeering Act Twelve:

A.   Murder

24.   On or about March 6, 2010, within the Eastern
District of New York, the defendants VIDAL ESPINAL, also known as
"Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS
MARTINEZ, also known as "Carlito," together with others, with
intent to cause the death of another person, to wit: Nestor
Moreno, did cause his death, in violation of New York Penal Law
Sections 125.25(1) and 20.00.

B.   Conspiracy to Murder

25.   In or about February 2010 and March 2010, such
dates being approximate and inclusive, within the Eastern
District of New York, the defendants VIDAL ESPINAL, also known as
"Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS
MARTINEZ, also known as "Carlito," together with others, did
knowingly and intentionally conspire to cause the death of
another person, to wit: Nestor Moreno, in violation of New York
Penal Law Sections 125.25(1) and 105.15.

12

## RACKETEERING ACT THIRTEEN
(Murder and Conspiracy to Murder Mario Alberto Canton Quijada)

26.  The defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," ROGER ALVARADO, also known as "Michichi," VIDAL ESPINAL, also known as "Demente," and CARLOS MARTINEZ, also known as "Carlito," committed the following acts, either one of which alone constitutes Racketeering Act Thirteen:

A.  Murder

27.  On or about March 17, 2010, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and ROGER ALVARADO, also known as "Michichi," together with others, with intent to cause the death of another person, to wit: Mario Alberto Canton Quijada, also known as "Baby Blue," did cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

B.  Conspiracy to Murder

28.  In or about March 2010, such date being approximate and inclusive, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," ROGER ALVARADO, also known as "Michichi," VIDAL ESPINAL, also known as "Demente," and CARLOS MARTINEZ, also known as "Carlito," together with others, did knowingly and intentionally conspire to cause the death of another person, to

13

wit: Mario Alberto Canton Quijada, also known as "Baby Blue," in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1962(c), 1963 and 3551 et seq.)

## COUNT TWO
(Racketeering Conspiracy)

29.  The allegations contained in paragraphs one through five are realleged and incorporated as if fully set forth in this paragraph.

30.  In or about and between April 2001 and the date of this Superseding Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants GIOVANNI PRADO, also known as "Joker," EFRAIN ZUNIGA, also known as "Panico," YONIS ACOSTA-YANES, also known as "Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," EMILIO SABALLOS, also known as "Caballo," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," CARLOS MARTINEZ, also known as "Carlito," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," together with others, being persons employed by and associated with the MS-13, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate

14

Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and (5).

31.  The pattern of racketeering activity through which the defendants GIOVANNI PRADO, also known as "Joker," EFRAIN ZUNIGA, also known as "Panico," YONIS ACOSTA-YANES, also known as "Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," EMILIO SABALLOS, also known as "Caballo," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," CARLOS MARTINEZ, also known as "Carlito," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," agreed to conduct the affairs of the enterprise consisted of the racketeering acts set forth in paragraphs eight through twenty-eight of Count One of this Superseding Indictment, as Racketeering Acts One through Thirteen, which are realleged and incorporated as if fully set forth in this paragraph.  Each defendant agreed that a

15

conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

## COUNT THREE
(Conspiracy to Distribute Cocaine)

32.  In or about and between January 2003 and May 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants GIOVANNI PRADO, also known as "Joker," and EMILIO SABALLOS, also known as "Caballo," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and 841(b)(1)(C); Title 18, United States Code, Sections 3551 et seq.)

## COUNT FOUR
(Conspiracy to Distribute Cocaine)

33.  In or about and between April 2008 and November 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants EFRAIN ZUNIGA, also known as "Panico," and YONIS ACOSTA-YANES, also known as "Brujita," together with others, did knowingly and

16

intentionally conspire to distribute and to possess with intent
to distribute a controlled substance, which offense involved a
substance containing cocaine, a Schedule II controlled substance,
in violation of Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and
841(b)(1)(C); Title 18, United States Code, Sections 3551 et
seq.)

### COUNT FIVE
(Attempted Murder of John Doe #1)

34.   At all times relevant to this Superseding
Indictment, the MS-13, as more fully described in paragraphs one
through five, which are realleged and incorporated as if fully
set forth in this paragraph, including its leadership, membership
and associates, constituted an "enterprise" as defined in Section
1959(b)(2) of Title 18, United States Code, that is, a group of
individuals associated in fact that was engaged in, and the
activities of which affected, interstate and foreign commerce.
The enterprise constituted an ongoing organization whose members
functioned as a continuing unit for a common purpose of achieving
the objectives of the enterprise.

35.   At all times relevant to this Superseding
Indictment, the MS-13, through its members and associates,
engaged in racketeering activity, as defined in Title 18, United
States Code, Sections 1959(b)(1) and 1961(1), that is, acts and
threats involving murder and robbery, in violation of the laws of

17

the State of New York, and narcotics trafficking, in violation of
Title 21, United States Code, Sections 841 and 846.

36.   On or about June 28, 2008, within the Eastern
District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, also
known as "Payaso," together with others, for the purpose of
maintaining and increasing position in the MS-13, an enterprise
that was engaged in racketeering activity, did knowingly and
intentionally attempt to murder John Doe #1, in violation of New
York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2
and 3551 et seq.)

### COUNT SIX
(Assault With Dangerous Weapons:
Machete and Baseball Bat Attack on John Doe #1)

37.   The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

38.   On or about June 28, 2008, within the Eastern
District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, also
known as "Payaso," together with others, for the purpose of
maintaining and increasing position in the MS-13, an enterprise
that was engaged in racketeering activity, did knowingly and
intentionally assault John Doe #2 with dangerous weapons, to wit:

18

a machete and baseball bats, in violation of New York Penal Law
Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2
and 3551 et seq.)

### COUNT SEVEN
(Conspiracy to Murder John Doe #2)

39.   The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

40.   On or about August 2008, within the Eastern
District of New York, the defendants EFRAIN ZUNIGA, also known as
"Panico," YONIS ACOSTA-YANES, also known as "Brujita," and DIEGO
NINOS, also known as "Veneno" and "Mico," together with others,
for the purpose of maintaining and increasing position in the MS-
13, an enterprise that was engaged in racketeering activity, did
knowingly and intentionally conspire to murder John Doe #2, in
violation of New York Penal Law Sections 125.25 and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and
3551 et seq.)

### COUNT EIGHT
(Possessing a Firearm During a Crime of Violence)

41.   The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

19

42.   In or about August 2008, within the Eastern
District of New York, the defendants EFRAIN ZUNIGA, also known as
"Panico," YONIS ACOSTA-YANES, also known as "Brujita," and DIEGO
NINOS, also known as "Veneno" and "Mico," together with others,
did knowingly and intentionally use and carry a firearm during
and in relation to a crime of violence, to wit: the crime charged
in Count Seven, and did knowingly and intentionally possess that
firearm in furtherance of said crime of violence.

(Title 18, United States Code, Sections
924(c)(1)(A)(i), 2 and 3551 et seq.)

### COUNT NINE
(Conspiracy to Commit Assaults with Dangerous Weapons)

43.   The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

44.   On or about September 14, 2008, within the Eastern
District of New York, the defendants GIOVANNI PRADO, also known as
"Joker," SERGIO MEJIA-BARRERA, also known as "Pelon," EMILIO
SABALLOS, also known as "Caballo," WALTER FLORES-REYES, also known
as "Scrappy," DAVID VALLE, also known as "Niño" and "Oreo," LOUIS
RUIZ, also known as "Chucky," and FRANCISCO RAMOS, also known as
"Cruiser," together with others, for the purpose of maintaining
and increasing position in the MS-13, an enterprise that was
engaged in racketeering activity, did knowingly and intentionally
conspire to assault John Doe #9, Iber Marin, and John Doe #10,
individuals whose

20

identities are known to the Grand Jury, with dangerous weapons, to wit: glass beer bottles, in violation of New York Penal Law Sections 120.05(2) and 105.05.

(Title 18, United States Code, Sections 1959(a)(6) and 3551 et seq.)

COUNT TEN
(Assault Resulting in Serious Bodily Injury: Iber Marin)

45. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

46. On or about September 14, 2008, within the Eastern District of New York, the defendants GIOVANNI PRADO, also known as "Joker," SERGIO MEJIA-BARRERA, also known as "Pelon," EMILIO SABALLOS, also known as "Caballo," WALTER FLORES-REYES, also known as "Scrappy," DAVID VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky," and FRANCISCO RAMOS, also known as "Cruiser," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally assault Iber Marin, which assault resulted in serious bodily injury, to wit: death, in violation of New York Penal Law Section 120.10(1).

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

21

COUNT ELEVEN
(Assault Resulting in Serious Bodily Injury: John Doe #10)

47. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

48. On or about September 14, 2008, within the Eastern District of New York, the defendants WALTER FLORES-REYES, also known as "Scrappy," DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally assault John Doe #10, which assault resulted in serious bodily injury, in violation of New York Penal Law Sections 120.10(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

COUNT TWELVE
(Conspiracy to Murder John Doe #3)

49. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

50. On or about October 11, 2008, within the Eastern District of New York, the defendants YONIS ACOSTA-YANES, also known as "Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," and CESAR LANDAVERDE, also known as "Flaco" and

22

"Rebelde," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally conspire to murder John Doe #3, in violation of New York Penal Law Sections 125.25 and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT THIRTEEN
(Possessing a Firearm During a Crime of Violence)

51. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

52. On or about October 11, 2008, within the Eastern District of New York, the defendants YONIS ACOSTA-YANES, also known as "Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," and CESAR LANDAVERDE, also known as "Flaco" and "Rebelde," together with others, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence, to wit: the crime charged in Count Twelve, and did knowingly and intentionally possess that firearm in furtherance of said crime of violence.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 2 and 3551 et seq.)

23

COUNT FOURTEEN
(Conspiracy to Murder Rival Gang Members)

53. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

54. In or about May 2009, such date being approximate and inclusive, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally conspire to murder rival gang members, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT FIFTEEN
(Murder of Dexter Acheampong)

55. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

56. On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and

24

increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally murder Dexter Acheampong, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT SIXTEEN
(Unlawful Use of Firearm During a Crime
of Violence: Dexter Acheampong Murder)

57. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

58. On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, did knowingly and intentionally use and carry a firearm during and in relation to crimes of violence, to wit: the crimes charged in Counts Fourteen and Fifteen, and did knowingly and intentionally possess said firearm in furtherance of those crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

33

COUNT SEVENTEEN
(Causing the Death of Dexter Acheampong
Through the Use of a Firearm)

59. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

60. On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Sixteen, did knowingly and intentionally cause the death of a person through the use of a firearm, to wit: a handgun, which killing is a murder as defined in Title 18, United States Code, Section 1111(a), in that the defendant, with malice aforethought, did unlawfully kill Dexter Acheampong willfully, deliberately, maliciously, and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

COUNT EIGHTEEN
(Attempted Murder of John Doe #4)

61. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

62. On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES,

34

also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #4, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

COUNT NINETEEN
(Assault with a Dangerous Weapon:
Shooting of John Doe #4)

63. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

64. On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally assault John Doe #4 with a dangerous weapon, to wit: a .38 caliber revolver, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

27

COUNT TWENTY
(Discharge of Firearm During Crimes of Violence:
Attempted Murder and Assault of John Doe #4)

65. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

66. On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, did knowingly and intentionally use and carry a firearm during and in relation to crimes of violence, to wit: the crimes charged in Counts Eighteen and Nineteen, and did knowingly and intentionally possess said firearm in furtherance of those crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

COUNT TWENTY-ONE
(Conspiracy to Commit Assault with a Dangerous Weapon)

67. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

68. On or about November 21, 2009, the defendants GIOVANNI PRADO, also known as "Joker," ERICK ALVARADO, also known as "Gato Seco," and ELENILSON ORTIZ, also known as "Shorty," together with others, for the purpose of maintaining and

28

increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally conspire to assault John Doe #5, John Doe #6 and John Doe #7 with a dangerous weapon, to wit: a baseball bat, in violation of New York Penal Law Sections 120.05(2) and 105.05.

(Title 18, United States Code, Sections 1959(a)(6) and 3551 et seq.)

### COUNT TWENTY-TWO
(Attempted Murder of John Doe #5)

69. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

70. On or about November 21, 2009, within the Eastern District of New York, the defendants GIOVANNI PRADO, also known as "Joker," ERICK ALVARADO, also known as "Gato Seco," and ELENILSON ORTIZ, also known as "Shorty," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #5, in violation of New York Penal Law Sections 125.25(1) and 110.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

29

### COUNT TWENTY-THREE
(Assault with a Dangerous Weapon: Baseball Bat Beating of John Doe #5)

71. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

72. On or about November 21, 2009, within the Eastern District of New York, the defendants GIOVANNI PRADO, also known as "Joker," ERICK ALVARADO, also known as "Gato Seco," and ELENILSON ORTIZ, also known as "Shorty," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally assault John Doe #5 with a dangerous weapon, to wit: a baseball bat, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

### COUNT TWENTY-FOUR
(Threatening to Commit Crimes of Violence)

73. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

74. On or about November 21, 2009, within the Eastern District of New York, the defendants GIOVANNI PRADO, also known as "Joker," ERICK ALVARADO, also known as "Gato Seco," and ELENILSON ORTIZ, also known as "Shorty," together with others,

30

for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally threaten to commit crimes of violence against one or more individuals, to wit: John Doe #6 and John Doe #7, in violation of New York Penal Law Sections 120.14(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(4), 2 and 3551 et seq.)

### COUNT TWENTY-FIVE
(Tampering with Witnesses)

75. In or about and between January 2010 and March 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendant EMILIO SABALLOS, also known as "Caballo," together with others, did knowingly and intentionally use intimidation, threaten, corruptly persuade and engage in misleading conduct towards John Doe #6 and John Doe #7 with the intent to influence, delay and prevent the testimony of John Doe #6 and John Doe #7 in an official proceeding, to wit: an Eastern District of New York grand jury investigation, and to cause and induce such persons to withhold testimony from said official proceeding.

(Title 18, United States Code, Sections 1512(b)(1), 1512(b)(2)(A), 2 and 3551 et seq.)

31

### COUNT TWENTY-SIX
(Conspiracy to Murder David Sandler)

76. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

77. In or about February 2010, such dates being approximate and inclusive, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally conspire to murder David Sandler, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

### COUNT TWENTY-SEVEN
(Murder of David Sandler)

78. The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

79. On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together

32

with others, for the purpose of maintaining and increasing
position in the MS-13, an enterprise that was engaged in
racketeering activity, did knowingly and intentionally murder
David Sandler, in violation of New York Penal Law Sections
125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2
and 3551 et seq.)

COUNT TWENTY-EIGHT
(Discharge of Firearm During a Crime
of Violence: David Sandler Murder)

80.  The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

81.  On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, did knowingly and intentionally use and carry a
firearm during and in relation to crimes of violence, to wit: the
crimes charged in Counts Twenty-Six and Twenty-Seven, and did
knowingly and intentionally possess said firearm in furtherance
of those crimes of violence, which firearm was brandished and
discharged.

(Title 18, United States Code, Sections
924(c)(1)(A)(iii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

33

COUNT TWENTY-NINE
(Causing the Death of David Sandler Through the Use of a Firearm)

82.  The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

83.  On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, in the course of a violation of Title 18, United
States Code, Section 924(c), to wit: the crime charged in Count
Twenty-Eight, did knowingly and intentionally cause the death of
a person through the use of a firearm, to wit: a handgun, which
killing is a murder as defined in Title 18, United States Code,
Section 1111(a), in that the defendants, with malice
aforethought, did unlawfully kill David Sandler willfully,
deliberately, maliciously, and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2
and 3551 et seq.)

COUNT THIRTY
(Attempted Murder of John Doe #8)

84.  The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

34

85.  On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, for the purpose of maintaining and increasing
position in the MS-13, an enterprise that was engaged in
racketeering activity, did knowingly and intentionally attempt to
murder John Doe #8, in violation of New York Penal Law Sections
125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and
3551 et seq.)

COUNT THIRTY-ONE
(Assault with a Dangerous Weapon:
Shooting of John Doe #8)

86.  The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

87.  On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, for the purpose of maintaining and increasing
position in the MS-13, an enterprise that was engaged in
racketeering activity, did knowingly and intentionally assault
John Doe #8 with a dangerous weapon, to wit: a .38 caliber

35

revolver, in violation of New York Penal Law Sections 120.05(2)
and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2
and 3551 et seq.)

COUNT THIRTY-TWO
(Discharge of Firearm During Crimes of Violence:
Attempted Murder and Assault of John Doe #8)

88.  The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

89.  On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, did knowingly and intentionally use and carry a
firearm during and in relation to crimes of violence, to wit: the
crimes charged in Counts Thirty and Thirty-One, and did knowingly
and intentionally possess said firearm in furtherance of those
crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections
924(c)(1)(A)(iii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

COUNT THIRTY-THREE
(Conspiracy to Murder Nestor Moreno)

90.  The allegations contained in paragraphs one
through five and thirty-four and thirty-five are realleged and
incorporated as if fully set forth in this paragraph.

36

91.  In or about and between February 2010 and March 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally conspire to murder Nestor Moreno, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT THIRTY-FOUR
(Murder of Nestor Moreno)

92.  The allegations contained in paragraphs one through five and thirty-four are realleged and incorporated as if fully set forth in this paragraph.

93.  On or about March 6, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and

37

intentionally murder Nestor Moreno, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT THIRTY-FIVE
(Discharge of Firearm During a Crime
of Violence: Nestor Moreno Murder)

94.  The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

95.  On or about March 6, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, did knowingly and intentionally use and carry a firearm during and in relation to crimes of violence, to wit: the crimes charged in Counts Thirty-Three and Thirty-Four, and did knowingly and intentionally possess said firearm in furtherance of those crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

COUNT THIRTY-SIX
(Causing the Death of Nestor Moreno Through the Use of a Firearm)

96.  The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and

38

incorporated as if fully set forth in this paragraph.

97.  On or about March 6, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Thirty-Five, did knowingly and intentionally cause the death of a person through the use of a firearm, to wit: a handgun, which killing is a murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants, with malice aforethought, did unlawfully kill Nestor Moreno willfully, deliberately, maliciously, and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

COUNT THIRTY-SEVEN
(Conspiracy to Murder Mario Alberto Canton Quijada)

98.  The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

99.  In or about March 2010, such dates being approximate and inclusive, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO,

39

also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally conspire to murder Mario Alberto Canton Quijada, also known as "Baby Blue," in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT THIRTY-EIGHT
(Murder of Mario Alberto Canton Quijada)

100.  The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

101.  On or about March 17, 2010, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally murder Mario Alberto Canton Quijada, also known as "Baby Blue," in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

40

## COUNT THIRTY-NINE
(Brandishing of a Firearm During a Crime
of Violence: Quijada Murder)

102.  The allegations contained in paragraphs one through five and thirty-four are realleged and incorporated as if fully set forth in this paragraph.

103.  On or about March 17, 2010, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and ROGER ALVARADO, also known as "Michichi," together with others, did knowingly and intentionally use and carry a firearm during and in relation to crimes of violence, to wit: the crimes charged in Counts Thirty-Seven and Thirty-Eight, and did knowingly and intentionally possess said firearm in furtherance of those crimes of violence, which firearm was brandished.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 2 and 3551 et seq.)

## COUNT FORTY
(Witness Retaliation)

104.  On or about May 30, 2010, within the Eastern District of New York and elsewhere, the defendant JOSE SALAZAR ERAZO, together with others, did knowingly and intentionally engage in conduct and thereby cause bodily injury to another person, to wit: John Doe #6, with intent to retaliate against

41

108.  On or about May 30, 2010, within the Eastern District of New York, the defendant JOSE SALAZAR ERAZO together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally assault John Doe #6 with a dangerous weapon, to wit: a baseball bat, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

A TRUE BILL

FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

43

John Doe #6 for providing information relating to the commission and possible commission of a Federal offense to a law enforcement officer.

(Title 18, United States Code, Sections 1513(b)(2), 2 and 3551 et seq.)

## COUNT FORTY-ONE
(Attempted Murder of John Doe #6)

105.  The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

106.  On or about May 30, 2010, within the Eastern District of New York, the defendant JOSE SALAZAR ERAZO, together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise that was engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #6 in violation of New York Penal Law Sections 125.25(1), 110.00, and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

## COUNT FORTY-TWO
(Assault with a Dangerous Weapon:
Baseball Bat Beating of John Doe #6)

107.  The allegations contained in paragraphs one through five and thirty-four and thirty-five are realleged and incorporated as if fully set forth in this paragraph.

42

NB:JJD
F.#2010R00014

FILED
IN CLERK'S OFFICE
DISTRICT COURT E D N Y

★   MAR 03 2011   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

GIOVANNI PRADO,
    also known as "Joker,"
ERICK ALVARADO,
    also known as "Gato Seco,"
ELENILSON ORTIZ,
    also known as "Shorty,"
EFRAIN ZUNIGA,
    also known as "Panico,"
YONIS ACOSTA-YANES,
    also known as "Brujita,"
DIEGO NINOS,
    also known as "Veneno" and
    "Mico,"
EMILIO SABALLOS,
    also known as "Caballo,"
WALTER FLORES-REYES,
    also known as "Scrappy,"
DAVID VALLE,
    also known as "Niño" and
    "Oreo,"
LOUIS RUIZ,
    also known as "Chucky,"
FRANCISCO RAMOS,
    also known as "Cruiser,"
CESAR LANDAVERDE,
    also known as "Flaco" and
    "Rebelde,"
HERIBERTO MARTINEZ,
    also known as "Boxer,"
VIDAL ESPINAL,
    also known as "Demente,"
ROGER ALVARADO,
    also known as "Michichi,"
CARLOS MARTINEZ,
    also known as "Carlito,"
JOSE GUSTAVO ORELLANA-TORRES,
    also known as "Diablito" and
    "Gustavo Jefferson Orellana-
    Torres,"

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 10-074 (S-3)(JFB)
(T. 18, U.S.C., §§
924(c)(1)(A)(i),
924(c)(1)(A)(ii),
924(c)(1)(A)(iii),
924(c)(1)(C), 924(j)(1),
1512(a)(3), 1512(b)(1),
1512(b)(2)(A), 1512(b)(3),
1512(k), 1959(a)(1),
1959(a)(3), 1959(a)(4),
1959(a)(5), 1959(a)(6),
1962(c), 1962(d), 1963,
2, 3 and 3551 et seq.;
T. 21, U.S.C., §§
841(b)(1)(C) and 846)

---

MARIO ALPHONSO HERRERA-UMANZOR,
    also known as "Perdido,"
JIMMY SOSA,
    also known as "Junior,"
JEREMIAS EXEQUIEL AMAYA,
    also known as "Payaso,"
FRANKLIN VILLATORO,
    also known as "Monstro,"
WILBER AYALA-ARDON,
    also known as "Pajaro" and
    "Piolin,"
YOBANY CALDERON,
    also known as "Tego,"
ADALBERTO ARIEL GUZMAN,
    also known as "Gringo," and
RENE MENDEZ MEJIA,
    also known as "Zorro,"

          Defendants.

- - - - - - - - - - - - - - - - - - -X

THE GRAND JURY CHARGES:

INTRODUCTION

    At all times relevant to this Superseding Indictment,
unless otherwise indicated:

The Enterprise

    1.   La Mara Salvatrucha, also known as the "MS-13,"
(hereinafter the "MS-13" or the "enterprise") was a street gang
comprised primarily of immigrants from Central America, with
members located throughout Long Island, New York, Queens, New
York and elsewhere.  Members and associates of the MS-13 have
engaged in acts of violence, including murder, attempted murder,
robbery and assault, as well as other criminal activity,
including narcotics trafficking, extortion, witness tampering and

2

---

witness retaliation.

    2.   The defendants GIOVANNI PRADO, also known as
"Joker," ERICK ALVARADO, also known as "Gato Seco," ELENILSON
ORTIZ, also known as "Shorty," EFRAIN ZUNIGA, also known as
"Panico," YONIS ACOSTA-YANES, also known as "Brujita," DIEGO
NINOS, also known as "Veneno" and "Mico," EMILIO SABALLOS, also
known as "Caballo," WALTER FLORES-REYES, also known as "Scrappy,"
DAVID VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also
known as "Chucky," FRANCISCO RAMOS, also known as "Cruiser,"
CESAR LANDAVERDE, also known as "Flaco" and "Rebelde," HERIBERTO
MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as
"Demente," ROGER ALVARADO, also known as "Michichi," CARLOS
MARTINEZ, also known as "Carlito," JOSE GUSTAVO ORELLANA-TORRES,
also known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"
MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY
SOSA, also known as "Junior," JEREMIAS EXEQUIEL AMAYA, also known
as "Payaso," WILBER AYALA-ARDON, also known as "Pajaro" and
"Piolin," FRANKLIN VILLATORO, also known as "Monstro," YOBANY
CALDERON, also known as "Tego," ADALBERTO ARIEL GUZMAN, also
known as "Gringo," and RENE MENDEZ MEJIA, also known as "Zorro,"
were members and associates of the MS-13.

    3.   The MS-13, including its leadership, membership and
associates, constituted an "enterprise" as defined by Title 18,
United States Code, Section 1961(4), that is, a group of

3

---

individuals associated in fact.  The enterprise constituted an
ongoing organization whose members functioned as a continuing
unit for a common purpose of achieving the objectives of the
enterprise.  The enterprise was engaged in, and its activities
affected, interstate and foreign commerce.

Purposes of the Enterprise

    4.   The purposes of the enterprise included the
following:

        a.   Promoting and enhancing the prestige,
reputation and position of the enterprise with respect to rival
criminal organizations.

        b.   Preserving and protecting the power,
territory and criminal ventures of the enterprise through the use
of intimidation, threats of violence and acts of violence,
including assault and murder.

        c.   Keeping victims and rivals in fear of the
enterprise and its members and associates.

        d.   Enriching the members and associates of the
enterprise through criminal activity, including robbery,
extortion and narcotics trafficking.

        e.   Ensuring discipline within the enterprise and
compliance with the enterprise's rules by members and associates
through threats of violence and acts of violence.

4

### Means and Methods of the Enterprise

5. Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

a. Members of the MS-13 and their associates committed, attempted to commit and threatened to commit acts of violence, including murder, attempted murder, robbery and assault, to enhance the enterprise's prestige and protect and expand the enterprise's criminal operations.

b. Members of the MS-13 and their associates used and threatened to use physical violence against various individuals, including members of rival criminal organizations and MS-13 members who violated the enterprise's rules.

c. Members of the enterprise and their associates used, attempted to use and conspired to use robbery, extortion and narcotics trafficking as means of obtaining money.

### COUNT ONE
(Racketeering)

6. The allegations contained in paragraphs one through five are realleged and incorporated as if fully set forth in this paragraph.

7. On or about and between April 1, 2001 and the date of this Superseding Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants GIOVANNI PRADO, also known as "Joker," ELENILSON ORTIZ, also known as "Shorty," EFRAIN ZUNIGA, also known as

5

"Caballo," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and 846.

### RACKETEERING ACT TWO
(Conspiracy to Distribute Cocaine)

9. In or about and between April 2008 and November 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants EFRAIN ZUNIGA, also known as "Panico," and YONIS ACOSTA-YANES, also known as "Brujita," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and 846.

### RACKETEERING ACT THREE
(Murder of Santos Castillo-Martinez and Conspiracy to Murder Rival Gang Members)

10. The defendants DAVID VALLE, also known as "Niño" and "Oreo," and YONIS ACOSTA-YANES, also known as "Brujita," together with others, committed the following acts, either one of which alone constitutes Racketeering Act Three:

7

"Panico," YONIS ACOSTA-YANES, also known as "Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," EMILIO SABALLOS, also known as "Caballo," DAVID VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky," HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," CARLOS MARTINEZ, also known as "Carlito," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and FRANKLIN VILLATORO, also known as "Monstro," together with others, being persons employed by and associated with the MS-13, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conduct and participate, directly and indirectly, in the conduct of the affairs of the MS-13 through a pattern of racketeering activity, as that term is defined by Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of the racketeering acts set forth below.

### RACKETEERING ACT ONE
(Conspiracy to Distribute Cocaine)

8. In or about and between January 2003 and May 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants GIOVANNI PRADO, also known as "Joker," and EMILIO SABALLOS, also known as

6

A. Murder

11. On or about May 5, 2008, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and YONIS ACOSTA-YANES, also known as "Brujita," together with others, with intent to cause the death of another person, to wit: Santos Castillo-Martinez, did cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

B. Conspiracy to Murder

12. In or about May 2008, such date being approximate and inclusive, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and YONIS ACOSTA-YANES, also known as "Brujita," together with others, did knowingly and intentionally conspire to cause the death of members of the rival Salvadorans With Pride ("SWP") and 18th Street gangs, in violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT FOUR
(Attempted Murder of John Doe #1)

13. On or about May 5, 2008, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and YONIS ACOSTA-YANES, also known as "Brujita," together with others, did knowingly and intentionally attempt to cause the death of another person, to wit: John Doe #1, an individual whose identity is known to the Grand Jury, in

violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

RACKETEERING ACT FIVE
(Attempted Murder of John Doe #2)

14. On or about June 28, 2008, within the Eastern District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," together with others, did knowingly and intentionally attempt to cause the death of another person, to wit: John Doe #2, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

RACKETEERING ACT SIX
(Conspiracy to Murder John Doe #3)

15. In or about August 2008, within the Eastern District of New York, the defendants EFRAIN ZUNIGA, also known as "Panico," YONIS ACOSTA-YANES, also known as "Brujita," and DIEGO NINOS, also known as "Veneno" and "Mico," together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: John Doe #3, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT SEVEN
(Conspiracy to Murder John Doe #4)

16. On or about October 11, 2008, within the Eastern District of New York, the defendants YONIS ACOSTA-YANES, also known as "Brujita," and DIEGO NINOS, also known as "Veneno" and

"Mico," together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: John Doe #4, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT EIGHT
(Murder of Dexter Acheampong and
Conspiracy to Murder Rival Gang Members)

17. The defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, committed the following acts, either one of which alone constitutes Racketeering Act Eight:

A. Murder

18. On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, with intent to cause the death of another person, to wit: Dexter Acheampong, did cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

B. Conspiracy to Murder

19. In or about May 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, did knowingly and intentionally conspire to cause the death of rival gang members, in violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT NINE
(Attempted Murder of John Doe #5)

20. On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, did knowingly and intentionally attempt to cause the death of another person, to wit: John Doe #5, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

RACKETEERING ACT TEN
(Murder of Jairo Vasquez and
Conspiracy to Murder Rival Gang Members)

21. The defendants DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky," together with others, committed the following acts, either one of which alone constitutes Racketeering Act Ten:

A. Murder

22. On or about October 22, 2009, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky," together with others, with intent to cause the death of another person, to wit: Jairo Vasquez, did cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

B.   Conspiracy to Murder

23.   In or about October 2009, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky," together with others, did knowingly and intentionally conspire to cause the death of members of the rival SWP and 18th Street gangs, in violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT ELEVEN
(Attempted Murder of John Doe #6)

24.   On or about November 21, 2009, within the Eastern District of New York, the defendants GIOVANNI PRADO, also known as "Joker," and ELENILSON ORTIZ, also known as "Shorty," together with others, did knowingly and intentionally attempt to cause the death of another person, to wit: John Doe #6, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

RACKETEERING ACT TWELVE
(Tampering with a Witness and Bribery of a Witness)

25.   The defendant ELENILSON ORTIZ, also known as "Shorty," together with others, committed the following acts, either one of which alone constitutes Racketeering Act Twelve:

A.   Tampering with a Witness

26.   In or about and between November 2009 and December 2009, both dates being approximate and inclusive, within the

12

Eastern District of New York, the defendant ELENILSON ORTIZ, also known as "Shorty," together with others, did knowingly and intentionally use intimidation, threaten, corruptly persuade and engage in misleading conduct toward another person, to wit: John Doe #6, with intent to (a) influence, delay and prevent the testimony of John Doe #6 in an official proceeding, to wit: a proceeding before a Federal grand jury in the Eastern District of New York, (b) cause and induce John Doe #6 to withhold testimony from said official proceeding, and (c) hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of one or more Federal offenses, to wit: the offenses charged in Counts Thirty-Six through Thirty-Nine, in violation of Title 18, United States Code, Sections 1512(b)(1), 1512(b)(2)(A), 1512(b)(3) and 2.

B.   Bribery of a Witness

27.   In or about and between November 2009 and December 2009, both dates being approximate and inclusive, within the Eastern District of New York, the defendant ELENILSON ORTIZ, also known as "Shorty," together with others, did knowingly and intentionally offer and agree to confer a benefit upon a witness in an action and proceeding, to wit: John Doe #6, upon an agreement and understanding that the testimony of such witness will thereby be influenced, and such witness will absent himself

13

from, and otherwise avoid and seek to avoid appearing and testifying at, such action and proceeding, in violation of New York Penal Law Sections 215.00 and 20.00.

RACKETEERING ACT THIRTEEN
(Murder of Erick Avalos and
Conspiracy to Murder Rival Gang Members)

28.   The defendant FRANKLIN VILLATORO, also known as "Monstro," together with others, committed the following acts, either one of which alone constitutes Racketeering Act Thirteen:

A.   Murder

29.   On or about December 12, 2009, within the Eastern District of New York, the defendant FRANKLIN VILLATORO, also known as "Monstro," together with others, with intent to cause the death of another person, to wit: Erick Avalos, did cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

B.   Conspiracy to Murder

30.   On or about December 12, 2009, within the Eastern District of New York, the defendant FRANKLIN VILLATORO, also known as "Monstro," together with others, did knowingly and intentionally conspire to cause the death of members of the rival 18th Street gang, in violation of New York Penal Law Sections 125.25(1) and 105.15.

14

RACKETEERING ACT FOURTEEN
(Tampering with Witnesses)

31.   In or about and between January 2010 and March 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendant EMILIO SABALLOS, also known as "Caballo," together with others, did knowingly and intentionally use intimidation, threaten, corruptly persuade and engage in misleading conduct toward one or more other persons, to wit: John Doe #7 and John Doe #8, individuals whose identities are known to the Grand Jury, with the intent to (a) influence, delay and prevent the testimony of such persons in an official proceeding, to wit: a proceeding before a Federal grand jury in the Eastern District of New York, and (b) cause and induce such persons to withhold testimony from said official proceeding, in violation of Title 18, United States Code, Sections 1512(b)(i), 1512(b)(2)(A) and 2.

RACKETEERING ACT FIFTEEN
(Conspiracy to Murder Vanessa Argueta)

32.   In or about and between January 2010 and February 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendant HERIBERTO MARTINEZ, also known as "Boxer," together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: Vanessa Argueta, in violation of New York Penal Law Sections 125.25(1) and 105.15.

15

RACKETEERING ACT SIXTEEN
(Murder and Conspiracy to Murder David Sandler)

33.  The defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, committed the following acts, either one of which alone constitutes Racketeering Act Sixteen:

A.  Murder

34.  On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, with intent to cause the death of another person, to wit: David Sandler, did cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

B.  Conspiracy to Murder

35.  In or about February 2010, such date being approximate and inclusive, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: David Sandler, in violation of New York Penal Law Sections 125.25(1) and 105.15.

16

RACKETEERING ACT SEVENTEEN
(Attempted Murder of John Doe #9)

36.  On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, did knowingly and intentionally attempt to cause the death of another person, to wit: John Doe #9, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

RACKETEERING ACT EIGHTEEN
(Murder and Conspiracy to Murder Nestor Moreno)

37.  The defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, committed the following acts, either one of which alone constitutes Racketeering Act Eighteen:

A.  Murder

38.  On or about March 6, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, with intent to cause

17

the death of another person, to wit: Nestor Moreno, did cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

B.  Conspiracy to Murder

39.  In or about February 2010 and March 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: Nestor Moreno, in violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT NINETEEN
(Murder and Conspiracy to Murder Mario Alberto Canton Quijada)

40.  The defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," ROGER ALVARADO, also known as "Michichi," VIDAL ESPINAL, also known as "Demente," and CARLOS MARTINEZ, also known as "Carlito," together with others, committed the following acts, either one of which alone constitutes Racketeering Act Nineteen:

A.  Murder

41.  On or about March 17, 2010, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and ROGER ALVARADO, also known as "Michichi," together with others, with intent to cause the death

18

of another person, to wit: Mario Alberto Canton Quijada, also known as "Baby Blue," did cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

B.  Conspiracy to Murder

42.  In or about March 2010, such date being approximate and inclusive, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," ROGER ALVARADO, also known as "Michichi," VIDAL ESPINAL, also known as "Demente," and CARLOS MARTINEZ, also known as "Carlito," together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: Mario Alberto Canton Quijada, also known as "Baby Blue," in violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT TWENTY
(Attempted Extortion of John Doe #10)

43.  In or about August 2010, within the Eastern District of New York, the defendants LOUIS RUIZ, also known as "Chucky," and FRANKLIN VILLATORO, also known as "Monstro," together with others, did knowingly and intentionally attempt to steal property by extortion, in that the defendants and others attempted to obtain property, to wit: money, drugs and commissary items, by compelling and inducing one or more inmates at the Nassau County Correctional Center, including John Doe #10, an individual whose identity is known to the Grand Jury, to deliver such property by instilling in them a fear that, if the property

19

were not so delivered, the defendants and others would cause physical injury to them in the future, in violation of New York Penal Law Sections 155.40(2)(a), 155.05(2)(e)(i), 110.00 and 20.00.

RACKETEERING ACT TWENTY-ONE
(Attempted Extortion of John Doe #11)

44. In or about and between August 2010 and November 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and ELENILSON ORTIZ, also known as "Shorty," together with others, did knowingly and intentionally attempt to steal property by extortion, in that the defendants and others attempted to obtain property, to wit: money, drugs and commissary items, by compelling and inducing one or more inmates at the Nassau County Correctional Center, including John Doe #11, an individual whose identity is known to the Grand Jury, to deliver such property by instilling in them a fear that, if the property were not so delivered, the defendants and others would cause physical injury to them in the future, in violation of New York Penal Law Sections 155.40(2)(a), 155.05(2)(e)(i), 110.00 and 20.00.

RACKETEERING ACT TWENTY-TWO
(Tampering with a Witness)

45. In or about November 2010, within the Eastern District of New York, the defendants DAVID VALLE, also known as

20

known as "Caballo," DAVID VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky," HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," CARLOS MARTINEZ, also known as "Carlito," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and FRANKLIN VILLATORO, also known as "Monstro," together with others, being persons employed by and associated with the MS-13, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

48. The pattern of racketeering activity through which the defendants GIOVANNI PRADO, also known as "Joker," ELENILSON ORTIZ, also known as "Shorty," EFRAIN ZUNIGA, also known as "Panico," YONIS ACOSTA-YANES, also known as "Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," EMILIO SABALLOS, also known as "Caballo," DAVID VALLE, also known as "Niño" and "Oreo,"

22

"Niño" and "Oreo," and ELENILSON ORTIZ, also known as "Shorty," together with others, did knowingly and intentionally use intimidation, threaten, corruptly persuade and engage in misleading conduct toward another person, to wit: John Doe #12, an individual whose identity is known to the Grand Jury, with the intent to hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of Federal offenses, to wit: the offenses charged in Counts Thirty-Four and Thirty-Five, in violation of Title 18, United States Code, Sections 1512(b)(3) and 2.

(Title 18, United States Code, Sections 1962(c), 1963 and 3551 et seq.)

COUNT TWO
(Racketeering Conspiracy)

46. The allegations contained in paragraphs one through five are realleged and incorporated as if fully set forth in this paragraph.

47. On or about and between April 1, 2001 and the date of this Superseding Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants GIOVANNI PRADO, also known as "Joker," ELENILSON ORTIZ, also known as "Shorty," EFRAIN ZUNIGA, also known as "Panico," YONIS ACOSTA-YANES, also known as "Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," EMILIO SABALLOS, also

21

LOUIS RUIZ, also known as "Chucky," HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," CARLOS MARTINEZ, also known as "Carlito," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERREEA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and FRANKLIN VILLATORO, also known as "Monstro," together with others, agreed to conduct the affairs of the enterprise consisted of the racketeering acts set forth in paragraphs eight through forty-five of Count One of this Superseding Indictment, as Racketeering Acts One through Twenty-Two, which are realleged and incorporated as if fully set forth in this paragraph. Each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

COUNT THREE
(Conspiracy to Distribute Cocaine)

49. In or about and between January 2003 and May 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants GIOVANNI PRADO, also known as "Joker," and EMILIO SABALLOS, also known as "Caballo," together with others, did knowingly and intentionally

23

conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and 841(b)(1)(C); Title 18, United States Code, Sections 3551 et seq.)

COUNT FOUR
(Conspiracy to Distribute Cocaine)

50.  In or about and between April 2008 and November 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants EFRAIN ZUNIGA, also known as "Panico," and YONIS ACOSTA-YANES, also known as "Bruhita," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and 841(b)(1)(C); Title 18, United States Code, Sections 3551 et seq.)

COUNT FIVE
(Conspiracy to Commit Assault with
Dangerous Weapons at Roosevelt Field Mall)

51.  At all times relevant to this Superseding Indictment, the MS-13, as more fully described in paragraphs one

24

through five, which are realleged and incorporated as if fully set forth in this paragraph, including its leadership, membership and associates, constituted an "enterprise" as defined in Section 1959(b)(2) of Title 18, United States Code, that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

52.  At all times relevant to this Superseding Indictment, the MS-13, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts and threats involving murder, extortion and robbery, in violation of the laws of the State of New York, witness tampering and witness retaliation, in violation of Title 18, United States Code, Sections 1512 and 1513, and narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846.

53.  On or about May 4, 2008, the defendant LOUIS RUIZ, also known as "Chucky," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to assault John Doe #13, an individual whose identity is known to the Grand Jury, with one or more dangerous weapons, to

25

wit: a steak knife, a box cutter and a gravity knife, in violation of New York Penal Law Sections 120.05(2) and 105.05.

(Title 18, United States Code, Sections 1959(a)(6) and 3551 et seq.)

COUNT SIX
(Conspiracy to Murder Rival Gang Members)

54.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

55.  In or about May 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, also known as "Brujita," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder members of the rival SWP and 18th Street gangs, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT SEVEN
(Murder of Santos Castillo-Martinez)

56.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

57.  On or about May 5, 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, also

26

known as "Brujita," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Santos Castillo-Martinez, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT EIGHT
(Discharge of Firearm During a Crime
of Violence: Santos Castillo-Martinez Murder)

58.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

59.  On or about May 5, 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, also known as "Brujita," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Six and Seven, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

27

## COUNT NINE
### (Causing the Death of Santos Castillo-Martinez
### Through the Use of a Firearm)

60. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

61. On or about May 5, 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, also known as "Brujita," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Eight, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111(a), in that the defendant, with malice aforethought, did unlawfully kill Santos Castillo-Martinez willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

## COUNT TEN
### (Attempted Murder of John Doe #1)

62. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

63. On or about May 5, 2008, within the Eastern District of New York, the defendant YONIS-ACOSTA-YANES, also known as "Brujita," together with others, for the purpose of

28

maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #1, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

## COUNT ELEVEN
### (Discharge of Firearm During Crime of Violence:
### Attempted Murder of John Doe #1)

64. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

65. On or about May 5, 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, also known as "Brujita," together with others, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence, to wit: the crime charged in Count Ten, and did knowingly and intentionally possess said firearm in furtherance of such crime of violence, which firearms was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

29

## COUNT TWELVE
### (Attempted Murder of John Doe #2)

66. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

67. On or about June 28, 2008, within the Eastern District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #2, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

## COUNT THIRTEEN
### (Assault with Dangerous Weapons:
### Machete and Baseball Bat Attack on John Doe #2)

68. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

69. On or about June 28, 2008, within the Eastern District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #2 with one or more dangerous weapons, to wit:

30

a machete and baseball bats, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

## COUNT FOURTEEN
### (Conspiracy to Murder John Doe #3)

70. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

71. In or about August 2008, within the Eastern District of New York, the defendants EFRAIN ZUNIGA, also known as "Panico," YONIS ACOSTA-YANES, also known as "Brujita," and DIEGO NINOS, also known as "Veneno" and "Mico," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder John Doe #3, in violation of New York Penal Law Sections 125.25 and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

## COUNT FIFTEEN
### (Using a Firearm During a Crime of Violence)

72. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

31

73.   In or about August 2008, within the Eastern District of New York, the defendants EFRAIN ZUNIGA, also known as "Panico," YONIS ACOSTA-YANES, also known as "Brujita," and DIEGO NINOS, also known as "Veneno" and "Mico," together with others, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence, to wit: the crime charged in Count Fourteen, and did knowingly and intentionally possess said firearm in furtherance of such crime of violence.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(C), 2 and 3551 et seq.)

<u>COUNT SIXTEEN</u>
(Conspiracy to Commit Assault with Dangerous Weapons)

74.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

75.   On or about September 14, 2008, the defendants GIOVANNI PRADO, also known as "Joker," EMILIO SABALLOS, also known as "Caballo," WALTER FLORES-REYES, also known as "Scrappy," DAVID VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky," and FRANCISCO RAMOS, also known as "Cruiser," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to assault one or more individuals, to wit: Iber Marin, John Doe #14 and John Doe #15, individuals whose identities are known to

32

the Grand Jury, with one or more dangerous weapons, to wit: glass beer bottles, in violation of New York Penal Law Sections 120.05(2) and 105.05.

(Title 18, United States Code, Sections 1959(a)(6) and 3551 et seq.)

<u>COUNT SEVENTEEN</u>
(Assault Resulting in Serious Bodily Injury: Iber Marin)

76.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

77.   On or about September 14, 2008, within the Eastern District of New York, the defendants GIOVANNI PRADO, also known as "Joker," EMILIO SABALLOS, also known as "Caballo," WALTER FLORES-REYES, also known as "Scrappy," DAVID VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky," and FRANCISCO RAMOS, also known as "Cruiser," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault Iber Marin, which assault resulted in serious bodily injury, to wit: death, in violation of New York Penal Law Sections 120.05(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

33

<u>COUNT EIGHTEEN</u>
(Assault Resulting in Serious Bodily Injury: John Doe #15)

78.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

79.   On or about September 14, 2008, within the Eastern District of New York, the defendants WALTER FLORES-REYES, also known as "Scrappy," DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #15, which assault resulted in serious bodily injury, in violation of New York Penal Law Sections 120.05(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

<u>COUNT NINETEEN</u>
(Conspiracy to Murder John Doe #4)

80.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

81.   On or about October 11, 2008, within the Eastern District of New York, the defendants YONIS ACOSTA-YANES, also known as "Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," and CESAR LANDAVERDE, also known as "Flaco" and

34

"Rebelde," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder John Doe #4, in violation of New York Penal Law Sections 125.25 and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

<u>COUNT TWENTY</u>
(Using a Firearm During a Crime of Violence)

82.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

83.   On or about October 11, 2008, within the Eastern District of New York, the defendants YONIS ACOSTA-YANES, also known as "Brujita," DIEGO NINOS, also known as "Veneno" and "Mico," and CESAR LANDAVERDE, also known as "Flaco" and "Rebelde," together with others, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence, to wit: the crime charged in Count Nineteen, and did knowingly and intentionally possess said firearm in furtherance of such crime of violence.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(C), 2 and 3551 et seq.)

35

Case 13-3877, Document 180, 07/08/2015, 1549431, Page179 of 203
GA095
Case 2:10-cr-00074-JFB   Document 370   Filed 03/03/11   Page 37 of 72 PageID #: 1029
Case 2:10-cr-00074-JFB   Document 370   Filed 03/03/11   Page 39 of 72 PageID #: 1031

## COUNT TWENTY-ONE
### (Conspiracy to Murder Rival Gang Members)

84.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

85.  In or about May 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder rival gang members, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

## COUNT TWENTY-TWO
### (Murder of Dexter Acheampong)

86.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

87.  On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in

36

## COUNT TWENTY-FOUR
### (Causing the Death of Dexter Acheampong Through the Use of a Firearm)

90.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

91.  On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Twenty-Three, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111(a), in that the defendant, with malice aforethought, did unlawfully kill Dexter Acheampong willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

## COUNT TWENTY-FIVE
### (Attempted Murder of John Doe #16)

92.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

93.  On or about June 6, 2009, within the Eastern District of New York, the defendant WILBER AYALA-ARDON, also

38

racketeering activity, did knowingly and intentionally murder Dexter Acheampong, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

## COUNT TWENTY-THREE
### (Discharge of Firearm During a Crime of Violence: Dexter Acheampong Murder)

88.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

89.  On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit; the crimes charged in Counts Twenty-One and Twenty-Two, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

37

known as "Pajaro" and "Piolin," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #16, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

## COUNT TWENTY-SIX
### (Assault with a Dangerous Weapon: Shooting of John Doe #16)

94.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

95.  On or about June 6, 2009, within the Eastern District of New York, the defendant WILBER AYALA-ARDON, also known as "Pajaro" and "Piolin," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #16 with a dangerous weapon, to wit: a .38 caliber revolver, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

39

COUNT TWENTY-SEVEN
(Discharge of Firearm During Crimes of Violence:
Attempted Murder and Assault of John Doe #16)

96.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

97.   On or about June 6, 2009, within the Eastern District of New York, the defendant WILBER AYALA-ARDON, also known as "Pajaro" and "Piolin," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Twenty-Five and Twenty-Six, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

COUNT TWENTY-EIGHT
(Attempted Murder of John Doe #17)

98.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

99.   On or about July 1, 2009, within the Eastern District of New York, the defendant WILBER AYALA-ARDON, also known as "Pajaro" and "Piolin," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and

40

intentionally attempt to murder John Doe #17, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

COUNT TWENTY-NINE
(Assault with a Dangerous Weapon:
Shooting of John Doe #17)

100.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

101.   On or about July 1, 2009, within the Eastern District of New York, the defendant WILBER AYALA-ARDON, also known as "Pajaro" and "Piolin," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #17 with a dangerous weapon, to wit: a .38 caliber revolver, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

41

COUNT THIRTY
(Discharge of Firearm During Crimes of Violence:
Attempted Murder and Assault of John Doe #17)

102.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

103.   On or about July 1, 2009, within the Eastern District of New York, the defendant WILBER AYALA-ARDON, also known as "Pajaro" and "Piolin," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Twenty-Eight and Twenty-Nine, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

COUNT THIRTY-ONE
(Attempted Murder of John Doe #5)

104.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

105.   On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and

42

increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #5, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

COUNT THIRTY-TWO
(Assault with a Dangerous Weapon:
Shooting of John Doe #5)

106.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

107.   On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #5 with a dangerous weapon, to wit: a .38 caliber revolver, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

43

COUNT THIRTY-THREE
(Discharge of Firearm During Crimes of Violence:
Attempted Murder and Assault of John Doe #5)

108.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

109.   On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Thirty-One and Thirty-Two, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

COUNT THIRTY-FOUR
(Conspiracy to Murder Rival Gang Members)

110.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

111.   In or about October 2009, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky,"

44

together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder members of the rival SWP and 18th Street gangs, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT THIRTY-FIVE
(Murder of Jairo Vasquez)

112.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

113.   On or about October 22, 2009, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Jairo Vasquez, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

45

COUNT THIRTY-SIX
(Conspiracy to Commit Assault with a Dangerous Weapon)

114.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

115.   On or about November 21, 2009, the defendants GIOVANNI PRADO, also known as "Joker," ERICK ALVARADO, also known as "Gato Seco," and ELENILSON ORTIZ, also known as "Shorty," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to assault one or more individuals, to wit: John Doe #6, John Doe #7 and John Doe #8, with one or more dangerous weapons, to wit: a baseball bat and glass beer bottles, in violation of New York Penal Law Sections 120.05(2) and 105.05.

(Title 18, United States Code, Sections 1959(a)(6) and 3551 et seq.)

COUNT THIRTY-SEVEN
(Attempted Murder of John Doe #6)

116.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

117.   On or about November 21, 2009, within the Eastern District of New York, the defendants GIOVANNI PRADO, also known as "Joker," ERICK ALVARADO, also known as "Gato Seco," and

46

ELENILSON ORTIZ, also known as "Shorty," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #6, in violation of New York Penal Law Sections 125.25(1) and 110.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

COUNT THIRTY-EIGHT
(Assault with a Dangerous Weapon:
Baseball Bat Beating of John Doe #6)

118.   The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

119.   On or about November 21, 2009, within the Eastern District of New York, the defendants GIOVANNI PRADO, also known as "Joker," ERICK ALVARADO, also known as "Gato Seco," and ELENILSON ORTIZ, also known as "Shorty," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #6 with a dangerous weapon, to wit: a baseball bat, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

47

COUNT THIRTY-NINE
(Threatening to Commit Crimes of Violence)

120.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

121.  On or about November 21, 2009, within the Eastern District of New York, the defendants GIOVANNI PRADO, also known as "Joker," ERICK ALVARADO, also known as "Gato Seco," and ELENILSON ORTIZ, also known as "Shorty," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally threaten to commit crimes of violence against one or more individuals, to wit: John Doe #7 and John Doe #8, in violation of New York Penal Law Sections 120.14(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(4), 2 and 3551 et seq.)

COUNT FORTY
(Tampering with a Witness)

122.  In or about and between November 2009 and December 2009, both dates being approximate and inclusive, within the Eastern District of New York, the defendant ELENILSON ORTIZ, also known as "Shorty," together with others, did knowingly and intentionally use intimidation, threaten, corruptly persuade and engage in misleading conduct toward another person, to wit: John Doe #6, with intent to (a) influence, delay and prevent the

48

testimony of John Doe #6 in an official proceeding, to wit: a proceeding before a Federal grand jury in the Eastern District of New York, (b) cause and induce John Doe #6 to withhold testimony from said official proceeding, and (c) hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of one or more Federal offenses, to wit: the offenses charged in Counts Thirty-Six through Thirty-Nine.

(Title 18, United States Code, Sections 1512(b)(1), 1512(b)(2)(A), 1512(b)(3), 2 and 3551 et seq.)

COUNT FORTY-ONE
(Conspiracy to Murder Rival Gang Members)

123.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

124.  On or about December 12, 2009, within the Eastern District of New York, the defendants FRANKLIN VILLATORO, also known as "Monstro," and YOBANY CALDERON, also known as "Tego," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder members of the rival 18th Street gang, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

49

COUNT FORTY-TWO
(Murder of Erick Avalos)

125.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

126.  On or about December 12, 2009, within the Eastern District of New York, the defendants FRANKLIN VILLATORO, also known as "Monstro," and YOBANY CALDERON, also known as "Tego," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Erick Avalos, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT FORTY-THREE
(Tampering with Witnesses)

127.  In or about and between January 2010 and March 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendant EMILIO SABALLOS, also known as "Caballo," together with others, did knowingly and intentionally use intimidation, threaten, corruptly persuade and engage in misleading conduct toward one or more other persons, to wit: John Doe #7 and John Doe #8, with the intent to (a) influence, delay and prevent the testimony of such persons in an

50

official proceeding, to wit: a proceeding before a Federal grand jury in the Eastern District of New York, and (b) cause and induce such persons to withhold testimony from said official proceeding.

(Title 18, United States Code, Sections 1512(b)(1), 1512(b)(2)(A), 2 and 3551 et seq.)

COUNT FORTY-FOUR
(Conspiracy to Murder Vanessa Argueta and Diego Torres)

128.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

129.  In or about and between January 2010 and February 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ADALBERTO ARIEL GUZMAN, also known as "Gringo," RENE MENDEZ MEJIA, also known as "Zorro," and HERIBERTO MARTINEZ, also known as "Boxer," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder one or more individuals, to wit: Vanessa Argueta and Diego Torres, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

51

## COUNT FORTY-FIVE
### (Murder of Vanessa Argueta)

130. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

131. On or about February 5, 2010, within the Eastern District of New York, the defendants ADALBERTO ARIEL GUZMAN, also known as "Gringo," and RENE MENDEZ MEJIA, also known as "Zorro," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Vanessa Argueta, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

## COUNT FORTY-SIX
### (Discharge of Firearm During Crimes of Violence: Argueta Murder and Murder Conspiracy)

132. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

133. On or about February 5, 2010, within the Eastern District of New York, the defendants ADALBERTO ARIEL GUZMAN, also known as "Gringo," RENE MENDEZ MEJIA, also known as "Zorro," HERIBERTO MARTINEZ, also known as "Boxer," together with others, did knowingly and intentionally use and carry a firearm during

52

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

## COUNT FORTY-EIGHT
### (Murder of Diego Torres)

136. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

137. On or about February 5, 2010, within the Eastern District of New York, the defendants ADALBERTO ARIEL GUZMAN, also known as "Gringo," and RENE MENDEZ MEJIA, also known as "Zorro," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Diego Torres, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

## COUNT FORTY-NINE
### (Discharge of Firearm During a Crime of Violence: Torres Murder)

138. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

139. On or about February 5, 2010, within the Eastern District of New York, the defendants ADALBERTO ARIEL GUZMAN, also known as "Gringo," and RENE MENDEZ MEJIA, also known as "Zorro,"

54

and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Forty-Four and Forty-Five, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

## COUNT FORTY-SEVEN
### (Causing the Death of Vanessa Argueta Through the Use of a Firearm)

134. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

135. On or about February 5, 2010, within the Eastern District of New York, the defendants ADALBERTO ARIEL GUZMAN, also known as "Gringo," and RENE MENDEZ MEJIA, also known as "Zorro," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Forty-Six, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing was a murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants, with malice aforethought, did unlawfully kill Vanessa Argueta willfully, deliberately, maliciously and with premeditation.

53

together with others, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence, to wit: the crime charged in Count Forty-Eight, and did knowingly and intentionally possess said firearm in furtherance of such crime of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

## COUNT FIFTY
### (Causing the Death of Diego Torres Through the Use of a Firearm)

140. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

141. On or about February 5, 2010, within the Eastern District of New York, the defendants ADALBERTO ARIEL GUZMAN, also known as "Gringo," and RENE MENDEZ MEJIA, also known as "Zorro," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Forty-Nine, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing was a murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants, with malice aforethought, did

55

unlawfully kill Diego Torres willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

### COUNT FIFTY-ONE
(Accessory After the Fact)

142.  In or about February 2010, within the Eastern District of New York, the defendant HERIBERTO MARTINEZ, also known as "Boxer," knowing that one or more offenses against the United States had been committed, to wit: the offenses charged in Counts Forty-Four through Fifty, did knowingly and intentionally receive and assist one or more offenders, to wit: ADALBERTO ARIEL GUZMAN, also known as "Gringo," and RENE MENDEZ MEJIA, also known as "Zorro," in order to hinder and prevent the offenders' apprehension, trial and punishment.

(Title 18, United States Code, Sections 3 and 3551 et seq.)

### COUNT FIFTY-TWO
(Conspiracy to Murder David Sandler)

143.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

144.  In or about February 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as

56

"Junior," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder David Sandler, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

### COUNT FIFTY-THREE
(Murder of David Sandler)

145.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

146.  On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder David Sandler, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

57

### COUNT FIFTY-FOUR
(Discharge of Firearm During a Crime
of Violence: David Sandler Murder)

147.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

148.  On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Fifty-Two and Fifty-Three, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

### COUNT FIFTY-FIVE
(Causing the Death of David Sandler Through the Use of a Firearm)

149.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

150.  On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as

58

"Junior," and ROGER ALVARADO, also known as "Michichi," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Fifty-Four, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants, with malice aforethought, did unlawfully kill David Sandler willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

### COUNT FIFTY-SIX
(Attempted Murder of John Doe #9)

151.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

152.  On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder John

59

Doe #9, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

COUNT FIFTY-SEVEN
(Assault with a Dangerous Weapon:
Shooting of John Doe #9)

153. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

154. On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #9 with a dangerous weapon, to wit: a .38 caliber revolver, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

60

COUNT FIFTY-EIGHT
(Discharge of Firearm During Crimes of Violence:
Attempted Murder and Assault of John Doe #9)

155. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

156. On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Fifty-Six and Fifty-Seven, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

COUNT FIFTY-NINE
(Conspiracy to Murder Nestor Moreno)

157. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

158. In or about and between February 2010 and March 2010, both dates being approximate and inclusive, within the

61

Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder Nestor Moreno, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT SIXTY
(Murder of Nestor Moreno)

159. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

160. On or about March 6, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally

62

murder Nestor Moreno, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT SIXTY-ONE
(Discharge of Firearm During Crimes
of Violence: Nestor Moreno Murder and Murder Conspiracy)

161. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

162. On or about March 6, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Fifty-Nine and Sixty, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

63

COUNT SIXTY-TWO
(Causing the Death of Nestor Moreno Through the Use of a Firearm)

163.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

164.  On or about March 6, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Sixty-One, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants, with malice aforethought, did unlawfully kill Nestor Moreno willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

COUNT SIXTY-THREE
(Conspiracy to Murder Mario Alberto Canton Quijada)

165.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

64

Mario Alberto Canton Quijada, also known as "Baby Blue," in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT SIXTY-FIVE
(Brandishing of a Firearm During a Crime of Violence: Quijada Murder)

169.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

170.  On or about March 17, 2010, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and ROGER ALVARADO, also known as "Michichi," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Sixty-Three and Sixty-Four, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(C), 2 and 3551 et seq.)

COUNT SIXTY-SIX
(Assault Resulting in Serious Bodily Injury: John Doe #10)

171.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

66

166.  In or about March 2010, such dates being approximate and inclusive, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," and CARLOS MARTINEZ, also known as "Carlito," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder Mario Alberto Canton Quijada, also known as "Baby Blue," in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT SIXTY-FOUR
(Murder of Mario Alberto Canton Quijada)

167.  The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

168.  On or about March 17, 2010, within the Eastern District of New York, the defendants JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder

65

172.  On or about August 30, 2010, within the Eastern District of New York, the defendants LOUIS RUIZ, also known as "Chucky," and FRANKLIN VILLATORO, also known as "Monstro," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #10, which assault resulted in serious bodily injury, in violation of New York Penal Law Section 120.05(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

COUNT SIXTY-SEVEN
(Tampering with a Witness)

173.  In or about November 2010, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and ELENILSON ORTIZ, also known as "Shorty," together with others, did knowingly and intentionally use intimidation, threaten, corruptly persuade and engage in misleading conduct toward another person, to wit: John Doe #12, with the intent to hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of Federal offenses, to wit: the offenses charged in Counts Thirty-Four and Thirty-Five.

(Title 18, United States Code, Sections 1512(b)(3), 2 and 3551 et seq.)

67

Case 13-3877, Document 180, 07/08/2015, 1549431, Page187 of 203
GA103
Case 2:10-cr-00074-JFB   Document 370   Filed 03/03/11   Page 69 of 72 PageID #: 1061
Case 2:10-cr-00074-JFB   Document 370   Filed 03/03/11   Page 71 of 72 PageID #: 1063

## COUNT SIXTY-EIGHT
(Conspiracy to Murder Jane Doe #1,
Jane Doe #2, and John Doe #18)

174. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

175. In or about and between September 2010 and December 2010, such dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FRANCISCO RAMOS, also known as "Cruiser," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder Jane Doe #1, Jane Doe #2 and John Doe #18, individuals whose identities are known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

## COUNT SIXTY-NINE
(Conspiracy to Commit the Obstruction of Justice
Murders of Jane Doe #1, Jane Doe #2 and John Doe #18)

176. In or about and between September 2010 and December 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant FRANCISCO RAMOS, also known as "Cruiser," together with others, did knowingly and intentionally conspire to kill one or more

68

dangerous weapon, to wit: a prison shank, in violation of New York Penal Law Sections 120.05(2) and 105.65.

(Title 18, United States Code, Sections 1959(a)(6) and 3551 et seq.)

A TRUE BILL

FOREPERSON

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

70

other persons, to wit: Jane Doe #1, Jane Doe #2 and John Doe #18, with intent to (a) prevent the attendance and testimony of such persons in one or more official proceedings, to wit: proceedings before a judge and court of the United States, and (b) prevent the communication by such persons to a law enforcement officer of the United States of information relating to the commission and possible commission of Federal offenses, to wit: the offenses charged in Counts Sixteen through Eighteen, contrary to Title 18, United States Code, Sections 1512(a)(1)(A) and 1512(a)(1)(C).

(Title 18, United States Code, Sections 1512(k), 1512(a)(3) and 3551 et seq.)

## COUNT SEVENTY
(Conspiracy to Commit Assault with a Dangerous Weapon)

177. The allegations contained in paragraphs one through five and fifty-one and fifty-two are realleged and incorporated as if fully set forth in this paragraph.

178. On or about December 8, 2010, the defendant FRANCISCO RAMOS, also known as "Cruiser," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to assault John Doe #11 with a

69

No. ___ 10 CR 0074 (S-3) (JFB)

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK
CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

v.

GIOVANI PRADO, ET AL.,
Defendant(s).

## INDICTMENT

T. 18, U.S.C., §§ 924 (c)(1)(A), 924 (c)(1)(A)(ii), 924 (c)(1)(A)(iii), 924 (c)(1)(C), 924 (j)(1), 1512 (a)(3), 1512 (b)(1), 1512 (k)(2)(A), 1512 (b)(2), 1512 (d), 1959 (a)(1), 1959 (a)(3), 1959 (a)(5), 1959 (a)(6), 1959 (a)(6), 1962 (c), 1962 (d), 1963, 2, 3 and et seq.; T. 21, U.S.C., §§ 841 (b)(1)(C) and 846

A True Bill _____
                              Foreman

Filed in open court this ____ day,
of ___March___ A.D. 20 11
                              Clerk

Bail, $ _____

JOHN J. DURHAM, ASSISTANT U.S. ATTORNEY
U.S. ATTORNEY'S OFFICE - EDNY
610 FEDERAL PLAZA
CENTRAL ISLIP, NEW YORK 11722
(631) 715-7851

NB:JJD
F.#2010R00014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

YONIS ACOSTA-YANES,
   also known as "Brujita,"
DAVID VALLE,
   also known as "Niño" and
   "Oreo,"
LOUIS RUIZ,
   also known as "Chucky,"
HERIBERTO MARTINEZ,
   also known as "Boxer,"
VIDAL ESPINAL,
   also known as "Demente,"
ROGER ALVARADO,
   also known as "Michichi,"
JOSE GUSTAVO ORELLANA-TORRES,
   also known as "Diablito" and
   "Gustavo Jefferson Orellana-
   Torres,"
MARIO ALPHONSO HERRERA-UMANZOR,
   also known as "Perdido,"
JIMMY SOSA,
   also known as "Junior,"
JEREMIAS EXEQUIEL AMAYA,
   also known as "Payaso,"
FRANKLIN VILLATORO,
   also known as "Monstro,"
YOBANY CALDERON,
   also known as "Tego,"
ADALBERTO ARIEL GUZMAN,
   also known as "Gringo," and
DIEGO NINOS,
   also known as "Veneno"
   and "Mico,"

            Defendants.

- - - - - - - - - - - - - - - - - -X

FILED
IN CLERK'S OFFICE
DISTRICT COURT E.D.N.Y.

★ OCT 13 2011 ★

LONG ISLAND OFFICE

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 10-074 (S-4)(JFB)
(T. 18, U.S.C., §§
924(c)(1)(A)(i),
924(c)(1)(A)(ii),
924(c)(1)(A)(iii),
924(c)(1)(C), 924(j)(1),
1512(b)(3), 1513(b)(2)
1959(a)(1), 1959(a)(3),
1959(a)(5), 1959(a)(6),
1962(c), 1962(d), 1963,
2, 3 and 3551 et seq.;
T. 21, U.S.C., §§
841(b)(1)(C) and 846)

THE GRAND JURY CHARGES:

---

INTRODUCTION

    At all times relevant to this Superseding Indictment, unless otherwise indicated:

The Enterprise

    1.  La Mara Salvatrucha, also known as the "MS-13," (hereinafter the "MS-13" or the "enterprise") was a street gang comprised primarily of immigrants from Central America, with members located throughout Long Island, New York, Queens, New York and elsewhere. Members and associates of the MS-13 have engaged in acts of violence, including murder, attempted murder, robbery and assault, as well as other criminal activity, including narcotics trafficking, extortion, witness tampering and witness retaliation.

    2.  The defendants YONIS ACOSTA-YANES, also known as "Brujita," DAVID VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky," HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," FRANKLIN VILLATORO, also known as "Monstro," YOBANY CALDERON, also known as "Tego," ADALBERTO ARIEL GUZMAN, also

2

---

known as "Gringo," and DIEGO NINOS, also known as "Veneno" and "Mico," were members and associates of the MS-13.

    3.  The MS-13, including its leadership, membership and associates, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

Purposes of the Enterprise

    4.  The purposes of the enterprise included the following:

    a.  Promoting and enhancing the prestige, reputation and position of the enterprise with respect to rival criminal organizations.

    b.  Preserving and protecting the power, territory and criminal ventures of the enterprise through the use of intimidation, threats of violence and acts of violence, including assault and murder.

    c.  Keeping victims and rivals in fear of the enterprise and its members and associates.

3

---

    d.  Enriching the members and associates of the enterprise through criminal activity, including robbery, extortion and narcotics trafficking.

    e.  Ensuring discipline within the enterprise and compliance with the enterprise's rules by members and associates through threats of violence and acts of violence.

Means and Methods of the Enterprise

    5.  Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

    a.  Members of the MS-13 and their associates committed, attempted to commit and threatened to commit acts of violence, including murder, attempted murder, robbery and assault, to enhance the enterprise's prestige and protect and expand the enterprise's criminal operations.

    b.  Members of the MS-13 and their associates used and threatened to use physical violence against various individuals, including members of rival criminal organizations and MS-13 members who violated the enterprise's rules.

    c.  Members of the enterprise and their associates used, attempted to use and conspired to use robbery, extortion and narcotics trafficking as means of obtaining money.

4

## COUNT ONE
(Racketeering)

6.  The allegations contained in paragraphs one through five are realleged and incorporated as if fully set forth in this paragraph.

7.  On or about and between April 1, 2001 and the date of this Superseding Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YONIS ACOSTA-YANES, also known as "Brujita," DAVID VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky," HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and FRANKLIN VILLATORO, also known as "Monstro," together with others, being persons employed by and associated with the MS-13, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conduct and participate, directly and indirectly, in the conduct of the affairs of the MS-13 through a pattern of racketeering activity, as that term is defined by Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of the racketeering acts set forth below.

5

## RACKETEERING ACT ONE
(Robbery of Miguel Alguera, John Doe #1
and John Doe #2 and the Murder of Miguel Alguera)

8.  The defendants DAVID VALLE and LOUIS RUIZ, together with others, committed the following acts, either one of which alone constitutes Racketeering Act One:

A.  Robbery

9.  On or about January 18, 2008, within the Eastern District of New York, the defendants DAVID VALLE and LOUIS RUIZ, together with others, did knowingly and intentionally rob Miguel Alguera, John Doe #1 and John Doe #2, individuals whose identities are known to the Grand Jury, in violation of New York Penal Law Sections 160.05 and 20.00.

B.  Murder

10.  On or about January 18, 2008, within the Eastern District of New York, the defendants DAVID VALLE and LOUIS RUIZ, together with others, did knowingly and intentionally commit the robbery of Miguel Alguera, John Doe #1 and John Doe #2, and, in the course of and in furtherance of such crime and of immediate flight therefrom, VALLE, RUIZ and others caused the death of a person other than one of the participants, to wit: Michael Alguera, in violation of New York Penal Law Sections 125.25(3) and 20.00.

6

## RACKETEERING ACT TWO
(Conspiracy to Distribute Cocaine)

11.  In or about and between April 2008 and November 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant YONIS ACOSTA-YANES, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## RACKETEERING ACT THREE
(Murder of Santos Castillo-Martinez and
Conspiracy to Murder Rival Gang Members)

12.  The defendants DAVID VALLE and YONIS ACOSTA-YANES, together with others, committed the following acts, either one of which alone constitutes Racketeering Act Three:

A.  Conspiracy to Murder

13.  In or about May 2008, within the Eastern District of New York, the defendants DAVID VALLE and YONIS ACOSTA-YANES, together with others, did knowingly and intentionally conspire to cause the death of members of the rival Salvadorans With Pride ("SWP") and 18th Street gangs, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.  Murder

14.  On or about May 5, 2008, within the Eastern District of New York, the defendants DAVID VALLE and YONIS

7

ACOSTA-YANES, together with others, with intent to cause the death of another person, to wit: Santos Castillo-Martinez, did knowingly and intentionally cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

## RACKETEERING ACT FOUR
(Attempted Murder of John Doe #3)

15.  On or about May 5, 2008, within the Eastern District of New York, the defendants DAVID VALLE and YONIS ACOSTA-YANES, together with others, did knowingly and intentionally attempt to cause the death of another person, to wit: John Doe #3, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

## RACKETEERING ACT FIVE
(Attempted Murder of John Doe #4)

16.  On or about June 28, 2008, within the Eastern District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, together with others, did knowingly and intentionally attempt to cause the death of another person, to wit: John Doe #4, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

## RACKETEERING ACT SIX
(Conspiracy to Murder John Doe #5)

17.  In or about August 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, together

8

with others, did knowingly and intentionally conspire to cause the death of another person, to wit: John Doe #5, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT SEVEN
(Conspiracy to Murder John Doe #6)

18.  On or about October 11, 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: John Doe #6, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1) and 105.15.

RACKETEERING ACT EIGHT
(Murder of Ruben Madrid and
Conspiracy to Murder Rival Gang Members)

19.  The defendant LOUIS RUIZ, together with others, committed the following acts, either one of which alone constitutes Racketeering Act Eight:

A.  Conspiracy to Murder

20.  In or about May 2009, within the Eastern District of New York, the defendant LOUIS RUIZ, together with others, did knowingly and intentionally conspire to cause the death of members of the rival SWP street gang, in violation of New York Penal Law Sections 125.25(1) and 105.15.

9

RACKETEERING ACT TEN
(Attempted Murder of John Doe #7)

25.  On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, together with others, did knowingly and intentionally attempt to cause the death of another person, to wit: John Doe #7, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

RACKETEERING ACT ELEVEN
(Murder of Jairo Vasquez and
Conspiracy to Murder Rival Gang Members)

26.  The defendants DAVID VALLE and LOUIS RUIZ, together with others, committed the following acts, either one of which alone constitutes Racketeering Act Eleven:

A.  Conspiracy to Murder

27.  In or about October 2009, within the Eastern District of New York, the defendants DAVID VALLE and LOUIS RUIZ, together with others, did knowingly and intentionally conspire to cause the death of members of the rival SWP and 18th Street gangs, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.  Murder

28.  On or about October 22, 2009, within the Eastern District of New York, the defendants DAVID VALLE and LOUIS RUIZ, together with others, with intent to cause the death of another

11

B.  Murder

21.  On or about May 17, 2009, within the Eastern District of New York, the defendant LOUIS RUIZ, together with others, with intent to cause the death of another person, to wit: Ruben Madrid, did knowingly and intentionally cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

RACKETEERING ACT NINE
(Murder of Dexter Acheampong and
Conspiracy to Murder Rival Gang Members)

22.  The defendant JOSE GUSTAVO ORELLANA-TORRES, together with others, committed the following acts, either one of which alone constitutes Racketeering Act Nine:

A.  Conspiracy to Murder

23.  In or about May 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, together with others, did knowingly and intentionally conspire to cause the death of rival gang members, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.  Murder

24.  On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, together with others, with intent to cause the death of another person, to wit: Dexter Acheampong, did knowingly and intentionally cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

10

person, to wit: Jairo Vasquez, did knowingly and intentionally cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

RACKETEERING ACT TWELVE
(Murder of Erick Avalos and
Conspiracy to Murder Rival Gang Members)

29.  The defendant FRANKLIN VILLATORO, together with others, committed the following acts, either one of which alone constitutes Racketeering Act Twelve:

A.  Conspiracy to Murder

30.  On or about December 12, 2009, within the Eastern District of New York, the defendant FRANKLIN VILLATORO, together with others, did knowingly and intentionally conspire to cause the death of members of the rival 18th Street gang, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.  Murder

31.  On or about December 12, 2009, within the Eastern District of New York, the defendant FRANKLIN VILLATORO, together with others, with intent to cause the death of another person, to wit: Erick Avalos, did knowingly and intentionally cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

12

### RACKETEERING ACT THIRTEEN
(Murder of Vanessa Argueta and
Conspiracy to Murder Vanessa Argueta)

32.  The defendant HERIBERTO MARTINEZ, together with others, committed the following acts, either one of which alone constitutes Racketeering Act Thirteen:

A.  Conspiracy to Murder

33.  In or about and between January 2010 and February 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendant HERIBERTO MARTINEZ, together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: Vanessa Argueta, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.  Murder

34.  On or about February 5, 2010, within the Eastern District of New York, the defendant HERIBERTO MARTINEZ, together with others, with intent to cause the death of another person, to wit: Vanessa Argueta, did knowingly and intentionally cause her death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

### RACKETEERING ACT FOURTEEN
(Murder and Conspiracy to Murder David Sandler)

35.  The defendants MARIO ALPHONSO HERRERA-UMANZOR, JIMMY SOSA and ROGER ALVARADO, together with others, committed the following acts, either one of which alone constitutes Racketeering Act Fourteen:

13

---

A.  Conspiracy to Murder

36.  In or about February 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, JIMMY SOSA and ROGER ALVARADO, together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: David Sandler, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.  Murder

37.  On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, JIMMY SOSA and ROGER ALVARADO, together with others, with intent to cause the death of another person, to wit: David Sandler, did knowingly and intentionally cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

### RACKETEERING ACT FIFTEEN
(Attempted Murder of John Doe #9)

38.  On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, JIMMY SOSA and ROGER ALVARADO, together with others, did knowingly and intentionally attempt to cause the death of another person, to wit: John Doe #8, an individual whose identity is known to the Grand Jury, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

14

---

### RACKETEERING ACT SIXTEEN
(Murder and Conspiracy to Murder Nestor Moreno)

39.  The defendants HERIBERTO MARTINEZ, VIDAL ESPINAL and ROGER ALVARADO, together with others, committed the following acts, either one of which alone constitutes Racketeering Act Sixteen:

A.  Conspiracy to Murder

40.  In or about February 2010 and March 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, VIDAL ESPINAL and ROGER ALVARADO, together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: Nestor Moreno, in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.  Murder

41.  On or about March 8, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, VIDAL ESPINAL and ROGER ALVARADO, together with others, with intent to cause the death of another person, to wit: Nestor Moreno, did knowingly and intentionally cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

### RACKETEERING ACT SEVENTEEN
(Murder and Conspiracy to Murder Mario Alberto Canton Quijada)

42.  The defendants HERIBERTO MARTINEZ, JEREMIAS EXEQUIEL AMAYA, ROGER ALVARADO and VIDAL ESPINAL, together with

15

---

others, committed the following acts, either one of which alone constitutes Racketeering Act Seventeen:

A.  Conspiracy to Murder

43.  In or about March 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, JEREMIAS EXEQUIEL AMAYA, ROGER ALVARADO and VIDAL ESPINAL, together with others, did knowingly and intentionally conspire to cause the death of another person, to wit: Mario Alberto Canton Quijada, also known as "Baby Blue," in violation of New York Penal Law Sections 125.25(1) and 105.15.

B.  Murder

44.  On or about March 17, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, JEREMIAS EXEQUIEL AMAYA and ROGER ALVARADO, together with others, with intent to cause the death of another person, to wit: Mario Alberto Canton Quijada, also known as "Baby Blue," did knowingly and intentionally cause his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

### RACKETEERING ACT EIGHTEEN
(Attempted Extortion of Inmates)

45.  In or about August 2010, within the Eastern District of New York, the defendants LOUIS RUIZ and FRANKLIN VILLATORO, together with others, did knowingly and intentionally attempt to steal property by extortion, in that the defendants and others attempted to obtain property, to wit: money, drugs and

16

commissary items, by compelling and inducing one or more inmates at the Nassau County Correctional Center, including John Doe #9, an individual whose identity is known to the Grand Jury, to deliver such property by instilling in them a fear that, if the property were not so delivered, the defendants and others would cause physical injury to them in the future, in violation of New York Penal Law Sections 155.40(2)(a), 155.05(2)(e)(i), 110.00 and 20.00.

### RACKETEERING ACT NINETEEN
#### (Attempted Extortion of Inmates)

46.  In or about and between August 2010 and November 2010, both dates being approximate and inclusive, within the Eastern District of New York, the defendant DAVID VALLE, together with others, did knowingly and intentionally attempt to steal property by extortion, in that the defendants and others attempted to obtain property, to wit: money, drugs and commissary items, by compelling and inducing one or more inmates at the Nassau County Correctional Center, including John Doe #10, an individual whose identity is known to the Grand Jury, to deliver such property by instilling in them a fear that, if the property were not so delivered, the defendants and others would cause physical injury to them in the future, in violation of New York Penal Law Sections 155.40(2)(a), 155.05(2)(e)(i), 110.00 and 20.00.

17

---

### RACKETEERING ACT TWENTY
#### (Tampering with a Witness)

47.  In or about November 2010, within the Eastern District of New York, the defendant DAVID VALLE, together with others, did knowingly and intentionally use intimidation, threaten, corruptly persuade and engage in misleading conduct toward another person, to wit: John Doe #11, an individual whose identity is known to the Grand Jury, with intent to hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of one or more Federal offenses, to wit: the offenses charged in Counts Thirty-One and Thirty-Two, in violation of Title 18, United States Code, Sections 1512(b)(3) and 2.

(Title 18, United States Code, Sections 1962(c), 1963 and 3551 et seq.)

### COUNT TWO
#### (Racketeering Conspiracy)

48.  The allegations contained in paragraphs one through five are realleged and incorporated as if fully set forth in this paragraph.

49.  On or about and between April 1, 2001 and the date of this Superseding Indictment, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants YONIS ACOSTA-YANES, also known as "Brujita," DAVID

18

---

VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky," HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and FRANKLIN VILLATORO, also known as "Monstro," together with others, being persons employed by and associated with the MS-13, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

50.  The pattern of racketeering activity through which the defendants YONIS ACOSTA-YANES, also known as "Brujita," DAVID VALLE, also known as "Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky," HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," ROGER ALVARADO, also known as "Michichi," JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," MARIO

19

---

ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and FRANKLIN VILLATORO, also known as "Monstro," together with others, agreed to conduct the affairs of the enterprise consisted of the racketeering acts set forth in paragraphs eight through forty-seven of Count One of this Superseding Indictment, as Racketeering Acts One through Twenty, which are realleged and incorporated as if fully set forth in this paragraph. Each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

### COUNT THREE
#### (Conspiracy to Distribute Cocaine)

51.  In or about and between April 2008 and November 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant YONIS ACOSTA-YANES, also known as "Brujita," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing cocaine, a Schedule II controlled

20

substance, contrary to Title 21, United States Code, Section
841(a)(1).

(Title 21, United States Code, Sections 846 and
841(b)(1)(C); Title 18, United States Code, Sections 3551 et
seq.)

COUNT FOUR
(Conspiracy to Commit Assault with
Dangerous Weapons at Roosevelt Field Mall)

52. At all times relevant to this Superseding
Indictment, the MS-13, as more fully described in paragraphs one
through five, which are realleged and incorporated as if fully
set forth in this paragraph, including its leadership, membership
and associates, constituted an "enterprise" as defined in Section
1959(b)(2) of Title 18, United States Code, that is, a group of
individuals associated in fact that was engaged in, and the
activities of which affected, interstate and foreign commerce.
The enterprise constituted an ongoing organization whose members
functioned as a continuing unit for a common purpose of achieving
the objectives of the enterprise.

53. At all times relevant to this Superseding
Indictment, the MS-13, through its members and associates,
engaged in racketeering activity, as defined in Title 18, United
States Code, Sections 1959(b)(1) and 1961(1), that is, acts and
threats involving murder, extortion and robbery, in violation of
the laws of the State of New York, witness tampering and witness

21

retaliation, in violation of Title 18, United States Code,
Sections 1512 and 1513, and narcotics trafficking, in violation
of Title 21, United States Code, Sections 841 and 846.

54. On or about May 4, 2008, within the Eastern
District of New York, the defendant LOUIS RUIZ, also known as
"Chucky," together with others, for the purpose of maintaining
and increasing position in the MS-13, an enterprise engaged in
racketeering activity, did knowingly and intentionally conspire
to assault John Doe #12, an individual whose identity is known to
the Grand Jury, with one or more dangerous weapons, to wit: a
steak knife, a box cutter and a gravity knife, in violation of
New York Penal Law Sections 120.05(2) and 105.05.

(Title 18, United States Code, Sections 1959(a)(6) and
3551 et seq.)

COUNT FIVE
(Conspiracy to Murder Rival Gang Members)

55. The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

56. In or about May 2008, within the Eastern District
of New York, the defendant YONIS ACOSTA-YANES, also known as
"Brujita," together with others, for the purpose of maintaining
and increasing position in the MS-13, an enterprise engaged in
racketeering activity, did knowingly and intentionally conspire

22

to murder members of the rival SWP and 18th Street gangs, in
violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and
3551 et seq.)

COUNT SIX
(Murder of Santos Castillo-Martinez)

57. The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

58. On or about May 5, 2008, within the Eastern
District of New York, the defendant YONIS ACOSTA-YANES, also
known as "Brujita," together with others, for the purpose of
maintaining and increasing position in the MS-13, an enterprise
engaged in racketeering activity, did knowingly and intentionally
murder Santos Castillo-Martinez, in violation of New York Penal
Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2
and 3551 et seq.)

COUNT SEVEN
(Discharge of Firearm During a Crime
of Violence: Santos Castillo-Martinez Murder)

59. The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

60. On or about May 5, 2008, within the Eastern
District of New York, the defendant YONIS ACOSTA-YANES, also

23

known as "Brujita," together with others, did knowingly and
intentionally use and carry a firearm during and in relation to
one or more crimes of violence, to wit: the crimes charged in
Counts Five and Six, and did knowingly and intentionally possess
said firearm in furtherance of such crimes of violence, which
firearm was brandished and discharged.

(Title 18, United States Code, Sections
924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

COUNT EIGHT
(Causing the Death of Santos Castillo-Martinez
Through the Use of a Firearm)

61. The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

62. On or about May 5, 2008, within the Eastern
District of New York, the defendant YONIS ACOSTA-YANES, also
known as "Brujita," together with others, in the course of a
violation of Title 18, United States Code, Section 924(c), to
wit: the crime charged in Count Seven, did knowingly and
intentionally cause the death of a person through the use of a
firearm, which killing was murder as defined in Title 18, United
States Code, Section 1111(a), in that the defendant, together
with others, with malice aforethought, did unlawfully kill Santos

24

Castillo-Martinez willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

COUNT NINE
(Attempted Murder of John Doe #3)

63.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

64.   On or about May 5, 2008, within the Eastern District of New York, the defendant YONIS-ACOSTA-YANES, also known as "Brujita," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #3, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

COUNT TEN
(Discharge of Firearm During Crime of Violence;
Attempted Murder of John Doe #3)

65.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

66.   On or about May 5, 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, also

25

known as "Brujita," together with others, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence, to wit: the crime charged in Count Nine, and did knowingly and intentionally possess said firearm in furtherance of such crime of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

COUNT ELEVEN
(Attempted Murder of John Doe #4)

67.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

68.   On or about June 28, 2008, within the Eastern District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #4, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

26

COUNT TWELVE
(Assault with Dangerous Weapons:
Machete and Baseball Bat Attack on John Doe #4)

69.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

70.   On or about June 28, 2008, within the Eastern District of New York, the defendant JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #4 with one or more dangerous weapons, to wit: a machete and baseball bats, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

COUNT THIRTEEN
(Conspiracy to Murder John Doe #5)

71.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

72.   On or about August 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, also known as "Brujita," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally

27

conspire to murder John Doe #5, in violation of New York Penal Law Sections 125.25 and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT FOURTEEN
(Using a Firearm During a Crime of Violence)

73.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

74.   In or about August 2008, within the Eastern District of New York, the defendant YONIS ACOSTA-YANES, also known as "Brujita," together with others, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence, to wit: the crime charged in Count Thirteen, and did knowingly and intentionally possess said firearm in furtherance of such crime of violence.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(C), 2 and 3551 et seq.)

COUNT FIFTEEN
(Conspiracy to Commit Assault with Dangerous Weapons)

75.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

76.   On or about September 14, 2008, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ,

28

also known as "Chucky," together with others, for the purpose of
maintaining and increasing position in the MS-13, an enterprise
engaged in racketeering activity, did knowingly and intentionally
conspire to assault one or more individuals, to wit: Iber Marin,
John Doe #13 and John Doe #14, individuals whose identities are
known to the Grand Jury, with one or more dangerous weapons, to
wit: glass beer bottles, in violation of New York Penal Law
Sections 120.05(2) and 105.05.

(Title 18, United States Code, Sections 1959(a)(6) and
3551 et seq.)

#### COUNT SIXTEEN
(Assault with Dangerous Weapons Resulting
in Serious Bodily Injury: Iber Marin)

77.  The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

78.  On or about September 14, 2008, within the Eastern
District of New York, the defendants DAVID VALLE, also known as
"Niño" and "Oreo," LOUIS RUIZ, also known as "Chucky,"
together with others, for the purpose of maintaining and
increasing position in the MS-13, an enterprise engaged in
racketeering activity, did knowingly and intentionally assault
Iber Marin with one or more dangerous weapons, to wit: glass beer
bottles, which assault resulted in serious bodily injury, in

29

violation of New York Penal Law Sections 120.05(1), 120.05(2) and
20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2
and 3551 et seq.)

#### COUNT SEVENTEEN
(Assault with Dangerous Weapons Resulting in
Serious Bodily Injury: John Doe #14)

79.  The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph

80.  On or about September 14, 2008, within the Eastern
District of New York, the defendants DAVID VALLE, also known as
"Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky,"
together with others, for the purpose of maintaining and
increasing position in the MS-13, an enterprise engaged in
racketeering activity, did knowingly and intentionally assault
John Doe #14, with one or more dangerous weapons, to wit: glass
beer bottles, which assault resulted in serious bodily injury, in
violation of New York Penal Law Sections 120.05(1), 120.05(2) and
20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2
and 3551 et seq.)

30

#### COUNT EIGHTEEN
(Conspiracy to Murder John Doe #6)

81.  The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

82.  On or about October 11, 2008, within the Eastern
District of New York, the defendant YONIS ACOSTA-YANES, also
known as "Brujita," together with others, for the purpose of
maintaining and increasing position in the MS-13, an enterprise
engaged in racketeering activity, did knowingly and intentionally
conspire to murder John Doe #6, in violation of New York Penal
Law Sections 125.25 and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and
3551 et seq.)

#### COUNT NINETEEN
(Using a Firearm During a Crime of Violence)

83.  The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

84.  On or about October 11, 2008, within the Eastern
District of New York, the defendant YONIS ACOSTA-YANES, also
known as "Brujita," together with others, did knowingly and
intentionally use and carry a firearm during and in relation to a
crime of violence, to wit: the crime charged in Count Eighteen,

31

and did knowingly and intentionally possess said firearm in
furtherance of such crime of violence.

(Title 18, United States Code, Sections
924(c)(1)(A)(i), 924(c)(1)(C), 2 and 3551 et seq.)

#### COUNT TWENTY
(Conspiracy to Murder Rival Gang Members)

85.  The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

86.  In or about May 2009, within the Eastern District
of New York, the defendant LOUIS RUIZ, also known as "Chucky,"
together with others, for the purpose of maintaining and
increasing position in the MS-13, An enterprise engaged in
racketeering activity, did knowingly and intentionally conspire
to murder members of the rival SWP gang, in violation of New York
Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and
3551 et seq.)

#### COUNT TWENTY-ONE
(Murder of Ruben Madrid)

87.  The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

88.  On or about May 17, 2009, within the Eastern
District of New York, the defendant LOUIS RUIZ, also known as

32

"Chucky," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Ruben Madrid, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT TWENTY-TWO
(Discharge of Firearm During a Crime of Violence: Ruben Madrid Murder)

89.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

90.  On or about May 17, 2009, within the Eastern District of New York, the defendant LOUIS RUIZ, also known as "Chucky," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Twenty and Twenty-One, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

33

COUNT TWENTY-THREE
(Causing the Death of Ruben Madrid Through the Use of a Firearm)

91.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

92.  On or about May 17, 2009, within the Eastern District of New York, the defendant LOUIS RUIZ, also known as "Chucky," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Twenty-Two, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing was murder as defined in Title 18, United States Code, Section 1111(a), in that the defendant, together with others, with malice aforethought, did unlawfully kill Ruben Madrid willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

COUNT TWENTY-FOUR
(Conspiracy to Murder Rival Gang Members)

93.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

94.  In or about May 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"

34

together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder rival gang members, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT TWENTY-FIVE
(Murder of Dexter Acheampong)

95.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

96.  On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Dexter Acheampong, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

35

COUNT TWENTY-SIX
(Discharge of Firearm During a Crime of Violence: Dexter Acheampong Murder)

97.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

98.  On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Twenty-Four and Twenty-Five, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

COUNT TWENTY-SEVEN
(Causing the Death of Dexter Acheampong Through the Use of a Firearm)

99.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

100.  On or about May 26, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"

36

together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Twenty-Six, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing was murder as defined in Title 18, United States Code, Section 1111(a), in that the defendant, together with others, with malice aforethought, did unlawfully kill Dexter Acheampong willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

COUNT TWENTY-EIGHT
(Attempted Murder of John Doe #7)

101.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

102.  On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder John Doe #7, in violation of New York Penal Law Sections 125.25(1), 110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and 3551 et seq.)

37

COUNT TWENTY-NINE
(Assault with a Dangerous Weapon:
Shooting of John Doe #7)

103.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

104.  On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #7 with a dangerous weapon, to wit: a .38 caliber revolver, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

COUNT THIRTY
(Discharge of Firearm During Crimes of Violence:
Attempted Murder and Assault of John Doe #7)

105.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

106.  On or about July 5, 2009, within the Eastern District of New York, the defendant JOSE GUSTAVO ORELLANA-TORRES, also known as "Diablito" and "Gustavo Jefferson Orellana-Torres,"

38

together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Twenty-Eight and Twenty-Nine, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

COUNT THIRTY-ONE
(Conspiracy to Murder Rival Gang Members)

107.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

108.  In or about October 2009, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder members of the rival SWP and 18th Street gangs, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

39

COUNT THIRTY-TWO
(Murder of Jairo Vasquez)

109.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

110.  On or about October 22, 2009, within the Eastern District of New York, the defendants DAVID VALLE, also known as "Niño" and "Oreo," and LOUIS RUIZ, also known as "Chucky," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Jairo Vasquez, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT THIRTY-THREE
(Conspiracy to Murder Rival Gang Members)

111.  The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

112.  On or about December 12, 2009, within the Eastern District of New York, the defendants FRANKLIN VILLATORO, also known as "Monstro," and YOBANY CALDERON, also known as "Tego," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in

40

racketeering activity, did knowingly and intentionally conspire to murder members of the rival 18th Street gang, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT THIRTY-FOUR
(Murder of Erick Avalos)

113. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

114. On or about December 12, 2009, within the Eastern District of New York, the defendants FRANKLIN VILLATORO, also known as "Monstro," and YOBANY CALDERON, also known as "Tego," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Erick Avalos, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT THIRTY-FIVE
(Conspiracy to Murder Vanessa Argueta and Diego Torres)

115. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

42

---

Vanessa Argueta, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT THIRTY-SEVEN
(Discharge of Firearm During Crimes of Violence:
Argueta Murder and Murder Conspiracy)

119. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

120. On or about February 5, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," and ADALBERTO ARIEL GUZMAN, also known as "Gringo," together with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Thirty-Five and Thirty-Six, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

43

---

116. In or about and between January 2010 and February 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HERIBERTO MARTINEZ, also known as "Boxer," and ADALBERTO ARIEL GUZMAN, also known as "Gringo," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder one or more individuals, to wit: Vanessa Argueta and Diego Torres, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

COUNT THIRTY-SIX
(Murder of Vanessa Argueta)

117. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

118. On or about February 5, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," and ADALBERTO ARIEL GUZMAN, also known as "Gringo," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder

42

---

COUNT THIRTY-EIGHT
(Causing the Death of Vanessa Argueta
Through the Use of a Firearm)

121. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

122. On or about February 5, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," and ADALBERTO ARIEL GUZMAN, also known as "Gringo," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Thirty-Seven, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing was murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants, together with others, with malice aforethought, did unlawfully kill Vanessa Argueta willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

COUNT THIRTY-NINE
(Murder of Diego Torres)

123. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

124. On or about February 5, 2010, within the Eastern District of New York, the defendant ADALBERTO ARIEL GUZMAN, also

44

known as "Gringo," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Diego Torres, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT FORTY
(Discharge of Firearm During a Crime of Violence: Torres Murder)

125. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

126. On or about February 5, 2010, within the Eastern District of New York, the defendant ADALBERTO ARIEL GUZMAN, also known as "Gringo," together with others, did knowingly and intentionally use and carry a firearm during and in relation to a crime of violence, to wit: the crime charged in Count Thirty-Nine, and did knowingly and intentionally possess said firearm in furtherance of such crime of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

45

COUNT FORTY-ONE
(Causing the Death of Diego Torres Through the Use of a Firearm)

127. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

128. On or about February 5, 2010, within the Eastern District of New York, the defendant ADALBERTO ARIEL GUZMAN, also known as "Gringo," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Forty, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing was murder as defined in Title 18, United States Code, Section 1111(a), in that the defendant, together with others, with malice aforethought, did unlawfully kill Diego Torres willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

COUNT FORTY-TWO
(Accessory After the Fact)

129. In or about February 2010, within the Eastern District of New York, the defendant HERIBERTO MARTINEZ, also known as "Boxer," knowing that one or more offenses against the United States had been committed, to wit: the offenses charged in Counts Thirty-Five through Forty-One, did knowingly and

46

intentionally receive and assist one or more offenders, to wit: ADALBERTO ARIEL GUZMAN, also known as "Gringo," and RENE MENDEZ MEJIA, also known as "Zorro," in order to hinder and prevent the offenders' apprehension, trial and punishment.

(Title 18, United States Code, Sections 3 and 3551 et seq.)

COUNT FORTY-THREE
(Conspiracy to Murder David Sandler)

130. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

131. In or about February 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder David Sandler, in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

47

COUNT FORTY-FOUR
(Murder of David Sandler)

132. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

133. On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder David Sandler, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

COUNT FORTY-FIVE
(Discharge of Firearm During a Crime of Violence: David Sandler Murder)

134. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

135. On or about February 17, 2010, within the Eastern District of New York, the defendants MARIO ALPHONSO HERRERA-UMANZOR, also known as "Perdido," JIMMY SOSA, also known as "Junior," and ROGER ALVARADO, also known as "Michichi," together with others, did knowingly and intentionally use and carry a

48

firearm during and in relation to one or more crimes of violence,
to wit: the crimes charged in Counts Forty-Three and Forty-Four,
and did knowingly and intentionally possess said firearm in
furtherance of such crimes of violence, which firearm was
brandished and discharged.

(Title 18, United States Code, Sections
924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 et seq.)

<u>COUNT FORTY-SIX</u>
(Causing the Death of David Sandler Through the Use of a Firearm)

136.   The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

137.   On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, in the course of a violation of Title 18, United
States Code, Section 924(c), to wit: the crime charged in Count
Forty-Five, did knowingly and intentionally cause the death of a
person through the use of a firearm, which killing was murder as
defined in Title 18, United States Code, Section 1111(a), in that
the defendants, together with others, with malice aforethought,

did unlawfully kill David Sandler willfully, deliberately,
maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2
and 3551 et seq.)

<u>COUNT FORTY-SEVEN</u>
(Attempted Murder of John Doe #8)

138.   The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

139.   On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, for the purpose of maintaining and increasing
position in the MS-13, an enterprise engaged in racketeering
activity, did knowingly and intentionally attempt to murder John
Doe #8, in violation of New York Penal Law Sections 125.25(1),
110.00 and 20.00.

(Title 18, United States Code, Sections 1959(a)(5), 2 and
3551 et seq.)

<u>COUNT FORTY-EIGHT</u>
(Assault with a Dangerous Weapon:
Shooting of John Doe #8)

140.   The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

141.   On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, for the purpose of maintaining and increasing
position in the MS-13, an enterprise engaged in racketeering
activity, did knowingly and intentionally assault John Doe #8
with a dangerous weapon, to wit: a .38 caliber revolver, in
violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2
and 3551 et seq.)

<u>COUNT FORTY-NINE</u>
(Discharge of Firearm During Crimes of Violence:
Attempted Murder and Assault of John Doe #8)

142.   The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

143.   On or about February 17, 2010, within the Eastern
District of New York, the defendants MARIO ALPHONSO HERRERA-
UMANZOR, also known as "Perdido," JIMMY SOSA, also known as
"Junior," and ROGER ALVARADO, also known as "Michichi," together
with others, did knowingly and intentionally use and carry a
firearm during and in relation to one or more crimes of violence,
to wit: the crimes charged in Counts Forty-Seven and Forty-Eight,
and did knowingly and intentionally possess said firearm in

furtherance of such crimes of violence, which firearm was
brandished and discharged.

(Title 18, United States Code, Sections
924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et
seq.)

<u>COUNT FIFTY</u>
(Conspiracy to Murder Nestor Moreno)

144.   The allegations contained in paragraphs one
through five and fifty-two and fifty-three are realleged and
incorporated as if fully set forth in this paragraph.

145.   In or about and between February 2010 and March
2010, both dates being approximate and inclusive, within the
Eastern District of New York, the defendants HERIBERTO MARTINEZ,
also known as "Boxer," VIDAL ESPINAL, also known as "Demente,"
and ROGER ALVARADO, also known as "Michichi," together with
others, for the purpose of maintaining and increasing position in
the MS-13, an enterprise engaged in racketeering activity, did
knowingly and intentionally conspire to murder Nestor Moreno, in
violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and
3551 et seq.)

#### COUNT FIFTY-ONE
(Murder of Nestor Moreno)

146.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

147.   On or about March 6, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Nestor Moreno, in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

#### COUNT FIFTY-TWO
(Discharge of Firearm During Crimes of Violence: Nestor Moreno Murder and Murder Conspiracy)

148.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

149.   On or about March 6, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," and ROGER ALVARADO, also known as "Michichi," together with others, did knowingly and intentionally use and carry a firearm during

53

unlawfully kill Nestor Moreno willfully, deliberately, maliciously and with premeditation.

(Title 18, United States Code, Sections 924(j)(1), 2 and 3551 et seq.)

#### COUNT FIFTY-FOUR
(Conspiracy to Murder Mario Alberto Canton Quijada)

152.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

153.   In or about March 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," VIDAL ESPINAL, also known as "Demente," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to murder Mario Alberto Canton Quijada, also known as "Baby Blue," in violation of New York Penal Law Sections 125.25(1) and 105.15.

(Title 18, United States Code, Sections 1959(a)(5) and 3551 et seq.)

55

and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Fifty and Fifty-One, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished and discharged.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(C), 2 and 3551 et seq.)

#### COUNT FIFTY-THREE
(Causing the Death of Nestor Moreno Through the Use of a Firearm)

150.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

151.   On or about March 6, 2010, within the Eastern District of New York, the defendant HERIBERTO MARTINEZ, also known as "Boxer," VIDAL ESPINAL, also known as "Demente," and ROGER ALVARADO, also known as "Michichi," together with others, in the course of a violation of Title 18, United States Code, Section 924(c), to wit: the crime charged in Count Fifty-Two, did knowingly and intentionally cause the death of a person through the use of a firearm, which killing was murder as defined in Title 18, United States Code, Section 1111(a), in that the defendants, together with others, with malice aforethought, did

54

#### COUNT FIFTY-FIVE
(Murder of Mario Alberto Canton Quijada)

154.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

155.   On or about March 17, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and ROGER ALVARADO, also known as "Michichi," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally murder Mario Alberto Canton Quijada, also known as "Baby Blue," in violation of New York Penal Law Sections 125.25(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(1), 2 and 3551 et seq.)

#### COUNT FIFTY-SIX
(Brandishing of a Firearm During a Crime of Violence: Quijada Murder)

156.   The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

157.   On or about March 17, 2010, within the Eastern District of New York, the defendants HERIBERTO MARTINEZ, also known as "Boxer," JEREMIAS EXEQUIEL AMAYA, also known as "Payaso," and ROGER ALVARADO, also known as "Michichi," together

56

with others, did knowingly and intentionally use and carry a firearm during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts Fifty-Four and Fifty-Five, and did knowingly and intentionally possess said firearm in furtherance of such crimes of violence, which firearm was brandished.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(C), 2 and 3551 et seq.)

COUNT FIFTY-SEVEN
(Assault Resulting in Serious Bodily Injury: John Doe #9)

158. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

159. On or about August 30, 2010, within the Eastern District of New York, the defendants LOUIS RUIZ, also known as "Chucky," and FRANKLIN VILLATORO, also known as "Monstro," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #9, which assault resulted in serious bodily injury, in violation of New York Penal Law Section 120.05(1) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

57

dangerous weapons, to wit: locks in socks and a rope, in violation of New York Penal Law Sections 120.05(2) and 105.05.

(Title 18, United States Code, Sections 1959(a)(6) and 3551 et seq.)

COUNT SIXTY
(Assault of John Doe #15 with Dangerous Weapons)

163. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

164. On or about June 28, 2011, within the Eastern District of New York, the defendant DIEGO NINOS, also known as "Veneno" and "Mico," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally assault John Doe #15 with one or more dangerous weapons, to wit: locks in socks and a rope, in violation of New York Penal Law Sections 120.05(2) and 20.00.

(Title 18, United States Code, Sections 1959(a)(3), 2 and 3551 et seq.)

59

COUNT FIFTY-EIGHT
(Tampering with a Witness)

160. In or about November 2010, within the Eastern District of New York, the defendant DAVID VALLE, also known as "Niño" and "Oreo," together with others, did knowingly and intentionally use intimidation, threaten, corruptly persuade and engage in misleading conduct toward another person, to wit: John Doe #11, with intent to hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of one or more Federal offenses, to wit: the offenses charged in Counts Thirty-One and Thirty-Two.

(Title 18, United States Code, Sections 1512(b)(3), 2 and 3551 et seq.)

COUNT FIFTY-NINE
(Conspiracy to Assault John Doe #15
with Dangerous Weapons)

161. The allegations contained in paragraphs one through five and fifty-two and fifty-three are realleged and incorporated as if fully set forth in this paragraph.

162. On or about June 28, 2011, the defendant DIEGO NINOS, also known as "Veneno" and "Mico," together with others, for the purpose of maintaining and increasing position in the MS-13, an enterprise engaged in racketeering activity, did knowingly and intentionally conspire to assault John Doe #15, an individual whose identity is known to the Grand Jury, with one or more

58

COUNT SIXTY-ONE
(Witness Retaliation)

165. On or about June 28, 2011, within the Eastern District of New York, the defendant DIEGO NINOS, also known as "Veneno" and "Mico," together with others, did knowingly and intentionally engage in conduct and thereby cause bodily injury to another person, to wit: John Doe #15, with intent to retaliate against John Doe #15 for information relating to the commission and possible commission of a Federal offense given by John Doe #15 to a law enforcement officer.

(Title 18, United States Code, Sections 1513(b)(2), 2 and 3551 et seq.)

A TRUE BILL

_____
FOREPERSON

_____
LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

60

Case 2:10-cr-00074-JFB Document 696 Filed 10/13/11 Page 61 of 61 PageID #: 2261

Bill:

PLEASE TAKE NOTICE that the within will be presented for settlement and signature to the Clerk of the United States District Court in his office at the U.S. Courthouse, 610 Federal Plaza, Central Islip, New York, on the ___ day of _____ 20__ at 10:30 o'clock in the forenoon.

Dated: Central Islip, New York

_____, 20__

_____

United States Attorney,
Attorney for _____

To:

_____

Attorney for: _____

_____

Sir:

PLEASE TAKE NOTICE that the within is a true copy of _____ duly entered herein on the ___ day of _____ in the office of the Clerk of the Eastern District of New York.

Dated: Central Islip, New York

_____, 20__

_____

United States Attorney,
Attorney for _____

To:

_____

_____

Attorney for _____

---

Criminal Action No: 10-CR-074 (S-4) (JFB)

UNITED STATES DISTRICT COURT
Eastern District of New York

UNITED STATES OF AMERICA

- against -

YONIS ACOSTA-YARES,
a/k/a "Brujita," et al.

Defendants

INDICTMENT

(T. 18, U.S.C., §§ 924(c)(1)(A)(i),
924(c)(1)(A)(ii), 924(c)(1)(A)(iii),
924(o)(1)(C), 924(j)(1), 1512(b)(3),
1513(b)(2) 1959(a)(1), 1959(a)(3),
1959(a)(5), 1959(a)(6), 1962(c),
1962(d), 1963, 2, 3 and 3551 et seq.;
T. 21, U.S.C., §§ 841(b)(1)(C) and 846)

a true bill.

_____
Susan Stansberry
Foreman □

Filed in open court this _____ day of
_____ A.D.

_____
Clerk

Bail, $ _____

John J. Durham
Assistant U.S. Attorney 631-715-7851